# LOAN AGREEMENT

between

SIMS FREEDOM BAY, LLC

a Connecticut limited liability company

("Lender")

and

ADULT ASSISTED CARE ASSOCIATES, LLC,

a Rhode Island limited liability company

and FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company

("Borrower")

$6,000,000.00 Loan

Freedom Bay
Portsmouth, Rhode Island

ARTICLE 1. THE LOAN ..... 4
1.1 Funding ..... 4
1.2 Loan Term ..... 4
1.3 Interest Rate ..... 4
1.4 Interest Payments ..... 4
1.5 Use of Proceeds ..... 4
1.6 Disbursements ..... 4
1.7 Prepayment of Loan ..... 4
1.8 [Intentionally Omitted] ..... 4
1.9 Non-Revolving Loan ..... 5
1.10 Exit Fee ..... 5
1.11 Amortization ..... 5
1.12 Interest Reserve Account, Interest and Expense Reserve Account and Controlled Account ..... 5
ARTICLE 2. SECURITY ..... 6
2.1 Collateral ..... 6
ARTICLE 3. CONDITIONS PRECEDENT ..... 6
3.1 Existing Loan ..... 6
3.2 Loan Documents ..... 7
3.3 Representations and Warranties ..... 8
3.4 Opinions ..... 8
3.5 [Intentionally Omitted] ..... 8
3.6 Appraisal ..... 8
3.7 Title ..... 8
3.8 Lien Searches ..... 8
3.9 Environmental Reports ..... 9
3.10 Commitment Fee and Expenses ..... 9
3.11 Survey ..... 9
3.12 Leases ..... 9
3.13 Construction Manager, Architects, Engineers and Contractors ..... 9
3.14 Permits and Approvals ..... 11
3.15 Utilities ..... 11
3.16 Separate Parcel ..... 11

3.17 Purpose of Loan ........ 11
3.18 ERISA ........ 11
3.19 Construction Documents and Reports ........ 11
3.20 Operator ........ 12
3.21 Marketing and Management Agreement ........ 12
3.22 Cottage Construction Revolver Budget ........ 12
3.23 Marketing Plan ........ 12
3.24 Development Plan ........ 13
3.25 Development Agreement ........ 13
3.26 [Intentionally Omitted] ........ 13
3.27 Plans and Specifications ........ 13
3.28 Tax and Utility Payments ........ 13
3.29 Condominium ........ 13
3.30 Additional Items ........ 14
3.31 Certificate of Borrower ........ 14
ARTICLE 4. REPRESENTATIONS AND WARRANTIES ........ 14
4.1 Borrower's Existence ........ 14
4.2 Members ........ 14
4.3 Borrower's Membership Documents ........ 15
4.4 Minimum Equity ........ 15
4.5 No Consents ........ 15
4.6 Other Agreements ........ 15
4.7 Property ........ 16
4.8 Property Access ........ 16
4.9 Utilities ........ 16
4.10 Flood Hazards/Wetlands ........ 16
4.11 Taxes/Assessments ........ 17
4.12 Eminent Domain ........ 17
4.13 Litigation ........ 17
4.14 Existing Loan Documents ........ 17
4.15 Accuracy ........ 17
4.16 Foreign Ownership ........ 17
4.17 Solvency ........ 17

4.18 Financial Condition/No Change ... 17
4.19 Active Management ... 18
4.20 No Broker ... 18
4.21 Casualty ... 18
4.22 Construction and Development Documents ... 18
4.23 Compliance with Health Care Laws ... 18
4.24 Health Care and Operating Licenses ... 19
4.25 Ownership of Health Care and Operating Licenses ... 19
4.26 Effectiveness of and Amendments to Health Care and Operating Licenses and Bed Capacity ... 19
4.27 Medicare and Medicaid Compliance ... 19
4.28 Third Party Payors ... 20
4.29 Governmental Proceedings and Notices ... 20
4.30 Physical Plant Standards ... 20
4.31 Past Violations ... 21
4.32 Audits ... 21
4.33 Recoupment ... 21
4.34 Pledges of Receivables ... 21
4.35 Patient Care Agreements and Patient Records ... 21
4.36 Management and Operating Agreements ... 21
4.37 Payment Procedures ... 22
4.38 [Intentionally Omitted] ... 22
4.39 Single Purpose Entity ... 22
4.40 Operating Account ... 22
4.41 [Intentionally Omitted] ... 23
4.42 OFAC Lists ... 23
4.43 Development of the Project ... 23
4.44 Other Members of AACA ... 24
ARTICLE 5. AFFIRMATIVE COVENANTS ... 24
5.1 Payment of Debt; Performance of Obligations ... 24
5.2 Easements, Restrictive Covenants, Zoning ... 24
5.3 Taxes and Other Obligations ... 25
5.4 Insurance ... 26

5.5 Condemnation ..... 26
5.6 Preservation and Maintenance of the Project ..... 26
5.7 Inspection ..... 27
5.8 Books and Records ..... 27
5.9 Financial Statements; Balance Sheets ..... 28
5.10 Annual Budgets ..... 30
5.11 Use of Proceeds ..... 30
5.12 Notice of Litigation, Default or Equity Contribution ..... 30
5.13 Affiliate Transactions ..... 31
5.14 Advertisement ..... 31
5.15 [Intentionally Omitted] ..... 31
5.16 Lockbox ..... 31
5.17 Health Care and Operating Licenses ..... 32
5.18 Health Care Deficiency Reports ..... 33
5.19 Third Party Payors ..... 33
5.20 Notices or Governmental Proceedings ..... 33
5.21 Storage of Materials ..... 33
5.22 Construction Documents ..... 33
5.23 Construction Consultant ..... 34
5.24 Reports and Vouchers ..... 34
5.25 Existing Loan Documents ..... 35
5.26 Further Security Agreements ..... 35
5.27 Termination of Marketing Agreement and/or Development Agreement ..... 35
5.28 Development of the Condominium ..... 35
5.29 Release of Collateral ..... 37
5.30 Cottage Construction Revolver Budget ..... 38
5.31 Development Plan ..... 39
5.32 Marketing Plan ..... 39
5.33 Trade Payables ..... 40
5.34 Development Milestones ..... 40
5.35 Marketing Targets ..... 41
5.36 Development of the Project ..... 42
5.37 Major Decisions ..... 43

5.38 Residency Agreement ..... 43
5.39 Skilled Nursing Bed Agreement ..... 43
5.40 Survey/Legal Description ..... 43
5.41 Compliance With Anti-Terrorism Regulations ..... 43
5.42 Permits and Approvals ..... 44
5.43 Membership Documents ..... 47
5.44 UCC Policy ..... 47
5.45 Performance Guarantee ..... 47
5.46 Amendments to Condominium Declaration ..... 47
5.47 Intentionally Omitted ..... 48
5.48 Construction Documents and Reports ..... 48
5.49 Waster Water Treatment Facility ..... 48
5.50 Agreements ..... 48
5.51 Assignment of Construction Documents ..... 50
5.52 Post Closing Loan Documents ..... 50
5.53 Approvals ..... 50
ARTICLE 6. NEGATIVE COVENANTS ..... 50
6.1 No Amendments ..... 50
6.2 Leases ..... 51
6.3 Transfers ..... 51
6.4 No Additional Liens, Encumbrances or Debt ..... 53
6.5 No Additional Debt ..... 53
6.6 Personal Property ..... 53
6.7 Conversion ..... 53
6.8 Use of Property; Improvements ..... 54
6.9 Single Purpose Entity ..... 54
6.10 Operator/Developer/Construction Manager/Property Manager ..... 56
6.11 [Intentionally Omitted] ..... 56
6.12 [Intentionally Omitted] ..... 56
6.13 No Commingling Funds ..... 56
6.14 Prior Approval of Contracts ..... 56
6.15 Payment of Withholding Taxes ..... 57
6.16 [Intentionally Omitted] ..... 57

6.17 No Distributions .......... 57
6.18 No Unauthorized Operating Expenditures .......... 57
6.19 No Unauthorized Capital Expenditures .......... 58
ARTICLE 7. EVENTS OF DEFAULT; ACCELERATION OF DEBT .......... 58
7.1 Events of Default .......... 58
7.2 Acceleration; Remedies .......... 61
ARTICLE 8. MISCELLANEOUS .......... 61
8.1 Borrower and Lien Not Released .......... 61
8.2 Lender's Consultation Rights .......... 62
8.3 Expenses .......... 62
8.4 Disclosure of Information .......... 62
8.5 Sale of Loan .......... 63
8.6 Indemnity .......... 63
8.7 Document Protocols .......... 63
8.8 Joint and Several Obligations .......... 64
8.9 Power of Attorney .......... 64

SCHEDULES AND EXHIBITS


| | |
|---|---|
| SCHEDULE I | DOCUMENT PROTOCOLS |
| SCHEDULE II | CERTAIN DEFINED TERMS |
| EXHIBIT A | LEGAL DESCRIPTION |
| EXHIBIT B | PERMITTED EXCEPTIONS |
| EXHIBIT C | COTTAGE CONSTRUCTION REVOLVER BUDGET |
| EXHIBIT D | LITIGATION |
| EXHIBIT E-1 | FORM OF CONTRACTOR'S AGREEMENT TO COMPLETE |
| EXHIBIT E-2 | FORM OF ARCHITECT'S AGREEMENT TO COMPLETE |
| EXHIBIT F | MARKETING PLAN |
| EXHIBIT G | DEVELOPMENT PLAN |
| EXHIBIT H | CONDOMINIUM DECLARATION |
| EXHIBIT I | LAND UNIT DIMENSIONS PLAN |
| EXHIBIT I-1 | OVERALL UNIT PLAN |
| EXHIBIT J | RELEASE PRICES |
| EXHIBIT K | FBC MAJOR DECISIONS |
| EXHIBIT L | AACA MAJOR DECISIONS |
| EXHIBIT M | PERMITS AND APPROVALS |
| EXHIBIT N | POST CLOSING LOAN DOCUMENTS |
| EXHIBIT P-1 | SUBORDINATION OF MANAGEMENT AGREEMENT |
| EXHIBIT P-2 | SUBORDINATION OF MARKETING AGREEMENT |
| EXHIBIT P-3 | SUBORDINATION OF DEVELOPMENT AGREEMENT |
| EXHIBIT P-4 | CONTRACTOR'S AGREEMENT, SUBORDINATION AND CONSENT TO ASSIGNMENT FROM CONTRACTOR |
| EXHIBIT P-5 | ENGINEER'S AGREEMENT TO COMPLETE FROM ENGINEER |
| EXHIBIT P-6 | ARCHITECT'S AGREEMENT TO COMPLETE FROM ARCHITECT |
| EXHIBIT P-7 | CONSTRUCTION MANAGER'S AGREEMENT TO COMPLETE FROM CONSTRUCTION MANAGER |
| EXHIBIT P-8 | SUBORDINATION OF CONSTRUCTION AND MANAGEMENT AGREEMENT |
| EXHIBIT R | ASSIGNMENT OF CONSTRUCTION DOCUMENTS |

# LOAN AGREEMENT

THIS LOAN AGREEMENT (this "Agreement") dated as of July 14, 2005 by and among ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company ("AACA") and FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company ("FBC") (FBC and AACA are hereinafter sometimes collectively referred to jointly and severally as "Borrower"), and SIMS FREEDOM BAY, LLC, a Connecticut limited liability company, together with its successors and/or assigns ("Lender").

## RECITALS

A. Lender has agreed to make a loan (the "Loan") to Borrower pursuant to the terms and conditions contained herein. The Loan is evidenced by that certain Promissory Note of even date herewith in the original principal amount of Six Million Dollars ($6,000,000.00) (the note and all amendments thereto and substitutions therefor are hereinafter referred to as the "Note").

B. Borrower is the fee owner of the real property described in Exhibit A attached hereto and incorporated herein and made a part of this document for all purposes (the "Property") and the improvements thereto with FBC owning the land, improvements and appurtenances thereto described on Exhibit A as Master Unit #1 and AACA owning the land, improvements and appurtenances thereto described on Exhibit A as Master Unit #2;

C. Borrower intends to develop the Property, or cause the Property to be developed into a continuing care retirement community made up of up to one hundred forty-nine (149) independent living cottages, a senior residence comprising of sixty-seven (67) congregate independent living units and an assisted living residence comprising of forty (40) assisted living units (the "Independent/ Assisted Facility"), a nursing/home/assisted living/Alzheimer's facility consisting of fifty-four (54) units (the "Assisted Living/Nursing Facility"), a 60,000 sq. foot commercial/medical center (the "Commercial Facility") and a guest house consisting of eighteen (18) units for guest lodging (the "Guest House Facility") (each of the Independent/Assisted Living Facility, the Assisted Living/Nursing Facility and the Commercial Facility are hereinafter sometimes referred to individually as a "Facility"). (The Improvements, as hereinafter defined, and the Property are collectively referred to as the "Project").

D. Pursuant to that certain Declaration of Condominium for Freedom Bay Condominium, dated as of May 19, 2004 (the "Condominium Declaration") entered into by AACA, as declarant, AACA intends to develop the Project into a multi-use condominium (the "Condominium") made up initially of two (2) land only Master Units (as defined in the Condominium Declaration), each Master Unit to be developed as provided in the Condominium Declaration; provided, however, that pursuant to the Condominium Declaration, AACA has reserved the right to (i) convert and/or reconfigure such Master Units into additional Master Units or Individual Units (as defined in the Condominium Declaration), (ii) create additional Master Units in order to create up to

eleven (11) land only Master Units in the aggregate, and (iii) create one or more Sub-Condominium Units (as defined in the Condominium Declaration), subject to the terms and conditions of the Condominium Declaration and this Agreement.

E. AACA has obtained a loan (the "Land Loan") in the original principal amount of $12,000,000. from SCM Freedom Bay, LLC ("SCM") and a $12,000,000 second mortgage securing HSH Nordbank's Revolving Cottage Construction Loan ("Cottage Revolver") provided to AACA by HSH Nordbank ("Nordbank") (the Land Loan and the Cottage Revolver are hereinafter sometimes collectively referred to as the "Existing Loan"). The Existing Loan is secured by, among other things, mortgages encumbering the fee interest of AACA and FBC in the Property and various other pledges and assignments and various other agreements.

F. Ronald A. Levesque, Edward F. Hayes, Manuel P. DeMenezes, Jr. (each a "Principal," and collectively, "Principals"), Richard Wessels ("Wessels") and Sims Capital Management LLC ("SIMS") are the members of FREEDOM BAY, LLC, a Rhode Island limited liability company ("FB") and collectively hold 100% of the membership interest in FB.

G. FB is the managing member of and holds a 98.66666% Class B membership interest in AACA and SIMS holds a 1.33334% Class B Membership interest in AACA. Ronald A. Levesque, Richard Wessels, Paul Cusson, Ron Hourihan, Mark Wachs, Frances Walters, George Bolton, Joseph Johnson, Vanny, LLC and Freedom Bay II, LLC are each Class A members of and each holds Class A Membership interests in AACA (collectively, the "AACA Members") as provided in that certain Amended and Restated Operating Agreement of Adult Assisted Care Associates, LLC dated as of the date hereof. There are no other members of AACA.

H. HDL, LLC, d/b/a RAL Company, shall have entered into a Development Agreement with AACA, in form and substance acceptable to and approved by Lender, to provide development and construction services to AACA with respect to the Project, and Flagship Realty LLC, Benchmark Associates, Inc. and Continuing Care Management, LLC shall have entered into a Marketing, Sales and Leasing Management Agreement with AACA, in form and substance acceptable to and approved by Lender, to provide management and marketing services to AACA with respect to the Project.

I. Continuing Care Management, LLC shall have entered into a Management Services Agreement with AACA, in form and substance acceptable to and approved by Lender, to provide management services to AACA with respect to the Project.

J. AACA shall have engaged Hodess Building Company to provide certain construction management services to AACA under the terms of a construction management agreement, in form and substance acceptable to and approved by Lender. The Project will be constructed by Somerfield Builders, LLC and such other general contractors approved by Lender pursuant to guaranteed maximum price contracts using a form of contract approved by Lender without any material changes to the contract form which have not been approved by Lender (such conforming guaranteed maximum price

contracts, the "Construction Contracts"). AACA shall have engaged Newport Collaborative Architects to provide architectural and design services to AACA with respect to a portion of the Project pursuant to the terms of an Architects Agreement to be entered into between AACA and Architect which Architect's Agreement shall be in form and substance acceptable to and approved by Lender. AACA shall have engaged The Architectural Team to provide architectural and design services to AACA with respect to a portion of the Project pursuant to the terms of an Architect's Agreement to be entered into between AACA and Architect which Architect's Agreement shall be in form and substance acceptable to and approved by Lender. AACA shall have engaged Fuss & O'Neill to provide engineering and design services to AACA with respect to the Project pursuant to the terms of an Engineering Agreement to be entered into between AACA and Engineer which Engineering Agreement shall be in form and substance acceptable to and approved by Lender.

K. Borrower's obligations under the Loan will be secured by, among other things, a pledge and assignment by each of the Principals and SIMS of 100% of such members interests in FB (collectively, the "FB Equity Interests") pursuant to those certain Pledge and Security Agreements of even date herewith (the "FB Pledge Agreements"), a pledge and assignment of 100% of SIMS', FB's, Freedom Bay II LLC's and Ronald A. Levesque's interest in AACA (collectively the "AACA Equity Interests") pursuant to those certain Pledge and Security Agreements of even date herewith (the "AACA Pledge Agreements"); a first priority pledge and assignment of 100% of AACA's membership interest in FBC (the "FBC Equity Interests") pursuant to that certain Pledge and Security Agreement of even date herewith (the "FBC Pledge Agreement"); a mortgage of the Project (the "Mortgage"); an assignment of rents and leases (the "Assignment of Leases"); an agreement by Principals to guarantee certain Borrower's obligations under the Loan (the "Unconditional Guaranty of Payment and Performance"); an Indemnity Agreement regarding Hazardous Materials from Borrower and Principals (the "Hazardous Materials Indemnity"); a blanket collateral assignment, pledge and security agreement granting a security interest in, and collaterally assigning and pledging to Lender, all of Borrower's tangible and intangible personal property now owned or hereafter acquired (the "Blanket Assignment and Security Agreement"); and various other agreements.

L. The agreements described in the preceding Recital paragraph, this Agreement, the Note, and any other documents evidencing or securing the Loan or executed in connection therewith, including, without limitation, those certain documents listed on Exhibit N attached hereto and made a part hereof to be entered into within thirty (30) days of the Closing Date, and any modifications, renewals and extensions thereof, are referred to herein collectively as the "Loan Documents."

M. A list of certain defined terms used in this Agreement appears on the attached Schedule II, which is incorporated herein by this reference.

NOW, THEREFORE, in consideration of the foregoing and the mutual conditions and agreements contained herein the parties agree as follows:

**Article 1.**
**<u>The Loan</u>**

1.1 <u>Funding</u>. On the Closing Date, Lender shall disburse to Borrower the proceeds of the Loan in the amount of Six Million Dollars ($6,000,000.00), less, at Lender's election, any payments to Lender (or for closing costs or expenses or for funding of the Interest Reserve Account (as hereinafter defined) and the Controlled Account (as hereinafter defined)), which are to be paid by Borrower on or before the "Closing Date." As used herein, the term "<u>Closing Date</u>" means the date of such disbursement, upon which Borrower shall have satisfied all conditions precedent thereto as set forth in this Agreement.

1.2 <u>Loan Term</u>. The Loan shall mature on the third (3rd) anniversary of the Closing Date or any earlier date on which the Loan shall be required to be paid in full, whether by acceleration or otherwise (the "<u>Maturity Date</u>").

1.3 <u>Interest Rate</u>. Borrower shall pay interest on the outstanding principal balance of the Loan at the applicable interest rates as described in the Note. Interest shall be computed based on a three hundred sixty (360) day year and charged for the actual number of days elapsed.

1.4 <u>Interest Payments.</u> Interest shall be payable in advance on the first of each calendar month commencing on September 1, 2005 as provided in the Note, with interest from the Closing Date until September 1, 2005 to be payable on the Closing Date.

1.5 <u>Use of Proceeds</u>. The proceeds of the Loan will be used to repay a portion of the Cottage Revolver, establish an Interest Reserve Account, an Interest and Expense Reserve Account and a Controlled Account and fund certain construction costs and working capital as approved by Lender. Borrower shall deliver such information and documentation as Lender shall request to verify that the uses are as indicated above.

1.6 <u>Disbursements</u>. Disbursement of the proceeds of the Loan shall be made in accordance with a loan settlement statement approved by Lender and executed by Borrower (the "<u>Settlement Statement</u>"). Borrower shall deliver such information and documentation as Lender shall request to verify the disbursements to be made on the Settlement Statement.

1.7 <u>Prepayment of Loan</u>. Except as otherwise provided in the Note the Loan may not be prepaid in whole or in part prior to the six month anniversary of the Closing Date without the prior written consent of Lender, which may be withheld in Lender's sole and absolute discretion. The Loan may be prepaid in whole during the period which is after the six month anniversary of the Closing Date and prior to the twelve month anniversary of the Closing Date in accordance with the provisions set out in the Note. The Loan may be prepaid after the twelve month anniversary of the Closing Date in accordance with the provisions set out in the Note.

1.8 [Intentionally Omitted].

1.9 Non-Revolving Loan. Lender shall have no further obligation or commitment to lend following the disbursement of the full amount of the Loan. The Loan is not revolving and may not be prepaid in part without the prior consent of Lender. Any amounts repaid hereunder may not be reborrowed.

1.10 Exit Fee. An "Exit Fee" representing deferred interest at the "Applicable IRR" (as defined in the Note) in an amount computed by Lender as provided in the Note (the "Exit Fee") shall be paid by Borrower to Lender as and when required by the Note.

1.11 Amortization. The Loan will be amortized through the principal portion, if any, of Excess Funds to be paid to Lender and applied in the following order as a Mandatory Prepayment under the Note: unpaid costs due from Borrower under the Loan Documents, accrued and unpaid interest at the applicable interest rate up to and including the date of prepayment, the Exit Fee and principal. "Excess Funds" shall mean the following amounts which shall be payable as and when indicated: (i) 10% of the net proceeds from each cottage sale, at the closing of a cottage sale, (ii) $900,000 on release of the Independent/Assisted Land Unit, (iii) $100,000 on release of the Assisted Living/Nursing Land Unit, (iv) $250,000 on release of the Guest House Land Unit and $150,000 on release of the Commercial Land Unit. If Excess Funds are available prior to the six (6) month anniversary of the Closing Date, such Excess Funds will be held in the Interest Reserve Account until the next Business Day following the six (6) month anniversary of the Closing Date at which time they shall be applied by Lender in the aforesaid order and the release of the lien of the mortgage for the relevant Master Unit or independent cottage unit shall be delivered; provided, however, release of the lien of the mortgage shall be delivered for independent cottage units when the closing occurs and even though the Excess Funds are to be held by Lender in the Interest Reserve Account and not applied as aforesaid until the next Business Day following the six (6) month anniversary of the Closing Date.

1.12 Interest Reserve Account, Interest and Expense Reserve Account and Controlled Account. Lender shall establish a fully funded interest reserve in the amount of $630,000.00 at Closing using proceeds of the Loan, and Borrower hereby irrevocably authorizes and directs Lender to deposit $130,000.00 of such amount at Closing in an account (the "Interest and Expense Reserve Account") in Lender's name and $500,000.00 of such amount at Closing in an account (the "Interest Reserve Account") to be held by an independent trustee appointed by Lender in connection with its issuance of bonds to generate the proceeds of the Loan. Sums in the Interest and Expense Account shall be applied by Lender for expenses incurred by it in connection with the Loan and interest on the Loan as it comes due and payable under the Note, unless an Event of Default occurs in which event sums may be applied as provided in this Section 1.12 below. Sums in the Interest Reserve Account shall be applied against interest on the Loan as it comes due and payable under the Note, unless an Event of Default occurs in which event sums may be applied as provided in this Section 1.12 below. Sums held in the Interest and Expense Reserve Account and the Interest Reserve Account shall be considered advances under the Loan. AACA shall establish a fully funded blocked account (the "Controlled Account") at Newport Federal Saving Bank in

the amount of $800,000.00 to fund draws for the following as provided in budgets approved by Lender, up to the indicated respective amounts, in connection with revised plans for the Project Master Units approved by Lender and related activities as approved by Lender, but only to the extent that these costs are not reimbursable under the Cottage Revolver: Due Diligence Deposits with Lender ($50,000), UST Removal & Remediation ($75,000), Asbestos Abatement ($350,000), Legal and Administrative ($50,000), Engineering ($100,000) and Miscellaneous($175,000). The Controlled Account shall be subject to a control agreement among AACA, Lender and such bank in form approved by Lender. Funds in the Controlled Account may be drawn by Borrower as aforesaid, but Borrower shall provide backup for the use of such funds as Lender may request from time to time; provided, however, if an Event of Default occurs funds in the Controlled Account may only be used by Lender and applied as provided in this Section 1.12 below. If an Event of Default occurs and is continuing, any funds then held in the Interest and Expense Reserve Account, the Interest Reserve Account and the Controlled Account may be drawn at Lender's direction and applied to any amounts due under the Loan in any order determined by Lender. At any time when funds available in the Interest and Expense Reserve Account and the Interest Reserve Account are insufficient, as determined by Lender, in its reasonable discretion, to make payments of scheduled interest to come due and payable under the Note and any Lender expenses to be paid from such accounts Borrower shall fund, within thirty (30) days following a written request therefor from Lender, such amount into the Interest and Expense Reserve Account or Interest Reserve Account, as Lender directs, as may be reasonably necessary and sufficient, as determined by Lender, in its reasonable discretion, to fund such shortfalls.

**Article 2.**
**Security**

2.1 Collateral. The Loan and all other indebtedness and obligations under the Loan Documents shall be secured by the collateral or security described in this Agreement or otherwise required by Lender in connection with the Loan (collectively the "Collateral").

**Article 3.**
**Conditions Precedent**

Lender's obligation to close the Loan and disburse the Loan proceeds is subject to satisfaction of each and all of the following conditions in Lender's sole and absolute discretion.

3.1 Existing Loan.

(a) Lender shall have received true and complete copies of all documents, which evidence or secure the Existing Loan (collectively the "Existing Loan Documents").

(b) No default shall exist under the Existing Loan and no circumstance shall exist which, with the passage of time, the giving of notice or both, would constitute a default under the Existing Loan.

3.2 Loan Documents. Lender shall have received originals of the following Loan Documents duly executed and acknowledged by all relevant parties as applicable, each in form and substance satisfactory to Lender:

(a) this Agreement;

(b) the Note;

(c) the Pledge and Security Agreement from Ronald A. Levesque regarding the membership interests in FB;

(d) the Pledge and Security Agreement from Edward Hayes regarding the membership interests in FB;

(e) the Pledge and Security Agreement from Manuel P. DeMenezes, Jr. regarding the membership interests in FB;

(f) the Pledge and Security Agreement from SIMS regarding the membership interests in FB

(g) the Pledge and Security Agreement from FB regarding the membership interests in AACA;

(h) the Pledge and Security Agreement from SIMS regarding the membership interests in AACA;

(i) the Pledge and Security Agreement from Ronald A. Levesque regarding the membership interests in AACA;

(j) the Pledge and Security Agreement from FBII regarding the membership interests in AACA;

(k) the Pledge and Security Agreement from AACA regarding the membership interests in FBC;

(l) Uniform Commercial Code financing statements;

(m) the Hazardous Materials Indemnity;

(n) the Unconditional Guaranty of Payment and Performance;

(o) the Mortgage;

(p) the Assignment of Leases;

(q) the Blanket Assignment and Security Agreement from AACA and FB;

(r) Engineer's Certificate from Engineer;

(s) Certificate of Borrower;

(t) a Letter from Engineer regarding Flood Zone designations;

(u) Reliance letter from Fuss & O'Neill, Inc.;

(v) such other documents as may be required by Lender.

3.3 Representations and Warranties. Each of the representations and warranties set forth in Article 4 hereof shall be true in all material respects.

3.4 Opinions. Borrower shall have furnished to Lender an opinion or opinions from counsel for Borrower and Principals covering the due authorization, execution and delivery and enforceability of the Loan Documents; the permissibility of the Loan and granting of the Collateral securing the Loan; zoning matters; environmental matters; health law matters the adequacy of the permits and licenses; and such other legal opinions as Lender shall require, all of which shall in form and substance acceptable to Lender from counsel approved by Lender.

3.5 [Intentionally Omitted].

3.6 Appraisal. Lender shall have received a copy of an appraisal report for the Property, which appraisal shall be in form and substance acceptable to Lender from an appraiser approved by Lender. The appraisal shall (a) be addressed to Lender; (b) state that Lender and its successors and/or assigns may rely thereon; and (c) be acceptable to Lender in its sole discretion.

3.7 Title. Borrower shall have furnished to Lender an ALTA Loan Title Commitment, acceptable to Lender, to issue a Lender's Policy of Title Insurance insuring the lien of the Mortgage as a valid lien upon the Project and all appurtenant easements with such endorsements as Lender shall require. There shall be no other exceptions to Borrower's title to the Project other than the exceptions as are set forth on Exhibit B attached hereto and made a part hereof or approved, in writing, by Lender in its reasonable discretion (the "Permitted Exceptions"). The title company issuing the commitment and policies shall be satisfactory to Lender.

3.8 Lien Searches. Borrower shall have furnished to Lender with respect to Borrower and Principals, current bankruptcy, federal tax lien and judgment searches and searches of all Uniform Commercial Code financing statements filed in each place UCC Financing Statements are to be filed hereunder, demonstrating the absence of adverse claims.

3.9 Environmental Reports. Lender shall have received (i) a Phase I Environmental audit and (ii) a Phase II Environmental audit of the Property from an environmental consultant approved by Lender and a Remedial Action Workplan approved by the State of Rhode Island, Department of Environmental Management. The foregoing audit reports shall (a) be addressed to Lender; (b) state that Lender and its successors and/or assigns may rely thereon; and (c) be acceptable to Lender in its reasonable discretion.

3.10 Commitment Fee and Expenses. Borrower shall have paid Lender (i) a commitment fee in an amount equal to 5.00% upfront points, which commitment fee (the "Commitment Fee") shall be nonrefundable and shall be deemed fully earned upon receipt and (ii) all Expenses incurred by Lender in connection with the negotiation, documentation or closing of the Loan or any of the Loan Documents up to and as of the Closing Date.

3.11 Survey. Lender shall have received and approved a survey of the Project (the "Survey"), dated no more than thirty (30) days prior to the Closing Date, prepared by a registered land surveyor in accordance with the 1999 American Land Title Association/American Congress on Surveying and Mapping Standards and certified in favor of Lender and the title insurer in form and substance acceptable to Lender. The surveyor shall certify that the Property is not in a flood hazard area and shall be sufficient for the title insurer to remove the general survey exception.

3.12 Leases. Lender shall have received and approved all leases and subleases in effect at the Project ("Leases"), including, as applicable any operating lease or similar agreement whereby the rights to operate the Project are granted to a Person other than Borrower. For purposes of this Agreement, the term "Leases" shall not include Residency Agreements entered into on AACA's standard form, if such form has been approved by Lender.

3.13 Construction Manager, Architects, Engineers and Contractors.

(a) Lender shall have approved Fuss & O'Neill ("Engineer") as the engineer of the Project and AACA shall have entered into an Engineering Agreement with Engineer or a similar agreement obligating Engineer to provide engineering and design services to AACA for the Project (the "Engineering Agreement"), which Engineering Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Engineer and the Engineering Agreement shall be subject to Lender's receipt of a "Engineer's Agreement to Complete" executed by AACA and Engineer in substantially the form attached hereto as Exhibit P-5 (an "Engineer's Agreement to Complete") in accordance with Section 5.50 hereof.

(b) Lender shall have approved Newport Collaborative Architects ("Architect") as the architect of the Project and AACA shall have entered into an Architect's Agreement with Architect or a similar agreement obligating the Architect to provide architectural and design services to AACA for

the Project (the "Architect's Agreement"), which Architect's Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Architect and the Architect's Agreement shall be subject to Lender's receipt of a "Architect's Agreement to Complete" executed by AACA and Architect in substantially the form attached hereto as Exhibit P-6 (an "Architect's Agreement to Complete") in accordance with Section 5.50 hereof.

(c) Lender shall have approved Hodess Building Company ("Construction Manager") as the construction manager of the Project and AACA shall have entered into a Construction Management Agreement with Construction Manager or a similar agreement obligating the Construction Manager to provide construction management services to AACA for the Project (the "Construction Management Agreement"), which Construction Management Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Construction Manager and the Construction Management Agreement shall be subject to Lender's receipt of a "Construction Manager's Agreement to Complete" executed by AACA and Construction Manager in substantially the form attached hereto as Exhibit P-7 (a "Construction Manager's Agreement to Complete") in accordance with Section 5.50 hereof.

(d) Lender shall have approved Somerfield Builders, LLC ("Contractor") as the contractor of the Project and AACA shall have entered into a Construction Agreement with Contractor, or a similar agreement obligating the Contractor to provide construction services to the Project (the "Construction Agreement"), which Construction Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Contractor and the Construction Agreement shall be subject to Lender's receipt of a "Contractor's Agreement, Subordination and Consent to Assignment from Contractor" executed by AACA and Contractor in substantially the form attached hereto as Exhibit P-4 (a "Contractor's Agreement, Subordination and Consent to Assignment from Contractor") in accordance with Section 5.50 hereof.

(e) Notwithstanding anything to the contrary contained herein, in the event Lender determines it is necessary for AACA to enter into an agreement with Contractor and Construction Manager collectively, at Lender's request, AACA shall enter into an agreement with Contractor and Construction Manager obligating Contractor and Construction Manager to provide construction and construction management services to the Project (the "Construction and Management Agreement"), which Construction and Management Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Construction and Management Agreement shall be subject to Lender's receipt of a "Subordination of Construction and Management Agreement" executed by AACA and , Contractor and Construction Manager in substantially the form attached hereto as Exhibit P-8 (a "Subordination of Construction and Management Agreement") in accordance with Section 5.50 hereof

(f) Lender shall have approved any and all other architects, engineers, and general contractors who are to be engaged to perform work at the Project and the form of any contract or agreement for work to be performed at the Project, which form of contract or agreement shall be in form and substance acceptable to Lender, and provided further that all construction contracts over $100,000.00 shall be guaranteed maximum price contracts, in form and substance acceptable to Lender. Lender's approval of such Persons and construction contracts shall be subject to Lender's receipt of an "Agreement to Complete" executed by such Person in substantially the form attached hereto as Exhibit E-1 or E-2 , as applicable (an "Agreement to Complete").

3.14 Permits and Approvals. Lender shall have received and approved copies of all necessary permits and approvals for the Project, including all applicable Health Care and Operating Licenses, building permits, zoning permits, special use permits, site plans and the development plat.

3.15 Utilities. Borrower shall have furnished to Lender (by way of utility letters or otherwise) evidence establishing to the satisfaction of Lender that the Project when constructed will have adequate water supply, storm and sanitary sewerage facilities, telephone, gas, electricity, means of ingress and egress to and from the Project and public highways and any other required public utilities and that the Project is benefited by insured easements as may be required for any of the foregoing and that the Project complies with all applicable access requirements for fire and police services.

3.16 Separate Parcel. Until such time as the real estate taxes are separately assessed and taxed to the separate Master Units under the Condominium Declaration, the Project as a whole is taxed separately without regard to any other property and for all purposes the Project may be mortgaged, conveyed and otherwise dealt with as an independent parcel.

3.17 Purpose of Loan. The Loan is not being made for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation G, T, U or X issued by the Board of Governors of the Federal Reserve System, and Borrower agrees to execute all instruments necessary to comply with all the requirements of Regulation U of the Federal Reserve System.

3.18 ERISA. Borrower is not a party in interest to any plan defined or regulated under ERISA, and the assets of Borrower are not "plan assets" of any employee benefit plan covered by ERISA or Section 4975 of the Internal Revenue Code.

3.19 Construction Documents and Reports. Lender shall have received a copy of any report prepared for Borrower by an independent consultant regarding any of the following matters (with a reliance letter or direct certification to Lender and its successors and/or assigns entitling Lender and its successors and/or assigns to rely on such report), if such report was commissioned by Borrower or is in Borrower's possession or under its control or is obtainable by Borrower, and the form and substance of such reports shall be acceptable to Lender: soil and subsurface conditions, the actual,

proposed or anticipated schedule for construction of all or any portion of the Project (the "Construction Schedule"), plans and specifications for construction of the Improvements, a budget for construction of the Improvements, actual or anticipated performance against construction budgets, and any Construction Documents. "Construction Documents" shall mean: the Construction Management Agreement, the Construction Agreement, the Construction and Management Agreement, if applicable, a detailed budget for construction of the Improvements which shall show the Project construction costs on a building-by-building basis (the "Construction Budget"), the Construction Contract(s), a Construction Schedule, and architect's and engineer's contracts for performance of work in connection with the Project and other documents and reports used in preparation for or in the actual construction of the Improvements.

3.20 Operator. Lender shall have approved Continuing Care Management LLC ("Operator") as the manager and operator of the Project and AACA shall have entered into a Management Services Agreement with Operator, or a similar agreement obligating the Operator to provide or cause to be provided all services required to be provided to manage the Project and under or in connection with Residency Agreements (the "Management Agreement"), which Management Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Operator and the Management Agreement shall be subject to Lender's receipt of a "Subordination of Management Agreement" executed by AACA and Operator in substantially the form attached hereto as Exhibit P-1 (a "Subordination of Management Agreement") in accordance with Section 5.50 hereof.

3.21 Marketing and Management Agreement. Lender shall have approved Flagship Realty, LLC, Benchmark Associates, Inc. and Continuing Care Management, LLC, (collectively, "Marketing Agents") as the marketing agents for the Project and AACA shall have entered into a Marketing, Leasing and Sales Agreement with the Marketing Agents, or a similar agreement obligating the Marketing Agents to provide or cause to be provided all of the marketing services required to be provided for the Project (the "Marketing Agreement"), which Marketing Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of the Marketing Agents and the Marketing Agreement shall be subject to Lender's receipt of a "Subordination of Marketing Agreement" executed by AACA and the Marketing Agents in substantially the form attached hereto as Exhibit P-2 (a "Subordination of Marketing Agreement") in accordance with Section 5.50 hereof.

3.22 Cottage Construction Revolver Budget. Lender shall have approved Cottage Construction Revolver Budget for the Project, a copy of which Cottage Construction Revolver Budget is attached hereto as Exhibit C and made a part hereof.

3.23 Marketing Plan. Lender shall have approved the initial Marketing Plan for the Project, a copy of which Marketing Plan is attached hereto as Exhibit F and made a part hereof.

3.24 Development Plan. Lender shall have approved the initial Development Plan for the Project, a copy of which Development Plan is attached hereto as Exhibit G and made a part hereof.

3.25 Development Agreement. Lender shall have approved HDL, LLC, d/b/a RAL Company ("Developer") as the development company for the development and construction of the Project and AACA shall have entered into a Development Agreement with Developer, or a similar agreement obligating Developer to provide or cause to be provided all of the development services required to be provided for the Project (the "Development Agreement"), which Development Agreement shall be in form and substance acceptable to and approved by Lender; provided, however, Lender's approval of Developer and the Development Agreement shall be subject to Lender's receipt of a "Subordination of Development Agreement" executed by AACA and Developer in substantially the form attached hereto as Exhibit P-3 (a "Subordination of Development Agreement") in accordance with Section 5.50 hereof.

3.26 [Intentionally Omitted].

3.27 Plans and Specifications. Lender shall have received and approved two (2) true and correct copies of all Plans and Specifications signed and sealed by the engineer, together with satisfactory evidence that all applicable state, federal, local, county governmental or quasi- governmental authorities and agencies including, without limitation the Planning and/or Zoning Departments of each of the Towns of Portsmouth and Middletown and the Rhode Island Department of Environmental Management (the "RIDEM"), Borrower, Architect, Engineer, Contractor, and Borrower's engineers, architects, and general contractors and the Construction Manager and Principals have reviewed and approved the same.

3.28 Tax and Utility Payments. Borrower shall have furnished to Lender evidence in form and substance acceptable to Lender that all bills for utilities and all real estate taxes and assessments have been or will be paid current prior to Closing.

3.29 Condominium. AACA shall have entered into the Condominium Declaration, a copy of which Condominium Declaration is attached hereto as Exhibit H, and By-Laws of the Freedom Bay Condominium Association (the "By-Laws"), which Condominium Declaration and By-Laws shall be in form and substance acceptable to and approved by Lender and shall not contain any amendment other than that acceptable to and approved by Lender. AACA shall have recorded the Condominium Declaration and the Plat and Plans (as defined in the Condominium Declaration) attached to the Condominium Declaration on the land records in the Towns of Portsmouth and Middletown, Rhode Island on or before the Closing Date. FBC shall have entered into the Sub-Condominium Declaration, a copy of which Sub-Condominium Declaration is attached hereto as Exhibit [ ] and By-Laws of The Orchards at Freedom Bay Condominium Association (the "FBC By-Laws"), which Sub-Condominium Declaration and FBC By-Laws shall be in form and substance acceptable to and approved by Lender and shall not contain any amendment other than that acceptable to and approved by Lender. FBC shall have recorded the Sub-Condominium Declaration and the Plat and

Plans (as defined in the Sub-Condominium Declaration) attached to the Sub-Condominium Declaration on the land records in the Towns of Portsmouth and Middletown, Rhode Island on or before the Closing Date.

3.30 Additional Items. Lender shall have received and approved such other items as Lender may reasonably require.

3.31 Certificate of Borrower. A certificate of an officer of the Borrower reasonably acceptable to the Lender, dated the Closing Date, stating that (i) the assumptions upon which the Cottage Construction Revolver Budget, Development Plan and Marketing Plan are made are reasonable and constitute an appropriate basis for the conclusions contained therein; (ii) there is no event, circumstance or fact pertaining to the Project or the Borrower which is known to management of the Borrower and not disclosed to Lender which, if disclosed, would have a material adverse effect on the assumptions or conclusions stated in the Cottage Construction Revolver Budget, Development Plan and Marketing Plan; (iii) the Development Milestones (as hereinafter defined) and marketing targets set forth in this Agreement are reasonable and should be achievable; and (iv) in the Borrower's judgment the Cottage Construction Revolver Budget sets forth the true, correct and complete good faith estimate of all Cottage Construction Revolver Costs necessary to acquire, develop and market the Project in accordance with the Development Plan and Marketing Plan and contains an adequate contingency.

## Article 4.
## Representations and Warranties

As an inducement to Lender to disburse the Loan, Borrower hereby represents and warrants as follows, which representations and warranties shall be true as of the date hereof and, subject to notice and cure rights, if any, provided by Section 7.1 of this Agreement, shall remain true throughout the term of the Loan:

4.1 Borrower's Existence. Borrower is the type of entity indicated on the first page of this Agreement and is duly organized, validly existing and in good standing under the laws of the state of its formation (as indicated on the first page of this Agreement) with its principal place of business at 2547 West Main Road, Portsmouth, Rhode Island. Borrower is in good standing under the laws of the state of its formation and is authorized to transact business in the state where the Project is located. The Loan Documents have each been duly authorized, executed and delivered and each constitutes the duly authorized, valid and legally binding obligation of Borrower and the other Persons executing any of the other Loan Documents, as the case may be, enforceable against the Borrower and such other Persons, as the case may be, in accordance with their respective terms.

4.2 Members. (a) SIMS, Wessels, Ronald A. Levesque, Edward F. Hayes and Manuel P. DeMenezes, Jr. are each members of FB and collectively own 100% of the membership interests in FB free and clear of all liens, claims, and encumbrances, except for liens of the Existing Loans. Each of the Principals, SIMS and

Wessels have full right, power and authority to execute the Loan Documents on their own behalf and on behalf of FB.

(b) FB, SIMS and the AACA Members are members of AACA and collectively own 100% of the membership interests in AACA free and clear of all liens, claims, and encumbrances except for liens of the Existing Loans. FB, as managing member of AACA, has full right, power and authority to execute the Loan Documents on its own behalf and on behalf of AACA.

4.3 Borrower's Membership Documents. A true and complete copy of the operating agreement and the Articles of Organization and by-laws, if any, for the Borrower, and any and all amendments thereto and restatements thereof (collectively, the "Operating Agreements") have been furnished to Lender. Each Operating Agreement constitutes the entire agreement among the members and is binding upon and enforceable against each of the members in accordance with its terms. There are no other agreements, oral or written, among any of the members relating to Borrower. No breach exists under either of the Operating Agreements and no condition exists which, with the giving of notice or the passage of time would constitute a breach under either of the Operating Agreements. Each of the Operating Agreements expressly recognizes and permits the pledges of the FB Equity Interests, AACA Equity Interests and the FBC Equity Interests, as applicable, and any transfers of membership interests relating thereto, and provides that such a transfer shall not cause a dissolution of the Borrower. Each of the Pledge Agreements is a binding and enforceable, perfected security interest in the FB Equity Interests, AACA Equity Interests or the FBC Equity Interests, as applicable, in favor of the Lender.

4.4 Minimum Equity. FB, certain AACA Members and Principals have collectively provided unreturned cash equity to Borrower in an amount of at least Two Million Five Hundred Thousand Dollars ($2,500,000.00) in the aggregate ("Equity).

4.5 No Consents. No consent, approval or authorization of or declaration, registration or filing with any governmental authority or nongovernmental person or entity, including any creditor or partner of the Borrower or Principal, is required in connection with the execution, delivery and performance of this Agreement or any of the Loan Documents.

4.6 Other Agreements. Borrower nor Principals are in default under any contract, agreement or commitment to which they are a party. The execution, delivery and compliance with the terms and provisions of this Agreement and the Loan Documents will not (i) violate any provisions of law or any applicable regulation, order or other decree of any court or governmental entity, or (ii) conflict or be inconsistent with, or result in any default under, any contract, agreement or commitment to which the Borrower or Principal is a party or by which the Borrower or Principal is bound. The Borrower has delivered to Lender copies of any agreements (including leases) between the Borrower or Principal and any Affiliate related in any way to the Project and any other agreements to which the Borrower, Principal or any Affiliate is a party or by which

the Borrower, Principal or any Affiliate is bound, which materially affect the construction, use and operation of the Project.

4.7 Property. Fee simple title to the Property is owned by AACA and FBC free and clear of all liens, claims, encumbrances, covenants, conditions and restrictions, security interests and claims of others, except for the matters referenced in Section 3.7 hereof and such other exceptions which have been approved in writing by Lender. Borrower has obtained all permits, consents, approvals, licenses and certificates needed to construct portions of the Project that are either constructed or under construction and has no reason to believe that all permits, consents, approvals, licenses and certificates needed to construct portions of the Project to be completed in the future will not be issued in a timely manner, without imposition of materially different requirements and for similar fees than were applicable to portions of the Project now complete or under construction. To the best of Borrower's knowledge, the Property is, and the Project when completed will be, in compliance with all zoning requirements, building codes, subdivision improvement agreements, and all covenants, conditions and restrictions of record. The zoning and subdivision approval of the Project and the right and ability to construct, use or operate the Improvements are not in any way dependent on or related to any real estate other than the Property. To the best of Borrower's knowledge, there are no, nor are there any alleged or asserted, violations of law, regulations, ordinances, codes, permits, licenses, declarations, covenants, or restrictions of record, or other agreements relating to the Project or the contemplated Improvements, or any part thereof, including, without limitation, Health Care Laws. Subject to the rights of Lender under the Loan Documents and except for Health Care and Operating Licenses to be maintained in the name of Operator under the Loan Documents, all permits, consents, approvals, licenses and certificates necessary for the construction and occupancy of the Improvements are and shall remain in the name of AACA.

4.8 Property Access. The Property is accessible through fully improved and dedicated roads accepted for maintenance and public use by the public authority having jurisdiction, and no access beyond that is now legally and physically available is required to construct, use and operate the Project in accordance with the Plans and Specifications in compliance with all applicable laws, rules, regulations, permits, approvals and consents.

4.9 Utilities. All utility services necessary and sufficient for the construction, use or operation of the Project are available at the boundary of the Property including water, gas, electric and telephone facilities. Unconditional written permission has been obtained from the applicable utilities or municipalities, as the case may be, to connect the Project with each of such services, and no bills for such services are past due. Storm water controls and sanitary sewer are provided for on-site.

4.10 Flood Hazards/Wetlands. The Property is not situated in an area designated as having special flood hazards as defined by the Flood Disaster Protection Act of 1973, as amended, or as a wetlands by any governmental entity having jurisdiction over the Property except for the special flood hazard area and wetlands delineated on the Survey, which do not adversely impact the Project.

4.11 Taxes/Assessments. There are no unpaid or outstanding real estate or other taxes or assessments on or against the Project or any part thereof, except general real estate taxes not yet due or payable. Copies of the current general real estate tax bills with respect to the Project have been delivered to Lender. Said bills cover the entire Project and do not cover or apply to any other property. To the best of Borrower's knowledge, there is no pending or contemplated action pursuant to which any special assessment may be levied against any portion of the Project.

4.12 Eminent Domain. There is no eminent domain or condemnation proceeding pending or, to the best of Borrower's knowledge threatened, relating to the Project.

4.13 Litigation. Except as set forth in Exhibit D attached hereto and made a part hereof, there is no litigation, arbitration or other proceeding or governmental investigation pending or, to the best of Borrower's knowledge, threatened against or relating to the Borrower, any members in the Borrower, Principals or any of their property, assets, or business, including the Project, which if decided adversely would materially adversely affect the business, affairs, assets or financial condition of Borrower, Principals, the Project, or the prospects for repayment of the Loan.

4.14 Existing Loan Documents. Borrower has furnished Lender with a true and complete copy of all documents creating, modifying, amending, evidencing and/or securing Borrower's obligations under the Existing Loan and the Project.

4.15 Accuracy. Neither this Agreement nor any document, financial statement, credit information, certificate or statement furnished to Lender by Borrower or Principals contains any untrue statement of a material fact or omits to state a material fact.

4.16 Foreign Ownership. Neither Borrower nor any members in the Borrower nor Principals are and no legal or beneficial interest of a member in Borrower is held, directly or indirectly, by a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate", "foreign person", "affiliate" of a "foreign person" or a "United States intermediary" of a "foreign person" within the meaning of IRC Sections 897 and 1445, the Foreign Investments in Real Property Tax Act of 1980, the International Foreign Investment Survey Act of 1976, the Agricultural Foreign Investment Disclosure Act of 1978, or the regulations promulgated pursuant to such Acts or any amendments to such Acts.

4.17 Solvency. Neither Borrower nor Principal is insolvent and there has been no: (i) assignment made for the benefit of the creditors of any of them; (ii) appointment of a receiver for any of them or for the property of any of them; or (iii) bankruptcy, reorganization, or liquidation proceeding instituted by or against any of them.

4.18 Financial Condition/No Change. Borrower has heretofore delivered to Lender copies of the most current financial statements of Borrower and

Principal. Said financial statements were prepared on a basis consistent with that of preceding years, and all of such financial statements present fairly the financial condition of Borrower and Principal as of the dates in question and the results of operations for the periods indicated. Since the dates of such statements, there has been no material adverse change in the business or financial condition of Borrower or Principal. Neither Borrower nor Principals have any material contingent liabilities not provided for or disclosed in said financial statements.

4.19 Active Management. Borrower and/ or Principals, as applicable, are actively engaged in the management and development of the Project in the ordinary course of its business.

4.20 No Broker. No brokerage commission or finder's fee is owing to any broker or finder arising out of any actions or activity of Borrower in connection with the Loan.

4.21 Casualty. There has been no damage or destruction of any part of the Improvements by fire or other casualty that has not been repaired. To the best of Borrower's knowledge, there are presently no existing defects in the Project and no repairs or alterations thereof are reasonably necessary or appropriate except for routine maintenance.

4.22 Construction and Development Documents. Borrower has furnished Lender with, or made available to Lender, as Lender has elected, true and complete copies of the following to the extent available: the Plans and Specifications, the Construction Contracts, the Construction Schedule, the Construction Budget, and Borrower has furnished Lender, with or made available to Lender, as Lender has elected, true and complete copies of all other documents in the possession of Borrower or under Borrower's control, which relate to development of the Property and construction of the Project. There have been no modifications thereof that are not fully set forth in the copies delivered or made available to Lender, and Borrower's interest therein is not subject to any claim, setoff, or lien other than liens granted by the Loan Documents. No action by Lender shall constitute an assumption by Lender of any obligation under any contract of Borrower or with respect to the Plans and Specifications, and Borrower shall continue to be liable for all obligations of Borrower with respect thereto, Borrower hereby agreeing to perform all of its obligations under all contracts.

4.23 Compliance with Health Care Laws. AACA, FBC and the Project each complies with all applicable federal, state and local laws, regulations, quality and safety standards, accreditation standards and requirements of the applicable state Department of Health ("DOH") and all other federal, state or local governmental authorities including, without limitation, those relating to the quality and adequacy of medical care, distribution of pharmaceuticals, rate setting, equipment, personnel, operating policies, additions to facilities and services and fee splitting (the "Health Care Laws").

4.24 Health Care and Operating Licenses. All Health Care and Operating Licenses are now, or upon completion of the relevant Facility will be, held by AACA in the name of AACA, FBC in the name of FBC and are in full force and effect, and AACAand FBC have agreed to operate the Project in a manner such that the Health Care and Operating Licenses shall remain in full force and effect. As used herein, the term "Health Care and Operating Licenses" shall mean, collectively, all certificates, permits, licenses and approvals, registrations, authorizations, regulatory agreements or other approvals or agreements required by applicable law or otherwise necessary and customary for the use and operation of the Project as a continuing care retirement community by all federal, state and local governmental or quasi-governmental agencies, including, without limitation, a valid certificate of need ("CON") or a CON exemption letter, as applicable, or similar certificate, license, permits or approval issued by the DOH, and approved provider status in any approved provider payment program, all health care and operating licenses, certificates, permits, licenses and approvals, registrations, authorizations and certifications required to obtain reimbursement as a provider of services under Title XVIII and/or Title XIX of the Social Security Act, as applicable, and any other applicable governmental or quasi-governmental program of reimbursement, including, without limitation, any programs instituted by the Department of Veteran's Affairs; provided, however, the phrase "Health Care and Operating Licenses" shall not include any certificates, permits, licenses, approvals, registrations, authorizations, regulatory or other approvals or agreements (collectively, "Future Health Care and Operating Agreements"), which may not be obtained under applicable law until after the completion of work at the Project not yet done, until the time that such work is completed or was required to be completed by this Agreement; provided further, however, Borrower knows of no reason why (a) any such work not yet done will not be completed in a timely fashion as required by this Agreement or (b) such Future Health Care and Operating Licenses will not be duly issued.

4.25 Ownership of Health Care and Operating Licenses. The Health Care and Operating Licenses, including without limitation, the CON or CON exemption letter, if applicable: (i) have not been, transferred to any location other than the Project; (ii) have not been pledged as collateral security for any loan or indebtedness other than the Loan (to the extent of Borrower's interest therein, if any, without assumption by Lender of any liabilities or obligations pertaining to such Health Care and Operating Licenses) and (iii) are held free from restrictions or known conflicts which would materially impair the use or operation of the Project as intended as a continuing care retirement community, and are not provisional, probationary.

4.26 Effectiveness of and Amendments to Health Care and Operating Licenses and Bed Capacity. No Health Care and Operating Licenses necessary for the operation of the Project required to be held by AACA or FBC have been rescinded, withdrawn, revoked, amended, modified, supplemented, or otherwise altered in violation of the Loan Documents. There has been no amendment or other change to the Project's authorized bed capacity and/or the number of beds approved by the DOH.

4.27 Medicare and Medicaid Compliance. To the extent the Project participates in Medicare, Medicaid or other similar programs, the Project holds a valid

certification for such participation, appropriate for the level of care provided at the Project and otherwise is in compliance with all requirements for such participation, including without limitation, if applicable, the Medicare and Medicaid Patient Protection Act of 1987. To the extent applicable, the Project is in conformance in all material respects with all insurance, reimbursement and cost reporting requirements, and, if applicable, has a current provider agreement which is in full force and effect under Medicare and Medicaid.

4.28 Third Party Payors. There is no threatened or pending revocation, suspension, termination, probation, restriction, limitation or non-renewal affecting the Project, AACA or FBC, or any participation or provider agreement with any third-party payor, including, without limitation, if applicable, Medicare, Medicaid, Blue Cross and/or Blue Shield, and any other private commercial insurance managed care and employees assistance program (such programs, the "Third-Party Payors' Programs") to which AACA, FBC or the Project is subject, and Borrower is not a party to or bound by any Third-Party Payor's Program, and Borrower has delivered notice to Lender promptly after receipt by Borrower of knowledge of any threatened or pending revocation, suspension, termination, probation, restriction, limitation or non-renewal of any such programs. All Medicaid and Medicare (if applicable) and private insurance cost reports and financial reports submitted by Borrower with respect to the Project are materially accurate and complete and are not misleading in any material respect. No cost reports for the Project remain "open" or unsettled, except as otherwise disclosed in writing to Lender. All cost reports for the Project have been filed within the time permitted, including any extension thereof.

4.29 Governmental Proceedings and Notices. Neither Borrower, Operator or the Project is currently the subject of any proceeding by any governmental agency, and no notice of any violation has been received that would, directly or indirectly, or with the passage of time: (i) have a material adverse impact on the Borrower's, Operator's or the Project's ability to accept and/or retain patients or residents, as the case may be, or result in the imposition of a fine, sanction, lower rate certification or lower reimbursement rate for services rendered to eligible patients; (ii) modify, limit or annul or result in the transfer, suspension, revocation or imposition of probationary use of any of the Health Care and Operating Licenses; or (iii) affect each of the Borrower's or Operator's continued participation in Medicaid or Medicare programs, if applicable, or any other of the Third-Party Payors' Programs, or any successor programs thereto, at current rate certifications, and Borrower has delivered to Lender promptly after receipt by Borrower of knowledge that Borrower, Operator or the Project are the subject of any such violation or proceeding.

4.30 Physical Plant Standards. The Project and the use thereof complies in all material respects with all applicable local, state and federal building codes, fire codes, health care, nursing facility and other similar regulatory requirements (the "Physical Plant Standards"), and no waivers of Physical Plant Standards exists at the Project.

4.31 Past Violations. The Project has not received a "Level IV" (or equivalent) violation or any other deficiency requiring the declaration of "immediate jeopardy" in applicable federal regulations, which have threatened the Borrower or Operator with respect to the operation of the Project or the Project's certification for participation in Medicare or Medicaid, to the extent applicable, and no statement or charges of deficiencies has been made or penalty enforcement action has been undertaken against the Project, the Borrower, Principals or Operator or against any officer, director, member or stockholder of the Borrower, Principals or Operator by any governmental agency during the last three (3) calendar years, and there have been no violations over the past three (3) calendar years which have threatened the Project's, the Borrower's, or the Operator's certification for participation in Medicare or Medicaid, if applicable, or the other Third-Party Payors' Programs and Borrower have delivered to Lender promptly after receipt by Borrower of knowledge that Borrower, Operator or the Project is the subject of any such violation or proceeding.

4.32 Audits. There are no current, pending or outstanding Medicaid or Medicare, if applicable, or Third-Party Payors' Programs reimbursement audits or appeals pending at the Project, and there are no years that are subject to audits. Neither the Borrower, Operator or the Project itself is subject to a material audit adjustment or material decrease in reimbursement with respect to its participation in any Third-Party Payors' Programs, and no managed care or other Third-Party Payors' Programs' contract is being or has been canceled, not renewed, or downgraded, and no such action is pending, threatened or contemplated.

4.33 Recoupment. There are no current or pending Medicaid or Medicare, if applicable, or Third-Party Payors' Programs recoupment efforts at the Project. Neither the Borrower or Operator is a participant in any federal program whereby any governmental agency may have the right to recover funds by reason of the advance of federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. §192, et. seq.).

4.34 Pledges of Receivables. Borrower has not pledged and shall not pledge its receivables as collateral security for any loan or indebtedness other than the Loan or the Existing Loans.

4.35 Patient Care Agreements and Patient Records. All Residence Agreements will be between AACA, or a wholly owned subsidiary, and Residents or FBC and Residents, and there are no patient or resident care agreements with patients or residents or with any other Persons which deviate in any material adverse respect from the standard form of Residence and Care Agreement approved by Lender. All patient or resident records at the Project, including patient or resident trust fund accounts, will be true and correct in all material respects.

4.36 Management and Operating Agreements. Any agreements pertaining to the management or operation of the Project, including, without limitation, the Management Agreement (each a "Management and Operating Agreement"), are in full force and effect. There is no material default, breach or violation under any

Management and Operating Agreement that is uncured, and no event has occurred which, with the passage of time or notice or the expiration of any grace or cure period, would constitute a material default, breach or violation under any Management and Operating Agreement that is uncured. Once a CON is obtained for the Facility, in the event any Management and Operating Agreement is terminated or in the event of foreclosure or other acquisition of the Project by Lender or its designee, neither Borrower, Lender, Operator, any subsequent operator nor any subsequent purchaser need obtain a CON or CON exemption letter, as applicable, prior to applying for and receiving a license to operate the Project or prior to receiving Medicare or Medicaid payments, if applicable.

4.37 Payment Procedures. Neither Borrower, Operator nor any other operator or manager of the Project, other than in the normal course of business, has changed the terms of any of the Third-Party Payors' Programs or its normal billing payment or reimbursement policies and procedures with respect thereto (including without limitation, the amount and timing of finance charges, fees and write-offs).

4.38 [Intentionally Omitted]

4.39 Single Purpose Entity. Borrower is a Single Purpose Entity and has not violated the restrictions imposed by Section 6.9.

4.40 Operating Account. (a) All funds received by FBC from any source have been deposited promptly upon receipt into that certain bank account number listed in the Deposit Account and Control Agreement (FBC) in FBC's name at the Lockbox Bank (the "FBC Operating Account"). FBC has directed Principals and any other parties to deposit any monies payable to FBC into the FBC Operating Account. The FBC Operating Account is subject to the Deposit Account and Control Agreement (FBC). No distributions shall be made from the FBC Operating Account except as permitted by this Agreement.

(a) All funds received by AACA from any source have been deposited promptly upon receipt into that certain bank account number listed in the Deposit Account and Control Agreement (AACA) in AACA's name at the Lockbox Bank (the "AACA Operating Account"). AACA has directed Principals, FB, certain AACA Members and any other parties to deposit any monies payable to AACA into the AACA Operating Account. The AACA Operating Account is subject to the Deposit Account and Control Agreement (AACA).] No distributions shall be made from the AACA Operating Account except as permitted by this Agreement

(b) All funds received by FB from any source have been deposited promptly upon receipt into that certain bank account number listed in the Deposit Account and Control Agreement (FB) in FB's name at the Lockbox Bank (the "FB Operating Account"). FB has directed Principals and any other parties to deposit any monies payable to FB into the FB Operating Account. The FB Operating Account is subject to the Deposit Account and Control Agreement

(FB). No distributions shall be made from the FB Operating Account except as permitted by this Agreement.

4.41 [Intentionally Omitted]

4.42 OFAC Lists. That (i) Neither Borrower, nor, to the best of Borrower's knowledge (after due inquiry and investigation), any persons or entities holding any legal or beneficial interest whatsoever in Borrower (whether directly or indirectly), are named on any list of persons, entities, and governments issued by the Office of Foreign Assets Control of the United States Department of the Treasury ("OFAC") pursuant to Executive Order 13224 – Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism ("Executive Order 13224"), as in effect on the date hereof, or any similar list issued by OFAC or any other department or agency of the United States of America (collectively, the "OFAC Lists"); (ii) neither Borrower, nor, to the best of Borrower's knowledge (after due inquiry and investigation), any persons or entities holding any legal or beneficial interest whatsoever in Borrower (whether directly or indirectly), are included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the OFAC Lists; provided, however, that with respect to the individual beneficiaries of the governmental plans holding indirect interests in Borrower, the foregoing representations and warranties are limited to Borrower's actual knowledge; (iii) none of the Principals are named on any OFAC Lists; (iv) none of the Principals are included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the OFAC Lists, and (v) neither Borrower nor any Principals, nor, to the best of Borrower's knowledge (after due inquiry and investigation), any persons or entities holding any legal or beneficial interest whatsoever in Borrower, have conducted business with or engaged in any transaction with any person or entity named on any of the OFAC Lists or any person or entity included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the OFAC Lists; provided, however, that with respect to tenants or residents of the Property, the foregoing representations and warranties are limited to Borrower's actual knowledge.

4.43 Development of the Project. (a) Borrower represents and warrants that Borrower has received or has been issued with all permits and approvals required to develop the Project and construct the Improvements in accordance with the Development Plan and the Marketing Plan and the Plans and Specifications, other than building or construction permits which shall be issued prior to commencement of construction of any of the Improvements. Notwithstanding the conditions contained in each of the Portsmouth Decision (as hereinafter defined) and the Middletown Decision (as hereinafter defined), respectively, to the contrary, Borrower shall have the right to construct a 60,000 sq. ft. commercial/ medical center on the Property.

(b) Borrower represents and warrants that the Plans and Specifications have been approved by all applicable state, federal, local, county governmental or quasi- governmental authorities and agencies, including; without limitation, the Planning and/or Zoning Departments of each of the Towns of Portsmouth and Middletown and the RIDEM; provided, however, that the Planning and/or Zoning Departments of each of the Towns of Portsmouth and Middletown were not required to approve (i) that certain plan entitled "Freedom Bay Development, West Main Road Portsmouth/Middletown, Rhode Island, Permit Modification Application #99-0300, Revised March 27, 2001" prepared by Northeast Engineers & Consultants, Inc. consisting of 12 sheets and stamped approved by RIDEM; and (ii) that certain plan entitled "Freedom Bay Development, West Main Road Portsmouth/Middletown, Rhode Island, Request for Preliminary Determination, Revised July 31, 2001" prepared by Northeast Engineers & Consultants, Inc. consisting of 7 sheets and stamped approved by RIDEM, as such plans were applicable to changes required by the RIDEM as such changes related to the wetlands located on the Property.

4.44 Other Members of AACA. Pursuant to that certain Adult Assisted Care Associates, LLC Offering and Subscription Agreement, Naushon Asset Management Company, LLC owned 3.5% of the membership interests in AACA. ("Naushon"). On June 1, 2004, Freedom Bay II, LLC purchased Naushon's membership interests in AACA pursuant to that certain Agreement for the Membership Interest Purchase Agreement dated June 1, 2004, by and between Freedom Bay II, LLC and Naushon (the "Naushon Purchase Agreement") and Naushon's membership interests in AACA were assigned to Freedom Bay II, LLC. There are no outstanding obligations, rights or duties under the Naushon Purchase Agreement and Naushon has no rights to membership interests in AACA.

## Article 5.
## Affirmative Covenants

5.1 Payment of Debt; Performance of Obligations. Borrower shall promptly pay when due all payment obligations of Borrower to Lender including, without limitation, any amounts expended by Lender to cure defaults by Borrower under any Loan Document or under any Existing Loan document (collectively, the "Debt") and shall promptly perform all other obligations of Borrower to Lender under the Loan Documents (the Debt and such obligations are sometimes referred to herein as the "Obligations").

5.2 Easements, Restrictive Covenants, Zoning. Borrower shall promptly perform and observe, or cause to be performed and observed, all of the terms, covenants and conditions of all instruments of record affecting such parties' interest in the Property, non-compliance with which may adversely affect the security of this Agreement, and Borrower shall do or cause to be done all things necessary to preserve intact and unimpaired any and all easements, appurtenances and other interests and rights in favor of, or benefiting any portion of, the Property.

5.2.1 Easements. Borrower shall not initiate, grant, join in, release or consent to any change in any restrictive covenant, easement, license, right of way (including the dedication of public highways) or any other public or private restriction limiting or defining the uses which may be made of the Property or any part thereof unless Borrower shall furnish to Lender the following items and obtain Lender's prior consent to such action:

(a) a certificate executed by an authorized officer of Borrower stating that (i) any such grant, consent, release or change shall not cause or result in an Event of Default under the Loan Documents or a default under the Existing Loan Documents, (ii) as of the date of such request, no Event of Default under the Loan Documents or any event which, with the lapse of time or the giving of notice, or either, would constitute an Event of Default under the Loan Documents, has occurred and is continuing, and (iii) such grant, release, consent or change will not adversely affect the revenue producing capability of the Property or deprive the Property of any real or personal property needed for the operation thereof; and

(b) a certificate dated within thirty (30) days preceding the date of such request of an independent architect or independent engineer to the effect that any such grant, consent, release or change (i) will not destroy or materially impair the means of ingress to or egress from the Property, (ii) will not materially impair the use of the Property for its intended purposes, (iii) will not materially impair the value of the Property, and (iv) will not materially interfere with or impair the efficiency of operations then being conducted on the Property by Borrower, Operator or any occupant of the Property. Provided no Event of Default under the Loan Documents or any event which, with the lapse of time or the giving of notice, or either, would constitute an Event of Default under the Loan Documents, has occurred and is continuing, upon receipt of the documentation required by this Section 5.2.1 in form and substance satisfactory to Lender and Borrower's payment of all costs and expenses incurred by Lender, Lender shall not unreasonably withhold its consent to the requested action by Borrower, and shall promptly execute and deliver any and all instruments of partial release or subordination as Lender deems necessary or appropriate in furtherance of Lender's consent.

5.3 Taxes and Other Obligations.

(a) Borrower shall, or shall cause Operator to, pay when due, and before any interest, collection fees or penalties shall accrue, all taxes, assessments, fines, impositions and other charges and obligations, which may become a lien on or charge against the Project (collectively, "Impositions"). Borrower shall have the right to contest, in good faith by appropriate proceedings, the amount or validity of any such Impositions, so long as: (i) Borrower has given prior written notice to Lender of Borrower's intent to so contest or object to any such Impositions; (ii) such contest stays the enforcement or collection of the Impositions or any lien created; and (iii) the Impositions or lien created are

bonded or insured over by the title insurance company or Borrower has posted security therefor in accordance with the provisions of the Existing Loan Documents and in a manner acceptable to Lender. Upon the request of Lender, Borrower shall immediately furnish to Lender all notices of amounts due and receipts evidencing payment. Borrower shall promptly notify Lender of any lien on all or any part of the Property and shall promptly discharge any unpermitted lien or encumbrance.

(b) Upon the occurrence of an Event of Default, at the option of Lender, unless SCM or Nordbank is collecting real estate tax escrow and assessment payments under the Existing Loan Documents, Borrower shall, or shall cause Operator to, establish a real estate tax, assessment and insurance escrow with Lender. On the first day of each calendar month each Borrower shall or shall cause Operator to deposit into such escrow one-twelfth (1/12) of the annual real estate taxes, assessments and insurance for the Project as estimated by Lender. If at any time there are insufficient funds in such escrow, when added to such monthly escrow payments, to pay the next due real estate tax, assessment and insurance invoices for the Project, immediately upon Lender's request Borrower shall deposit or shall cause Operator to deposit into such escrow an amount equal to such deficiency.

5.4 Insurance. Borrower shall, or shall cause Operator to, keep the Project insured, and shall, or shall cause Operator to, maintain commercial general liability coverage and such other coverages required by the Existing Loan Documents, by any Health Care and Operating License and as otherwise required by Lender, in its reasonable discretion, by insurers, in amounts and in the form specified by Lender. In case of loss or damage by fire or other casualty, Borrower shall give immediate written notice thereof to the insurers and to Lender.

5.5 Condemnation. Borrower shall, within five (5) business days of its receipt of notice thereof, notify Lender of any action or proceeding relating to any condemnation or other taking of the Project, or part thereof, and Borrower shall, after consultation with and subject to Lender's written approval, appear in and prosecute any such action or proceeding and/or settle or compromise any claim in connection therewith.

5.6 Preservation and Maintenance of the Project. Borrower shall, and shall cause Operator to: (a) not commit waste or permit impairment or deterioration of the Project; (b) not abandon the Project; (c) keep the Project in good repair and, in the event of casualty, condemnation or a breach of Borrower's obligation not to permit waste or deterioration and to keep the Project in good repair, restore or repair promptly, in a good and workmanlike manner, all or any part of the Project to the equivalent of its original condition; and (d) give notice in writing to Lender of and, unless otherwise directed in writing by Lender, appear in and defend any action or proceeding purporting to affect the Project, the security granted by the Loan Documents or the rights or powers of Lender. Borrower shall not and shall not permit Operator to remove, demolish or alter any Improvement on the Property except when incident to the Construction Documents.

The Project shall be operated by Borrower and Operator at all times in compliance with all Health Care Laws.

5.7 Inspection. Subject to the rights of tenants under Leases and Residents under Residency Agreements, Lender and its authorized agents may enter upon and inspect the Project at all reasonable times upon three (3) days advance notice given orally or in writing. Lender, at Borrower's expense, may retain one or more independent consultants to periodically inspect the progress of construction of the Project and all Construction Documents relating thereto.

5.8 Books and Records. Together with each payment made to Lender hereunder or under any other Loan Document, Borrower shall deliver to Lender a full accounting of all monies payable with respect thereto, certified by the chief financial officer of Borrower or Principal. Borrower shall, and shall cause Operator to, keep and maintain at all times at Principal's primary place of business, the Project or such other place as Lender may approve in writing, complete and accurate books of accounts and records adequate to reflect the results of the operation of the Project and to provide the financial statements required to be provided to Lender pursuant to Section 5.9 below and copies of the following, to the extent the same pertain in any way to the Project or any interest therein or the Existing Loan Documents or the Loan Documents; material correspondence including, without limitation, notices, reports and other correspondence from or on behalf of Borrower or Principals to Borrower, Principals, SCM, Nordbank, Construction Manager, Contractor, Engineer, Developer, Marketing Agents, Architect, Operator, architects, engineers, contractors, governmental authorities, insurance agents, insurance companies or Residents and notices, reports and other correspondence from such Persons to Principals or Borrower; reports of SCM's or Nordbank's independent consultant to the extent obtainable by or in the possession of Borrower or Principals; the Plans and Specifications, the Construction Contracts, the Construction Schedule, the Construction Budget, the Construction Management Agreement, the Construction Agreement, the Construction and Management Agreement, if applicable, the Management Agreement, the Marketing Agreement, the Architect's Agreement, the Engineering Agreement, the Development Agreement, architect's and engineer's contracts, change orders and all other documents in the possession of Borrower or under Borrower's control, which relate to development of the Property and construction of the Project; Management and Operating Agreements; Health Care and Operating Licenses; consents, permits, approvals, licenses and certifications; the Construction Budget and the Pre-Construction Budget; surveys, plat maps and site plans; insurance policies and certificates; and all written agreements to which Borrower, Principals or any Affiliate of either is party, bound by or obligated under. Lender and its designated agents shall have the right to inspect and copy any of the foregoing. Additionally, Lender may audit and determine, in Lender's sole and absolute discretion, the accuracy of Borrower's records and computations. The costs and expenses of the audit shall be paid by Borrower if the audit discloses a monetary variance in any financial information or computation as of the date of such computation equal to or greater than the greater of: (a) 5% and (b) $5,000 more than any computation submitted by Borrower on any statements or reports. In connection with any inspection or audit performed by Lender as described above, upon Lender's request, Borrower's accountants, property manager and Principals shall meet

with Lender on an annual basis to facilitate Lender's review and audit of such books and records.

5.9 Financial Statements; Balance Sheets. Borrower shall furnish to Lender, and shall cause Principals and, to the extent within Borrower's rights under any agreement with Operator shall cause Operator, to furnish to Lender such financial statements and other financial information as Lender may from time to time request. All such financial statements shall (a) be prepared in accordance with generally accepted accounting principles consistently applied or in accordance with other methods acceptable to Lender in its sole discretion, (b) show all material contingent liabilities and (c) shall accurately and fairly present the results of operations and the financial condition of Borrower or the relevant entity or person at the dates and for the period indicated. Without limitation of the foregoing, Borrower shall furnish to Lender and shall cause Principals to furnish to Lender the following statements:

5.9.1 Monthly, Quarterly and Annual Operating Statements. Statements of the operation of the Project (including a current rent roll, monthly and quarterly operating statements, monthly and quarterly delinquency reports and a monthly and quarterly schedule of delinquency of receipts and payments to be delivered within forty-five (45) days after the end of each month and quarter and certified by Borrower as true, correct, and complete; and a property management report showing the number of inquiries made and/or admission applications received from residents or prospective residents; reservations made; visits; waiting lists; deposits received from residents; marketing office activity and any other information requested by Lender) as of the last day of each month, to be delivered within twenty (20) days after the end of each month and quarter and certified by Borrower as true, correct, and complete, and yearly statements of the operation of the Project, to be delivered within ninety (90) days after the end of each fiscal year and certified by Borrower as true, correct, and complete.

5.9.2 Balance Sheets and Financial Statements. Quarterly balance sheets and financial statements from Borrower and Principals within thirty (30) days of the end of each quarter of each fiscal year; annual balance sheets and financial statements from Borrower and Principals, within ninety (90) days of the end of each fiscal year which are true and correct in all respects, have been prepared in accordance with sound accounting practices, and fairly present the financial condition(s) of the person(s) referred to therein as of the date(s) indicated. At Lender's request, such financial statements shall include, specific information concerning Borrower's and Principals' other real estate holdings, including property income and expenses, debt service requirements and occupancy. All annual balance sheets and financial statements shall be audited and certified by an independent certified public accountant selected by Borrower or Principals and consented to by Lender, which balance sheets and financial statements shall be without qualification or exception, other than those approved by Lender, and shall include audited consolidated financial statements of Principals prepared in accordance with generally accepted accounting principals consistently applied, which shall also include consolidating financial statements showing a balance sheet and income statement for Borrower.