5.9.3 Project Statements. To be delivered to Lender not less than thirty (30) days after each quarter, Borrower or Principals shall provide statements of the operation of the Project, including, without limitation, a description of the Project (and any construction or development progress reports), an analysis of variances from the amounts for such period budgeted under the Construction Budget and the Pre-Construction Budget, a summary of accounts receivable, a revised projection of cash flow, showing projected revenues and expenses including capital and operating expenses, for the balance of the fiscal year, an activity report of the Project including up to date sales information, a statement of professional fees paid, a status report on any ongoing litigation and/or legal matters, including, all activities related to tax assessments, a statement of fees paid to the manager of the Project or operator, as applicable, a leasing summary including occupancy rates, and such other information as requested by Lender.

5.9.4 Annual Plan. To be delivered to Lender not less than sixty (60) days before the end of each fiscal year, Borrower or Principals shall or Borrower shall cause Operator to provide an annual plan for the Project for the upcoming fiscal year, including, without limitation, an Operating Budget (as provided in Section 5.10 below); projected monthly cash flows for the operations for the Project; budgeted monthly capital expenditures (including management, construction and/or professional fees payable to the manager, Operator or contractor); a marketing plan for the residential units (including, without limitation, details on any proposed increases in fees or costs to be charged to existing or prospective residents and advertising programs); copies of any updated or new market analysis performed by, or provided to, Borrower, Operator or Principals (including, without limitation, details on vacancy rates, rents, operating costs, average returns and projections of market conditions in short and medium terms); a summary of insurance coverages and such other information as required or requested by Lender. Such annual plan shall be subject to Lender's prior written approval, which approval shall not be unreasonably withheld or delayed.

5.9.5 [Intentionally Omitted]

5.9.6 Copies of Construction Fundings and Requests. Borrower shall provide Lender, on a monthly basis, with copies of all notices, invoices and all draw or funding requests which is received by Borrower or Operator pertaining to the construction of the Project under the Construction Documents, with all applicable back-up information.

5.9.7 Health Care Related Reports. Borrower shall furnish to Lender or, as applicable, shall cause Operator to furnish to Lender the following statements or reports pertaining to the Project or any portion thereof:

(a) a quarterly utilization report listing the number of licensed and available beds, the number of admissions, the percentage of occupancy, the average length of stay, the number of patient days, the payor mix and the number of full time equivalent employees, certified by Borrower or Operator as true and correct, within, within forty-five (45) days after the end of each fiscal quarter;

(b) all Medicare, Medicaid and similar cost reports and any amendments thereto filed with respect to the Project, and all responses, audit reports, or other inquiries with respect to such cost reports, within twenty (20) days after Borrower's or Operator's receipt thereof;

(c) all Medicare, Medicaid and other similar Rate Calculation Worksheets issued by the appropriate agency for the Project, within ten (10) days after Borrower's or Operator's receipt thereof;

(d) evidence of payment of any applicable provider bed taxes or similar taxes, which taxes Borrower agrees to pay or cause to be paid by Operator prior to delinquency thereof, upon Lender's request therefor; and

(e) all state and federal survey reports, upon receipt by Borrower or Operator with respect to the Project.

5.9.8 Audits. If Borrower fails to furnish or cause to be furnished promptly any report required by this Section 5.9, or if Lender reasonably deems such reports to be unacceptable, Lender may elect (in addition to exercising any other right and remedy) to conduct an audit of all books and records of Borrower and Principals which in any way pertain to the Project and to prepare the statement or statements which Borrower failed to procure and deliver. Such audit shall be made and such statement or statements shall be prepared by an independent firm of certified public accountants to be selected by Lender. Borrower shall pay all reasonable expenses of the audit and other services, which expenses shall be immediately due and payable with interest thereon at the default rate contained in the Note.

5.10 Annual Budgets. Borrower shall submit to Lender, not later than the 60th day prior to the end of each fiscal year, a proposed operating budget, to include capital and operating expenses for the development, construction, operation and management of the Project for the succeeding fiscal year (the "Operating Budget"). Such budget shall be subject to Lender's prior written approval, which approval shall not be unreasonably withheld or delayed.

5.11 Use of Proceeds. Borrower shall use the proceeds of the Loan to (i) pay all Expenses incurred by Lender up to and as of the Closing Date, including the commitment fee as provided in Section 3.10 (a) hereof, and all other costs and expenses to close the Loan and (ii) in accordance with the uses provided for in 1.5 hereof and (iii) pay the balance of the proceeds of the Loan as provided in the Settlement Statement, and such uses shall be considered proper business purposes. No portion of the proceeds of the Loan shall be used by Borrower in any manner that might cause the borrowing or the application of such proceeds to violate Regulation G, Regulation U, Regulation T or Regulation X or any other regulation of the Board of Governors of the Federal Reserve System or to violate the Securities Act of 1933 or the Securities Exchange Act of 1934.

5.12 Notice of Litigation, Default or Equity Contribution. Borrower shall promptly provide Lender with:

(a) written notice of any litigation, arbitration, or other proceeding or governmental investigation pending or, to Borrower's or Principals' knowledge, threatened which could have a material adverse affect on Borrower, Principal, Operator, the Collateral or the Project;

(b) a copy of all notices of default and violations of laws, regulations, codes, ordinances and the like received by Borrower, Operator or Principals relating to the Project or the Collateral;

(c) written notice of any default under the Existing Loan Documents within two (2) Business Days of Borrower's actual knowledge of such default and, if Borrower has received written notice of default from SCM or Nordbank, a copy of such notice; and

(d) written notice of any capital or other equity contributions to Borrower.

5.13 Affiliate Transactions. Prior to entering into any agreement with an Affiliate, Borrower shall deliver to Lender a copy of such agreement, which shall be satisfactory to Lender, in its sole discretion. If requested by Lender, such agreement shall provide Lender the right to terminate same upon Lender's (or its designee's) taking possession of the Project or acquisition of the membership interests in Borrower through foreclosure, an assignment-in-lieu of foreclosure, UCC sale or otherwise.

5.14 Advertisement. Borrower agrees to allow Lender to advertise in the various news or financial media that Lender has provided financing to Borrower. During the construction of the Improvements, Borrower agrees that Lender may advertise that Lender has provided financing to Borrower for the Project on signs erected by Lender, or reasonably approved by Borrower. Lender shall be responsible for obtaining all permits and approvals for such signs, and Lender shall indemnify Borrower, Operator and Principals for any failure to obtain such permits or approvals or for failure to erect and maintain such signs in Lender's reasonable control, in accordance with such permits or approvals.

5.15 [Intentionally Omitted]

5.16 Lockbox.

(a) FB, SCM and Lockbox Bank have entered into a Deposit Account and Control Agreement (FB), which Deposit Account and Control Agreement (FB) is in form and substance acceptable to and approved by Lender, and pursuant to which Deposit Account and Control Agreement (FB), FB shall create the FB Operating Account. All funds received by FB from any source shall be deposited promptly upon receipt into the FB Operating Account. FB shall direct Principals, AACA and any other parties to deposit any monies payable to FB into the FB Operating Account. The FB Operating Account shall be subject at all times to the Deposit Account and Control Agreement (FB). No Distributions of such funds shall be made except as provided by this Agreement.

(b) AACA, SCM and Lockbox Bank have entered into a Deposit Account and Control Agreement (AACA), which Deposit Account and Control Agreement (AACA) is in form and substance acceptable to and approved by Lender, pursuant to which Deposit Account and Control Agreement (AACA) AACA shall create the AACA Operating Account. All funds received by AACA from any source shall be deposited promptly upon receipt into the AACA Operating Account. AACA shall direct FB, the AACA Subsidiaries, AACA Members, and any other parties to deposit any monies payable to AACA into the AACA Operating Account. Lender shall have a perfected security interest in the AACA Operating Account and all proceeds thereof subject to SCM's rights with respect to such AACA Operating Account under the SCM Loan. The AACA Operating Account shall be subject at all times to the Deposit Account and Control Agreement (AACA). No Distributions of such funds shall be made except as provided in this Agreement.

(c) FBC, Nordbank and Lockbox Bank have entered into a Deposit Account and Control Agreement (FBC), which Deposit Account and Control Agreement (FBC) is in form and substance acceptable to and approved by Lender, and pursuant to which Deposit Account and Control Agreement (FBC), FBC shall create the FBC Operating Account. All funds received by FBC from any source shall be deposited promptly upon receipt into the FBC Operating Account. FBC shall direct Principals, AACA and any other parties to deposit any monies payable to FBC into the FBC Operating Account. The FBC Operating Account shall be subject at all times to the Deposit Account and Control Agreement (FBC). No Distributions of such funds shall be made except as provided by this Agreement.

5.17 <u>Health Care and Operating Licenses</u>.

5.17.1 Borrower shall obtain and maintain in full force and effect all Health Care and Operating Licenses in AACA's own name.

5.17.2 Borrower shall notify Lender immediately upon the commencement or threat (if known to Borrower) of any proceedings by any federal, state or local governmental or quasi-governmental agency to modify, revoke or suspend any of the Health Care and Operating Licenses.

5.17.3 Borrower shall deliver to Lender a copy of each deficiency or inspection report issued by any federal, state or local governmental or quasi-governmental agency that surveys compliance with the Health Care and Operating Licenses, including, without limitation, Medicaid and Medicare certification requirements, which pertains to all or any portion of the Project, Borrower, Operator or Principal, within two (2) Business Days after receipt thereof.

5.17.4 Borrower shall not sell, transfer, assign, pledge or otherwise relinquish, in whole or in part, any of the Health Care and Operating Licenses.

5.18 Health Care Deficiency Reports. Borrower shall deliver to Lender, within two (2) Business Days after Borrower's receipt thereof, a copy of any Medicare, Medicaid or other licensing agency survey or report and any statement of deficiencies and/or any other report indicating that any action is pending or being considered to downgrade the Project to a substandard category; within the time period required by the particular agency for furnishing a plan of correction, Borrower also shall furnish or cause to be furnished to Lender a copy of the plan of correction generated from such survey or report for the Project and Operator shall correct any deficiency, the curing of which is a condition of continued licensure or for full participation in Medicaid, Medicare or other reimbursement program pursuant to any contract for existing patients or for new patients to be admitted with Medicaid or Medicare coverage, by the date required for cure by such agency (plus extensions granted by such agency).

5.19 Third Party Payors. Borrower shall deliver notice to Lender within two (2) Business Days if Borrower shall become aware of any threatened or pending revocation, suspension, termination, probation, restriction, limitation or non-renewal affecting the Project or Operator, or any participation or provider agreement with any third-party payor including, without limitation, if applicable, Medicare, Medicaid, Blue Cross and/or Blue Shield, and any Third-Party Payors' Programs to which Operator or the Project is subject.

5.20 Notices or Governmental Proceedings. Borrower shall deliver notice to Lender within two (2) Business Days if Borrower, Operator or the Project shall become the subject of any proceeding as provided in Section 4.29 hereof or if Borrower shall receive any such notice of violation.

5.21 Storage of Materials. Except as otherwise permitted by SCM or Nordbank, Borrower shall cause all materials supplied for, or intended to be utilized in the construction of the Improvements, but not yet affixed to or incorporated into the Improvements, to be stored on the Property with adequate safeguards as reasonably determined by Borrower to prevent loss, theft, damage (including damage to other persons and property) or commingling with other materials or projects.

5.22 Construction Documents. Borrower assumes full responsibility for the compliance of the Plans and Specifications and all other Construction Documents, the Improvements and the Project with all governmental requirements and sound building and engineering practices. No construction shall be undertaken on the Property except as shown in the Plans and Specifications and in accordance with the Construction Documents, subject to Change Orders as and to the extent specifically permitted by this Agreement. No plans or specifications, or any changes thereto except permitted Change Orders, shall be included as part of the Plans and Specifications until consented to by Lender, and, if applicable, approved by the Lender's Construction Consultant, all applicable governmental authorities, and all Persons whose approval is required under the Loan Documents. "Construction Consultant" means the person or entity, if any, from time to time designated by Lender in its discretion to review and advise Lender with respect to the construction of the Improvements. Lender shall have the right at any time (but shall have no obligation) to take in its name or in the name of Borrower such action

as Lender may determine necessary or proper to cure any default under a Construction Document or to protect the rights of Borrower or Lender with respect thereto. Lender shall incur no liability if any action so taken in good faith by it or on its behalf shall prove to be inadequate or invalid. Borrower agrees to indemnify and hold Lender harmless against and from any loss, cost, liability or expense (including attorneys' fees and expenses) incurred in connection with Borrower's failure to perform such Construction Documents or any action taken by Lender in good faith. Lender may use the Plans and Specifications for any purpose relating to the Project. Borrower does hereby make, constitute and appoint Lender their respective attorney-in-fact with full power to appoint substitutes or a trustee to accomplish such purpose (which power of attorney shall be irrevocable so long as any Indebtedness remains unpaid or any obligations remain unpaid or unperformed, shall be deemed coupled with an interest, shall survive the voluntary or involuntary dissolution of Borrower and shall not be affected by any disability or incapacity suffered by Borrower subsequent to the date hereof) to enforce all rights of Borrower under any Construction Document; provided, however, until an Event of Default has occurred, Lender shall not utilize this power of attorney to seek to enforce Borrower's rights under a Construction Document unless Lender, in good faith, believes that failure to do so could materially adversely affect the Project, Lender's rights under the Loan Documents or the value of the Property or any Collateral.

5.23 Construction Consultant. In the event Lender, at its option, designates a Construction Consultant, Borrower shall cooperate with the requests of Construction Consultant and will furnish Construction Consultant whatever Borrower or any Affiliate of Borrower is required to provide to Lender under the Loan Documents and whatever else Construction Consultant reasonably considers necessary or useful to perform its duties. The duties of Construction Consultant run solely to Lender and Construction Consultant shall have no obligations or responsibilities whatsoever to Borrower, Borrower's architect, engineer and/or contractor or to any of their agents or employees. Construction Consultant may, among other duties, perform construction cost analyses, review the Plans and Specifications and all proposed changes therein, observe work in place, and review disbursements requests. Borrower shall pay when due, and reimburse to Lender to the extent paid by Lender, all reasonable fees and charges of the Construction Consultant.

5.24 Reports and Vouchers. Borrower shall (a) promptly deliver to Lender upon request copies of all reports, studies, inspections and tests made on the Property, the Improvements or the materials to be incorporated into the Improvements which are in Borrower's possession or under its control; (b) make additional tests, at Borrower's sole cost and expense, as Lender reasonably requires; and (c) deliver to Lender, on demand, copies of all contracts, bills of sale, statements, receipted vouchers or agreements under which Borrower claims title to any materials, fixtures or articles incorporated or to be incorporated in the Improvements or otherwise subject to a lien in favor of Lender. Borrower shall immediately notify Lender of any report, study, inspection or test known to Borrower that indicates any adverse condition in the Property, the Improvements, or the materials to be incorporated into the Improvements.

5.25 Existing Loan Documents. Borrower shall, and shall cause Principals, to fully and timely comply with all the terms and provisions of the Existing Loan Documents to the extent applicable to any of them.

5.26 Further Security Agreements. Borrower acknowledges and agrees that, pursuant to the Loan Documents, Borrower has assigned, transferred and granted to Lender, and has created in favor of Lender, a security interest under the Rhode Island Uniform Commercial Codes in and to certain personal property, and Lender shall have the right to file UCC-1 Financing Statements to further evidence the same and establish the priority thereof.

5.27 Termination of Marketing Agreement and/or Development Agreement. Should an Event of Default occur hereunder or should any event occur which, with the passage of time, giving of notice, or both, would allow Lender or the Borrower to terminate the Management Agreement, the Marketing Agreement and/or the Development Agreement, at Lender's election, Borrower shall cooperate with Lender and use Borrower's best efforts to procure consents and approvals from the Principals or any other Persons, as requested by Lender, at Borrower's cost and expense, to facilitate the termination of the Management Agreement, the Marketing Agreement and/or Development Agreement, as Lender shall determine, and the engagement of a replacement property manager, marketing manager and/or development company on terms and conditions approved by Lender and/or the engagement of subcontractors selected by Lender to perform such activities prior to termination of such agreements.

5.28 Development of the Condominium. (a) Pursuant to the Condominium Declaration, AACA shall have the right to convert either or both of the existing land only Master Units into (i) one or more additional land only Master Units and/or other types of Individual Units and/or to create Master Common Elements (as defined in the Condominium Declaration) and Master Limited Common Elements (as defined in the Condominium Declaration) or (ii) any combination of the foregoing or (iii) create a Sub-Condominium on each Master Unit in lieu of creating Individual Units, pursuant to a recorded amendment to the Condominium Declaration, which amendment shall be approved in writing by Lender and shall include new Plats and Plans (as defined in the Condominium Declaration) to be recorded on the land records in the Towns of Portsmouth and Middletown respectively identifying any portion of the land only Master Unit converted to an additional land only Master Unit or other type of Individual Unit and/or the Master Common Elements and Master Limited Common Elements, Sub-Condominiums, and provided that the creations of such sub-condominiums and all units thereunder shall have been approved by the appropriate governmental or municipal authority, if applicable.

(b) Borrower shall develop the Property into the following proposed Master Units, as such proposed Master Units are described in the Condominium Declaration, which proposed Master Units are shown on that certain plan (the "Land Unit Dimensions Plans") entitled "Freedom Bay Development West Main Road Portsmouth/Middletown, Rhode Island Land Unit Dimensions Plan November 2001", prepared by Northeast Engineers &

Consultants, Inc. consisting of Sheets 1 through 9, a copy of Sheet 2 of the Land Unit Dimensions Plans is attached hereto as Exhibit I and made a part hereof, intended to be modified as shown on that certain overall land unit plan, Freedom Bay West Main Road, prepared by Fuss & O'Neill, Inc., dated December 1, 2004 and updated on July 11, 2005, a copy of which is attached hereto as Exhibit I-1 ("Overall Unit Plan"):

(i) Guest House Land Unit. The proposed Master Unit #4 referred to on the Overall Unit Plan as the "Guest House Land Unit" shall be developed into a guest house consisting of eighteen (18) rooms as an accessory use to the Project, with the guest house to be used by the family, guests, employees and invitees of the Residents, prospective residents and their families and shall not be advertised for use by or available to the general public.

(ii) Beech Hill and The Orchards Land Unit. The proposed Master Units #2 and #3 referred to on the Overall Unit Plan as the "Beech Hill and The Orchards Land Unit" shall be developed to create up to fifty-nine (59) two (2) bedroom independent living Residential Units (as defined in the Condominium Declaration) that are in compliance with the zoning board approvals. Such Residential Units shall be offered by AACA for sale or lease.

(iii) Meadow View Land Unit; Island View Land Unit; Spyglass Ridge Land Unit. The proposed Master Units #5 and #6 referred to on the Overall Unit Plan as the "Meadow View Land Unit", "Island View Land Unit" and the "Spyglass Ridge Land Unit" may be developed to create up to eleven (11) Residential Units, forty (40) Residential Units and thirty-nine (39) Residential Units respectively that are in compliance with zoning board approval. Such Residential Units shall be offered by AACA for sale or lease.

(iv) Assisted Living Land Unit. The proposed Master Unit #7 referred to on the Overall Unit Plan as the "Independent/Assisted Living Land Unit" shall be developed to create up to forty (40) assisted living Residential Units, and sixty seven (67) independent living Residential Units which Residential Units shall be offered by AACA for sale or lease.

(v) Commercial Land Unit. The proposed Master Unit #3 referred to on the Overall Unit Plan as the "Commercial Land Unit" shall be developed to create an unlimited number of commercial units, which units shall be limited to Non-Residential Units (as defined in the Condominium Declaration), the use of which Non-Residential Units shall be consistent with those uses approved by the applicable municipal zoning boards.

(vi) (Assisted Living/Nursing Land Unit. The proposed Master Unit #8 referred to on the Overall Unit Plan as the "Assisted Living/Nursing Land Unit" shall be developed to create up to fifty-four (54) assisted living/skilled nursing Residential Units, which Residential Units shall be offered by AACA for sale or lease.

(vii) (vii) Land Trust Unit. The proposed Master Unit #10 referred to on the Overall Unit Plan as the "Land Trust Unit" shall be developed in any manner consistent with the Permitted Uses (as defined in the Condominium Declaration), including, without limitation, as open space or as an executive golf course or other similar open space use. AACA reserves the right to convey the Land Trust Unit to a conservation agency, to record deeded lot restrictions or a conservation easement will be placed on the property or the Master Unit shall become part of the Master Common Elements upon the prior written approval of Lender.

(c) Notwithstanding anything to the contrary contained herein, upon the prior written approval of Lender AACA shall have the right to convert the Beech Hill and the Orchards Land Unit into the following two land only Master Units: (i) the Beech Hill Land Unit and (ii) the Orchards Land Unit, pursuant to a recorded amendment to the Condominium Declaration, which amendment shall be approved in writing by Lender and shall include new Plats and Plans identifying the Beech Hill Land Unit and the Orchards Land Unit, respectively.

(d) Notwithstanding anything to the contrary contained herein or in the Condominium Declaration, prior to AACA entering into and recording any amendment to the Condominium Declaration to create such Master Units, Individual Units, Sub-Condominium Units or otherwise, Lender shall approve any such amendment in writing.

5.29 Release of Collateral. The Lender shall not release the following Mortgaged Land (but shall release the individual units) making up a Master Unit created by AACA: Beech Hill and the Orchards Land Unit, Meadow View Land Unit, Spyglass Ridge Land Unit, Island View Land Unit; Lender shall release the following Mortgaged Land making up a Master Unit created by AACA: Assisted Living/Nursing Land Unit, Commercial Land Unit, the Guest House Land Unit and the Independent/Assisted Living Land Unit, from the lien of the Mortgage (provided that such release shall not affect or diminish Borrower's obligations under the Loan Documents) provided that all of the following conditions have been satisfied:

(a) Such Master Unit is sold or conveyed to a wholly owned subsidiary of AACA (each an "AACA Subsidiary"), which AACA Subsidiary shall have been approved by Lender, and, provided that, Lender shall have approved in writing the formation and organizational documents of such AACA Subsidiary, including, without limitation, the articles of incorporation,

certificate of formation, operating agreement, by-laws, as applicable, prior to such conveyance;

(b) The AACA Subsidiary purchasing such Master Unit shall have complied with all the material terms and conditions required to be performed by such AACA Subsidiary under its agreement with Borrower prior to the delivery of a deed for such Master Unit, which agreement shall have been approved by Lender in writing;

(c) Each of the Master Units being conveyed/purchased by an AACA Subsidiary shall be designated a separate real estate tax parcel by the applicable Town, for tax purposes and the remaining Property a separate tax parcel from the Master Units being conveyed; and

(d) The Lender shall have received the applicable Release Price for such Master Unit from such AACA Subsidiary in accordance with <u>Section 1.9</u> above or to such other Person as Lender may from time to time direct as well as all of payment of Lender's Expenses in connection with the release of such Master Unit. The Release Prices for the applicable Master Units are attached hereto as <u>Exhibit J</u> and made a part hereof.

(e) Notwithstanding anything to the contrary contained herein, under no circumstances shall Lender be required to release the Mortgaged Land making up the Land Trust Unit or shall AACA convey the Land Trust Unit to AACA Subsidiary during the term of the Loan, without the prior written consent of Lender.

The requirements set forth above shall not apply and Lender shall release any Mortgaged Land conveyed without consideration (i) pursuant to a corrective deed, (ii) for dedication of public rights-of-way for roads or utilities or (iii) in order to satisfy a requirement of a governmental authority (subject to the provisions of <u>Section 5.5</u> above). Upon the occurrence and during the continuance of a Default or an Event of Default, Lender shall continue to release Mortgaged Land from the lien of the Mortgage, provided that the above conditions are met and provided that the value of any remaining Collateral will not be materially diminished thereby. In addition to the foregoing, Lender shall in its reasonable discretion subordinate the Mortgage and any liens imposed by the other Loan Documents to subdivision declarations, utility easements, and similar instruments appropriate for the development of the Project.

5.30 Cottage Construction Revolver Budget.

(a) If Lender reasonably determines at any time that the provisions of the Cottage Construction Revolver Budget are not sufficient for Borrower to be in material compliance with the requirements of the Development Plan, the Marketing Plan or this Agreement, Lender shall have the right to require Borrower to revise the Cottage Construction Revolver Budget to bring Borrower into compliance with the requirements, and, further, to require Borrower upon the

written request of Lender to employ a Construction Consultant to submit a written report and recommendations with respect to revisions to such Pre-Construction Budget and appropriate methods by which Borrower may satisfy such requirements.

(b) The acceptance by Lender of the Cottage Construction Revolver Budget shall not constitute a representation or covenant of Lender as to the accuracy or adequacy of the Cottage Construction Revolver Budget for any purpose of Borrower or the operations of the Project.

(c) Borrower may modify the Cottage Construction Revolver Budget from time to time, subject to Lender's reasonable approval, in writing, prior to any such modification.

(d) If Lender determines at any time that a Cottage Construction Revolver Cost Deficit exists, Lender, in its sole discretion, may require Borrower to pay to Lender additional funds in the amount of the Cottage Construction Revolver Cost Deficit to secure payment and performance of Borrower's obligations under the Loan Documents. Borrower shall deposit with Lender the amount of any Cottage Construction Revolver Cost Deficit within thirty (30) days of written notice from Lender. So long as no uncured Default exists, sums so paid to Lender shall be held by Lender in a manner sufficient to create a perfected security interest in cash collateral and, so long as no uncured Default exists, shall be applied by Lender to Cottage Construction Revolver Costs.

5.31 Development Plan.

(a) Prior to the beginning of Borrower's fiscal year, Borrower shall submit a certificate signed by the chief executive officer or chief financial officer of Borrower and an authorized officer of the Marketing Agent and Developer updating the certifications made by each of them on the Closing Date pursuant to Sections 3.31 and 3.32 respectively, with respect to the Development Plan.

(b) Borrower shall not make any material changes to the Development Plan without the prior written consent of Lender.

5.32 Marketing Plan.

(a) Prior to the beginning of Borrower's fiscal year, Borrower shall submit a certificate signed by the chief executive officer or chief financial officer of Borrower and an authorized officer of the Marketing Agent and Developer updating the certifications made by each of them on the Closing Date pursuant to Sections 3.31 and 3.32 respectively, with respect to the Marketing Plan.

(b) Borrower shall not make any material changes to the Marketing Plan without the prior written consent of Lender.

5.33 Trade Payables. Borrower covenants that Borrower shall maintain at least ninety percent (90%) by dollar value of its trade accounts payable at less than sixty (60) days and the remainder of its trade accounts payable at less than ninety (90) days, provided that any trade account payable that is a matter contested in good faith, shall be excluded from such computation. Compliance shall be tested: quarterly based on Borrower's unaudited financial statements required pursuant to Section 5.9.2 annually based on Borrower's annual financial statements required pursuant to Section 5.9.2.

5.34 Development Milestones. Borrower shall complete each of the following "Development Milestones" to the reasonable satisfaction of Lender by the date shown below:

| **Date** | **Development Milestone** |
|---|---|
| **25-Aug-05** | Commence conversion of Priority Reservations to 10% deposits with signed residency agreements for the Independent Living Units. |
| **25-Dec-05** | Convey the Independent/Assisted Living/ Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Independent/Assisted Living Land Unit to Lender. Commence Construction of the Independent/Assisted Living Facility on the Independent/Assisted Living Land Unit comprising of assisted living and independent living units. |
| **25-Feb-06** | Convey the Island View Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Island View Land Unit to Lender. Commence Construction of the independent living cottages on the Island View Land Unit. |
| **25-Mar-06** | Convey the Guest House Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Guest House Land Unit to the Lender. Commence Construction of the Guest House consisting of eighteen (18) units on the Guest House Land Unit. |

| | |
|---|---|
| **25-Mar-06** | Have achieved a minimum of 50% presales for the sixty-seven (67) congregate independent living units with residency agreements signed and 10% deposits. |
| **25-Sept-06** | Convey the Meadow View Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Meadow View Land Unit to Lender. Commence Construction of the independent living cottages on the Meadow View Land Unit. |
| **25-Sept-06** | Convey the Assisted Living/Nursing Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Assisted Living/Nursing Land Unit to Lender. Commence Construction on the Assisted Living/Nursing Facility comprising of the nursing home/Alzheimer's/assisted living units on the Assisted Living/Nursing Land Unit. |
| **25-Oct-06** | Sign a lease for a minimum of 30,000 sq. ft. (approximately 50% of total gross rentable area) with an anchor tenant or tenants acceptable to Lender on terms outlined in the Development Plan. Convey the Commercial Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Commercial Land Unit to the Lender. Commence construction of the Medical Center on the Commercial Land Unit. |
| **25-Feb-07** | Convey the Spyglass Ridge Land Unit to the applicable AACA Subsidiary in accordance with Section 5.29 of the Loan Agreement and Section 5.34 of the Land Loan Agreement and pay the applicable Release Price for the Island View Land Unit to Lender. Commence Construction of the independent living cottages on the Spyglass Ridge Land Unit. |

5.35 Marketing Targets. Commencing with the month ending June 30, 2005 and each month thereafter, Borrower shall maintain an average number (calculated on a daily basis during such month) of Priority Reservations and Reserved Units (as hereinafter defined) for the independent living units located in the Congregate Facility at least equal to the following:

| Month Ending | Number of Priority Reservations | | Number of Reserved Units w/ 10% Dep. | |
|---|---|---|---|---|
| | (Cumulative Number) | (Percentage) | (Cumulative Number) | (Percentage) |
| June 30, 2005 | 30 | 45% | | |
| July 31, 2005 | 35 | 52% | | |
| August 31, 2005 | 40 | 60% | | |
| September 30, 2005 | 43 | 64% | 5 | 7% |
| October 31, 2005 | 46 | 69% | 10 | 15% |
| November 30, 2005 | 49 | 73% | 15 | 22% |
| December 31, 2005 | 52 | 78% | 20 | 30% |
| January 31, 2006 | 55 | 82% | 25 | 37% |
| February 28, 2006 | | | 30 | 45% |
| March 31, 2006 | | | 35 | 52% |
| July 31, 2006 | | | 50 | 75% |
| October 31, 2006 | | | 55 | 82% |
| December 31, 2006 | | | 60 | 90% |

"Priority Reservation" as used herein means an independent living unit at the Congregate Facility for which a prospective Resident has executed a Residency Agreement and has paid a refundable "priority reservation fee", which priority reservation fee shall be not less than $1,000; excluding, however, any independent living unit for which the prospective Resident has requested a refund of the priority reservation fee.

"Reserved Unit" as used herein means an independent living unit at the Project for which a prospective Resident has executed Residency Agreements and has paid at least 10% of the amount of the entrance fee as a deposit; excluding, however, any independent living unit for which the prospective Resident has requested a refund of the deposit.

5.36 Development of the Project.

(a) Borrower shall immediately commence the development and marketing of the Project in accordance with the Development Plan and the Marketing Plan, and thereafter prosecute the same with diligence and continuity to completion in compliance with all Laws. Notwithstanding the foregoing, prior to any development and/or marketing materials on the Project, including without limitation any offering documents and/or memoranda to

potential or prospective residents to be circulated by Borrower, Lender shall have the right to approve such materials in writing.

(b) Borrower shall cause all materials for the Project (i) to be purchased in a manner that will result in the ownership thereof vesting unconditionally in Borrower, free from all Liens, on delivery of such materials to the Property, (ii) to be stored at the Property or at such other place as Lender may reasonably approve, under adequate safeguards to minimize the possibility of loss, theft, damage or commingling with other materials or projects, (iii) to be covered by the lien and security interest of the Property and (iv) to be covered by the insurance policy required by Section 5.4.

5.37 Major Decisions. (a) FBC covenants and agrees that all "Major Decisions" (as defined in that certain Amended and Restated Operating Agreement for Freedom Bay Cottages, LLC) to be made by or on behalf of FBC, shall require the prior written approval of Lender, a copy of which Major Decisions (the "FBC Major Decisions") are attached hereto as Exhibit K and made a part hereof.

(b) AACA covenants and agrees that all "Major Decisions" (as defined in that certain Amended and Restated Operating Agreement for Adult Assisted Care Associates, LLC) to be made by or on behalf of AACA shall require the prior written approval of Lender, a copy of which Major Decisions (the "AACA Major Decisions") are attached hereto as Exhibit L and made a part hereof.

5.38 Residency Agreement. Borrower shall have provided the standard form of Residency Agreement for the Project to Lender for Lender's written approval.

5.39 Skilled Nursing Bed Agreement. Borrower shall have entered into an agreement or agreements (the "Skilled Nursing Beds Agreements") with third party providers to obtain not less than twenty-six (26) skilled nursing beds for the Project, which Skilled Nursing Beds Agreements shall have been approved by Lender in writing prior to execution by Borrower.

5.40 Survey/Legal Description. Borrower shall have provided for Lender's written approval an ALTA Land Survey with meters and bounds description certified by Fuss & O'Neill in recordable form indicating all the Master Units to be developed/created pursuant to the Condominium Declaration, including, without limitation, Guest House Land Unit, Beech Hill and the Orchards Land Unit or the Beech Hill Land Unit and the Orchards Land Unit, as applicable, Meadow View Land Unit, Spyglass Ridge Land Unit, Island View Land Unit, Independent/Assisted Living Unit, Commercial Land Unit, Assisted Living/Nursing Land Unit and the Land Trust Unit (the "Master Units Survey"). Upon approval by Lender and the Towns of Middletown and Portsmouth, such Master Units Survey shall be recorded on the land records in the Towns of Portsmouth and Middletown by Borrower.

5.41 Compliance With Anti-Terrorism Regulations.

(a) Borrower hereby covenants and agrees that neither Borrower nor any Principal, nor any persons or entities holding any legal or beneficial interest whatsoever in Borrower or (whether directly or indirectly), will knowingly conduct business with or engage in any transaction with any person or entity named on any of the OFAC Lists or any person or entity included in, owned by, controlled by, acting for or on behalf of, providing assistance, support, sponsorship, or services of any kind to, or otherwise associated with any of the persons or entities referred to or described in the OFAC Lists.

(b) Borrower hereby covenants and agrees that Borrower will comply at all times with the requirements of Executive Order 13224; the International Emergency Economic Powers Act, 50 U.S.C. Sections 1701-06; the United and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56; the Iraqi Sanctions Act, Pub. L. 101-513, 104 Stat. 2047-55; the United Nations Participation Act, 22 U.S.C. Section 287c; the Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. Section 219, 18 U.S.C. Section 2332d, and 18 U.S.C. Section 2339b); the International Security and Development Cooperation Act, 22 U.S.C. Section 2349 aa-9; the Terrorism Sanctions Regulations, 31 C.F.R. Part 595; the Terrorism List Governments Sanctions Regulations, 31 C.F.R. Part 596; and the Foreign Terrorist Organizations Sanctions Regulations, 31 C.F.R. Part 597 and any similar laws are regulation currently in force or hereafter enacted (collectively, the "Anti-Terrorism Regulations").

(c) Borrower hereby covenants and agrees that if the Borrower obtains actual knowledge or receives any written notice that Borrower, any Principal or the Property, or any person or entity holding any legal or beneficial interest whatsoever (whether directly or indirectly) in Borrower or in the Property, is named on any of the OFAC Lists (such occurrence, an "OFAC Violation"), Borrower will immediately (i) give written notice to Lender of such OFAC Violation, and (ii) comply with all Laws applicable to such OFAC Violation (regardless of whether the party included on any of the OFAC Lists is located within the jurisdiction of the United States of America), including, without limitation, the Anti-Terrorism Regulations, and Borrower hereby authorizes and consents to Lender's taking any and all steps Lender deems necessary, in its sole discretion, to comply with all Laws applicable to any such OFAC Violation, including, without limitation, the requirements of the Anti-Terrorism Regulations (including the "freezing" and/or "blocking" of assets).

(d) Upon Lender's request from time to time during the term of the Loan, Borrower agrees to deliver a certification confirming that the representations and warranties set forth in Section 4.42 above remain true and correct as of the date of such certificate and confirming Borrower's and any Principal's compliance with this Section 5.41.

5.42 Permits and Approvals. Borrower covenants and agrees that Borrower shall comply with and fulfill all of the conditions and obligations contained or

imposed by the Towns of Portsmouth, Middletown, the State of Rhode Island, other state, federal, county, municipal agencies and/or authorities having jurisdiction over the Property and the Project with respect to the proposed development, construction, management, use and operation of the Property and the Project, including, without limitation, the following zoning approvals, special use permits and other permits and approvals, copies of which are attached hereto as Exhibit M and made a part hereof and all such other permits and approvals and renewals, and extensions of the same (collectively, the "Permits and Approvals"):

(a) Town of Portsmouth Zoning Board Review Decision dated June 3, 2000 and recorded on June 16, 2000 in Book No. 641, Page 264, of the Portsmouth Land Evidence Records (the "Portsmouth Decision");

(b) Town of Middletown Zoning Board Review dated June 28, 2000 and recorded on June 28, 2000 in Book No. 546, Page 228 of the Middletown Land Evidence Records (the "Middletown Decision");

(c) Insignificant Alteration Permit dated June 7, 2000 issued by RIDEM Re: Application No. 99-0300 ("RIDEM Permit I"); and Revised Permit dated April 27, 2001 issued by the RIDEM Re: Application No. 99-0300 ("Revised RIDEM Permit I");

(d) Insignificant Alteration Permit dated September 11, 2001 issued by RIDEM Re: Application No. 01-0250 ("RIDEM Permit II");

(e) Physical Alteration Permit Application dated August 3, 2000 issued by the State of Rhode Island and Providence Plantations Department of Transportation ("RIDOT") to AACA;

(f) Letter issued by RIDEM dated September 9, 2003 Re: RIPDES Permit: RIR100372 to AACA;

(g) Draft Authorization to Discharge under the Rhode Island Pollutant Discharge Elimination System, Permit No. R10020346, draft issued by RIDEM to AACA ("Draft RIDEM Wastewater Discharge Permit"); and

(h) RIPDES General Stormwater Permit dated September 9, 2003.

In addition, Borrower covenants and agrees as follows:

(i) Borrower shall have recorded copies of RIDEM Permit I, Revised RIDEM Permit I and RIDEM Permit II on the land records in the Towns of Portsmouth and Middletown in accordance with such Permits and provided evidence of such recording to Lender in writing. Borrower shall have applied for a renewal of the RIDEM Permit I and Revised RIDEM Permit I from the RIDEM to extend the expiration date of the same beyond June 7, 2004 and

Borrower shall have obtained such renewal of the RIDEM Permit I and Revised RIDEM Permit I from RIDEM and recorded the same on the land records in the Towns of Portsmouth and Middletown [prior to June 7, 2004] and immediately provide a copy of such renewal and recordation to Lender upon receipt.

(j) Borrower shall have filed with the RIDEM a copy of the recorded Condominium Declaration as required by the Draft RIDEM Wastewater Discharge Permit. Borrower further covenants and agrees to file any amendments to the Condominium Declaration with the RIDEM in a timely fashion. Borrower shall provide evidence of such filings to Lender immediately upon filing.

(k) Borrower shall have secured a bond in the amount of $500,000, or such other amount as otherwise approved by RIDEM and Lender, and submited such bond to the RIDEM in accordance with Part I, A.6a. of the Draft RIDEM Wastewater Discharge Permit, and evidence of such bond submission shall be provided to Lender in writing simultaneously therewith.

(l) Borrower shall have satisfied any and all other requirements by the RIDEM and obtained the final RIDEM Wastewater Discharge Permit and the Order of Approval (the "Final RIDEM Wastewater Discharge Permit") from RIDEM, a copy of such Final RIDEM Wastewater Discharge Permit shall be immediately forwarded to Lender.

(m) Borrower covenants and agrees to establish a WWFT Compliance Account (as defined in the Draft RIDEM Wastewater Discharge Permit) in the amount of $500,000 in accordance with the Final RIDEM Wastewater Discharge Permit, as required by RIDEM and Lender. In addition, Borrower shall fund and maintain a separate WWFT Capital Fund Account in accordance with the Final RIDEM Wastewater Discharge Permit to fund operation and maintenance of the waste water facility as required by RIDEM and Lender. Borrower shall have entered into maintenance /operations agreement with a licensed sewage treatment plant operator approved by RIDEM for the wastewater disposal system in accordance with the Final RIDEM Wastewater Discharge Permit, as such maintenance /operations agreement shall be approved by RIDEM, Lender and the Towns of Portsmouth and Middletown, and Borrower shall file the same with the RIDEM and the Towns of Portsmouth and Middletown, and evidence of the same shall be immediately forwarded to Lender.

(n) As required by the Towns of Portsmouth and Middletown respectively, Borrower shall have submited an operations and maintenance plan for the drainage systems and detention basin with the Towns of Portsmouth and Middletown, which operations and maintenance plan shall be acceptable to Lender and the Towns of Portsmouth and Middletown and evidence of the same shall be immediately forwarded to Lender.

(o) As required by the Towns of Portsmouth and Middletown respectively, Borrower shall have submited the final design of the waste water treatment system with the Towns of Portsmouth and Middletown for their review and approval, which final design of the waste water treatment system shall be acceptable to Lender and the Towns of Portsmouth and Middletown and evidence of the same shall be immediately forwarded to Lender.

Borrower covenants and agrees to maintain all Permits and Approvals, including any renewal or extensions thereof, and to comply with all terms and conditions of the same in a timely fashion, including, without limitation, obtaining any renewals or extensions of such Permits and Approvals, as applicable.

5.43 Membership Documents. Borrower shall have entered into such documents and agreements approved by Lender in writing to create a membership club for the Project (the "Membership Club Documents") and provide for a 10% fee payable to such club upon the sale of Individual Units or Sub-Condominium Units by the AACA Subsidiaries to third parties in accordance with the Condominium Declaration.

5.44 UCC Policy. Within thirty (30) days of the Closing Date, Borrower shall furnish to Lender a UCC Title Insurance Policy acceptable to Lender, issued by Chicago Title Insurance Company to Lender, insuring the AACA Pledge Agreements, FB Pledge Agreements and the FBC Agreement as first priority valid liens upon one hundred percent (100%), in the aggregate, of the membership interests in each of AACA, FB and FBC.

5.45 Performance Guarantee. Borrower shall have filed with each of the Towns of Portsmouth and Middletown, respectively, a performance guarantee acceptable to each of the Towns of Portsmouth and Middletown and Lender, in accordance with each of the Portsmouth Decision and Middletown Decision respectively, and approved by Lender, from Applied Water Management, Inc., with evidence that AWM is licensed and approved by the Towns of Portsmouth and Middletown and the State of Rhode Island to construct and operate waster water treatment plants and approved in writing by Lender, which performance guarantee shall provide that all aspects of the waste water treatment system, including effluent and influent concentrations through each component, will be performed to standards of the industry and to RIDEM in accordance. A copy of the performance guarantee shall be immediately provided to Lender upon filing.

5.46 Amendments to Condominium Declaration. Notwithstanding anything to contrary contained herein, Borrower covenants and agrees that in the event Lender deems it necessary to amend the Condominium Declaration or the Sub-Condominium Declaration, as Lender shall determine in its reasonable discretion, AACA or FBC (as applicable) shall record an amendment to the Condominium Declaration or the Sub-Condominium Declaration (as applicable) (along with any Plats and Plans, if applicable) in the land records of the Towns of Portsmouth and Middletown, respectively, in accordance with Lender's written request, within ten (10) days of receipt of such

written request from Lender; provided such amendment shall have been approved by Lender in writing prior to recordation.

5.47 Intentionally Omitted.

5.48 Construction Documents and Reports. Borrower covenants and agrees to immediately provide the following documents, agreements, plans and schedules to Lender, which documents, agreements, plans and schedules shall be the form and substance acceptable to and approved by Lender, as and when such documents, agreements, plans and schedules are available or have been entered into by Borrower: the actual, the Construction Schedule, plans and specifications for construction of the Improvements, a budget for construction of the Improvements, actual or anticipated performance against construction budgets, and any Construction Documents.

5.49 Waster Water Treatment Facility. Borrower covenants and agrees that, Borrower shall have furnished the following items to Lender with respect to the construction, operation, use and maintenance of the waste water treatment facility (the "WWTF") to be constructed and operated on the Property in accordance with the Final RIDEM Wastewater Discharge Permit: (i) plans and specifications for the construction of the WWTF prepared by AWM approved by all applicable state, federal, local, county governmental or quasi- governmental authorities and agencies including, without limitation the Planning and/or Zoning Departments of each of the Towns of Portsmouth and Middletown and the RIDEM, (ii) a detailed budget for construction of the WWTF approved by Lender (iii) actual or anticipated performance against construction budget for the construction of the WWTF approved by Lender, (iv) completion schedule for the completion of construction of the WWTF approved by Lender (v) a construction agreement between AACA and AWM or such other contractor approved by Lender and RIDEM, if applicable, for the construction of the WWTF, (v) architect's and engineer's contracts for performance of work in connection with the WWTF approved by Lender and other documents, (vi) reports used in preparation for or in the actual construction of the WWTF, and (vii) any additional items as may be required or requested by Lender with respect to the WWTF.

5.50 Agreements. Borrower covenants and agrees as follows:

(a) AACA and Operator shall have executed a Management Agreement, which Management Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Management Agreement to Lender, and (ii) Operator and AACA shall have executed and delivered to Lender the Subordination of Management Agreement in substantially the form attached hereto as Exhibit P-1.

(b) AACA and the Marketing Agents shall have executed a Marketing Agreement, which Marketing Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Marketing Agreement to Lender, and (ii) Marketing Agents and AACA shall have executed and delivered to Lender the

Subordination of Marketing Agreement in substantially the form attached hereto as Exhibit P-2.

(c) AACA and Developer shall have executed a Development Agreement, which Development Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Development Agreement to Lender, and (ii) Developer and AACA shall have executed and delivered to Lender the Subordination of Development Agreement in substantially the form attached hereto as Exhibit P-3.

(d) AACA and Contractor shall have executed a Construction Agreement, which Construction Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Construction Agreement to Lender, and (ii) Contractor and AACA shall have executed and AACA shall have delivered to Lender the Contractor's Agreement, Subordination and Consent to Assignment in substantially the form attached hereto as Exhibit P-4.

(e) AACA and Engineer shall have executed an Engineering Agreement, which Engineering Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Engineering Agreement to Lender, and (ii) Engineer and AACA shall have executed and delivered to Lender the Engineer's Agreement to Complete in substantially the form attached hereto as Exhibit P-5.

(f) ACA and Architect shall have executed an Architect's Agreement, which Architect's Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Architect's Agreement to Lender, and (ii) Architect and AACA shall have executed and delivered to Lender the Architect's Agreement to Complete in substantially the form attached hereto as Exhibit P-6.

(g) AACA and Construction Manager shall have executed a Construction Management Agreement, which Construction Management Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall have delivered a copy of such executed Construction Management Agreement to Lender, and (ii) Construction Manager and AACA shall have executed and delivered to Lender the Construction Manager's Agreement to Complete in substantially the form attached hereto as Exhibit P-7.

(h) In the event Lender determines it is necessary for AACA to enter into an agreement with Contractor and Construction Manager collectively, at Lender's request, (i) AACA, Contractor and Construction Manager shall execute a Construction and Management Agreement, which Construction and Management Agreement shall be in form and substance acceptable to and approved by Lender, and AACA shall deliver a copy of such

executed Construction and Management Agreement to Lender, and (ii) Contractor, Construction Manager and AACA shall execute and deliver to Lender the Subordination of Construction and Management Agreement and in substantially the form attached hereto as Exhibit P-8.

5.51 Assignment of Construction Documents. AACA shall have executed and delivered to Lender an Assignment of Construction Documents approved by Lender, which Assignment of Construction Documents shall be in substantially the form attached hereto as Exhibit R and made a part hereof.

5.52 Post Closing Loan Documents. Borrower covenants and agrees to deliver executed originals of those certain Loan Documents listed on Exhibit N attached hereto and made a part hereof to Lender within thirty (30) days of the Closing Date, as such Loan Documents shall have been approved in writing by Lender.

5.53 Approvals. Prior to entering into any contract for the performance of any work or the supplying of any labor, materials, or services for the design or construction of any Improvements pertaining to the Project, including, without limitation, any Construction Contracts, which will incur an obligation in excess of Twenty-Five Thousand Dollars ($25,000.00) or which have a term exceeding thirty (30) days which is not cancelable on thirty (30) days notice without cause and without payments of a fee or penalty, Borrower shall obtain the prior written approval of Lender of any and all architects, engineers, and general contractors who are to be engaged to perform work at the Project and the form of any contract or agreement for work to be performed at the Project, which form of contract or agreement shall be in form and substance acceptable to Lender, and provided further that all construction contracts shall be guaranteed maximum price contracts, in form and substance acceptable to Lender. Lender's approval of such Persons and construction contracts shall be subject to Lender's receipt of an "Agreement to Complete" executed by such Person in substantially the form attached hereto as Exhibit E-1 or E-2 , as applicable (an "Agreement to Complete").

## Article 6.
## Negative Covenants

6.1 No Amendments. Borrower shall not:

(a) amend or modify any Management and Operating Agreement, the Management Agreement, the Marketing Agreement, Engineering Agreement, the Construction Agreement, Construction Management Agreement, Construction and Management Agreement, if applicable, Architect's Agreement or the Development Agreement without Lender's written consent;

(b) materially amend or modify Lender's approved form of Residency Agreement for the Project without Lender's written consent, except as may be required by governmental entities; provided, however, Borrower shall provide Lender written notice and copies of such amendments or

modifications to the form of Residency Agreement required by such governmental entities within ten (10) days of modification or amendment thereof;

(c) amend or modify the Pre-Construction Budget, Operating Budget or the Construction Budget without Lender's written consent;

(d) make or enter into any changes to the terms of the Existing Loan Documents without Lender's prior consent;

(e) amend or modify a Construction Document without Lender's written consent;

(f) suffer or permit the amendment or modification of Borrower's Operating Agreement without Lender's written consent;

(g) amend the Plans and Specifications or the Land Unit Dimension Plans other than as provided for in this Agreement;

(h) assign or transfer any of the approvals, permits, licenses, contracts and rights pertaining to any development of the Project (including the Improvements);

(i) amend the Marketing Plan and/or the Development Plan without Lender's prior written consent;

(j) amend the Condominium Declaration,the Sub-Condominium Declaration, Plats and Plans and/or By-Laws without Lender's prior written consent;

(k) amend the Membership Club Documents;

(l) agree or consent to the delegation of any of the duties and/or obligations of the Operator, Marketing Agent, Developer, Contractor, Engineer, Architect or Construction Manager, as applicable, under the applicable agreements to or subcontract with any third parties, affiliated or otherwise, by the Operator, Marketing Agent, Developer, Contractor, Engineer, Architect, or Construction Manager, as applicable, or assignment of any such agreement, without Lender's prior written consent.

6.2 Leases. Borrower shall not without Lender's prior written consent enter into any lease or other rental or occupancy arrangement or concession agreement with respect to the Project unless such lease or other arrangement is on a form previously approved by Lender.

6.3 Transfers.

6.3.1 Lender Consent Required. Notwithstanding any provision of this Agreement to the contrary and subject to the provisions of Section 6.3.2,

there shall be no Transfer of a direct or indirect interest in the Property, except for Transfers of interests in the Property permitted by Section 5.2 or Section 6.2 hereof, without the prior consent of Lender, which consent may be withheld in Lender's sole and absolute discretion, and there shall be no Transfer of a direct or indirect interest in Borrower, except for Transfers of direct and indirect interest in Borrower permitted by Section 6.3.3, without the prior consent of Lender, which consent shall not be unreasonably withheld or delayed unless such Transfer results in (a) a Change in Control, (b) the Borrower of a Single Purpose Entity, ceasing to be a Single Purpose Entity or (c) a dissolution or termination of a Borrower, in which case Lender's consent may be granted or denied in Lender's sole and absolute discretion.

6.3.2 Consent Procedure. No Transfer otherwise permitted under this Section 6.3 shall occur unless Borrower shall have given Lender not less than ten (10) Business Days prior notice of the intended Transfer together with a certificate of an authorized officer of the Borrower stating (a) the identity of the proposed transferee together with financial information necessary to enable Lender to underwrite such transferee's credit, (b) the material business terms of the Transfer, and (c) that the proposed transaction is a bona fide Transfer solely for cash or equivalent consideration, as specified. Lender reserves the right to condition any consent required pursuant to this Section 6.3 with respect to a Transfer upon (1) the absence of an Event of Default, (2) Lender's approval of the financial condition, credit history, managerial capabilities and ownership structure of the proposed transferee, including requiring that the transferee be a Single Purpose Entity, (3) the payment of all expenses (including, without limitation, reasonable attorney's fees and disbursements and actual fees incurred for any rating agency approvals) incurred by Lender in connection with the review, approval and documentation of any Transfer, (4) if the Transfer shall result in a Change in Control or a Transfer of title to the Property, execution of an assumption agreement by the proposed transferee, in form and content acceptable to Lender, (5) if required by Lender, receipt of an opinion of counsel reasonably satisfactory to Lender stating that the proposed Transfer would have no effect on the enforceability or priority of any of the Loan Documents, would not result in the substantive consolidation by a bankruptcy court of the assets and liabilities of the transferee with the assets and liabilities of the Borrower and such other entities as Lender may specify, and would not result in the dissolution or termination of Borrower or any Constituent Partner of Borrower, (6) if applicable, the approval by any applicable rating agencies of the qualifications of the proposed transferee and (7) such other conditions as Lender shall reasonably require. In no event shall any Transfer otherwise permitted under this Section occur if such Transfer is required to be registered under the Securities Act of 1933, as amended, or offered pursuant to Rule 144A under such Act, or registered under any state securities or "Blue Sky" laws.

6.3.3 Certain Permitted Transfers. Notwithstanding any other provision of this Section 6.3 to the contrary, Transfers of partnership interests, membership interests or corporate shares in members of Principals or in any Constituent Partner thereof between or among partners, members or shareholders of Principals or any Constituent Partner thereof existing as such on the date hereof, or Transfers of such interests to immediate family members of existing partners, members or shareholders or to trusts for estate planning purposes for the benefit of existing partners, members or

shareholders or members of the transferor's immediate family shall be permitted without Lender's consent; provided, however, that (a) no such Transfer shall cause Borrower to cease to be a Single Purpose Entity, (b) no such Transfer shall result in a Change of Control of Borrower (it being agreed that any Change of Control shall be subject to Lender's consent pursuant to Section 6.3.1) and (c) notice of such Transfer describing the material terms thereof shall be delivered to Lender at least ten (10) business days in advance of such Transfer; provided further, however, under no circumstance may a Principal, FB, or AACA Member Transfer any applicable FB Equity Interests or AACA Equity Interests in AACA or FB, applicable or any rights ancillary thereto without the prior written consent of Lender, which may be withheld in Lender's sole and absolute discretion.

6.4 No Additional Liens, Encumbrances or Debt. Borrower covenants not to grant or permit the filing of any lien or encumbrance on the Collateral, other than those created by the Existing Loan Documents or those referenced in Section 3.7 herein, without the prior written consent of Lender; provided, however, that Borrower may, by appropriate proceedings, contest the validity or amount of any asserted lien and, pending such contest, Borrower shall not be deemed to be in default hereunder if (a) Borrower has given prior written notice to Lender of Borrower's intent to so contest, (b) such contest stays the enforcement of the contested lien, and (c) within thirty (30) days of attachment, the contested lien is bonded or insured over by the title insurance company or Borrower has posted security therefor in accordance with the provisions of the Existing Loan Documents and in a manner acceptable to Lender.

6.5 No Additional Debt. Borrower shall not, without Lender's prior written consent, incur additional indebtedness, except for trade payables in the ordinary course of business.

6.6 Personal Property. Neither Borrower nor Principals shall, without the prior written consent of Lender, sell, assign, transfer, remove or permit to be removed from the Project any personal property owned by Borrower or Operator, to extent within Borrower's control, now or at any time located at or used in connection with the construction, operation, repair or replacement of the Project ("Personal Property"). So long as no Event of Default exists, Borrower may sell or otherwise dispose of the Personal Property when obsolete, worn out, inadequate, unserviceable or unnecessary for use in the operation of the Project, but only upon replacing the same with other Personal Property at least equal in value and utility to the disposed Personal Property (except to the extent such personal property is obsolete or otherwise no longer necessary for the proper operation of all or any portion of the Project and is removed in connection with a renovation or alteration as permitted under the Existing Loan).

6.7 Conversion. Borrower shall not, and shall not permit, the Project or any portion thereof to be converted or take any preliminary actions, which could lead to a conversion to condominium or cooperative form of ownership.

6.8 Use of Property; Improvements. Borrower shall not permit changes in the plat of subdivision, zoning classification or use of any part of the Project without Lender's written consent.

6.9 Single Purpose Entity. Borrower shall not:

(a) engage in any business or activity other than the ownership, leasing, construction of the Improvements and maintenance of the Project and activities incidental thereto;

(b) acquire or own any material assets other than as described in Section 6.9(a) above;

(c) merge into or consolidate with any Person or dissolve, terminate or liquidate in whole or in part;

(d) except as expressly permitted by this Agreement, Transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(e) fail to observe its organizational formalities or preserve its existence as an entity duly formed or organized (as applicable), validly existing and in good standing (if applicable) under the laws of the jurisdiction of its organization or formation, and qualification to do business in the state where the Property is located, if applicable, or without the prior written consent of Lender, amend, modify, terminate or fail to comply with the provisions of its organizational documents;

(f) own any subsidiary or make any investment in, any Person without the prior written consent of Lender;

(g) commingle its assets with the assets of any of its Constituent Partners, affiliates, or of any other Person, participate in a cash management system with any other Person or fail to use its own separate stationary, invoices and checks;

(h) except as expressly permitted by this Agreement, incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation);

(i) become insolvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due;

(j) fail to maintain its records, books of account and bank accounts separate and apart from those of its Constituent Partners and Affiliates, the Affiliates of its Constituent Partners and any other Person;

(k) enter into any contract or agreement with any Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arms-length basis with third parties other than any of the foregoing; provided, however, Lender shall approve the terms of the Development Agreement, the Construction Agreement and the Marketing Agreement in accordance with Section 5.50 hereof;

(l) seek to dissolve, liquidate or wind up in whole, or in part;

(m) fail to correct any known misunderstandings regarding its separate identity;

(n) except as expressly permitted by this Agreement, guarantee or become obligated for the debts of any other entity or person or hold itself out to be responsible for the debts of another person;

(o) except as expressly permitted by this Agreement, make any loans or advances to any third party, including any Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner, or acquire obligations or securities of any of the foregoing;

(p) fail to file its own tax returns;

(q) fail either to hold itself out to the public as a legal entity separate and distinct from any other entity or person or to conduct its business solely in its own name in order not (i) to mislead others as to the identity with which such other party is transacting business, or (ii) to suggest that Borrower is responsible for the debts of any third party (including any Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner);

(r) fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(s) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, or make an assignment for the benefit of creditors;

(t) share any common logo with or hold itself out as or be considered as a department or division of (i) any Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner or (ii) any other person or entity;

(u) fail to allocate fairly and reasonably any overhead expenses that are shared with an Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner Affiliate, including paying for office space and services performed by any employee of an Affiliate of Borrower or any Constituent Partner or any Affiliate, member, partner or principal of a Constituent Partner;

(v) except as expressly permitted by this Agreement, pledge its assets for the benefit of any other Person;

(w) fail to maintain a sufficient number of employees or independent contractors in light of its contemplated business operations or otherwise fail to do all things necessary to preserve its existence as a Single Purpose Entity;

(x) amend, modify or otherwise change its organizational documents in a manner which adversely affects Borrower's existence as a Single Purpose Entity;

(y) change its principal place of business set forth in Section 4.1 without delivering Lender at least thirty (30) days prior written notice; or

(z) permit any indebtedness other than the Existing Loan to be secured (senior, subordinate or pari passu) by the Project.

6.10 Operator/Developer/Construction Manager/Property Manager. In addition to the restrictions set forth in Section 6.1 regarding the Management and Operating Agreement, the Management Agreement, the Marketing Agreement and the Development Agreement, Borrower shall not change the Operator, Developer, Marketing Agent, Construction Manager, Contractor or any property manager or leasing agent or any subcontractors, consultants, or Persons providing any services to the Project, or terminate or, except as permitted by this Agreement, amend any Construction Contract, management contract or the leasing agency agreement for the Project without Lender's prior written consent; provided, however, Borrower may terminate any non-affiliated Persons or third parties for cause if a replacement Person or third party, approved by Lender, in its sole discretion, is available and willing to commence the provision of the applicable services.

6.11 [Intentionally Omitted]

6.12 [Intentionally Omitted]

6.13 No Commingling Funds. Neither Borrower nor Principals shall commingle funds related to the Project with funds from any other property.

6.14 Prior Approval of Contracts. Except as otherwise permitted by this Agreement, without Lender's prior written approval as to parties, terms, and all other

matters, Borrower shall not (i) enter into any management, leasing, sales, marketing, operating and/or maintenance contract pertaining to the Project, (ii) agree/consent to the subcontracting of, assignment or delegation any management, leasing, sales, marketing, operating and/or maintenance obligations/duties pertaining to the Project, including, without limitation, the delegation, assignment, and/ or subcontracting of the duties and obligations of Developer, Operator, Marketing Agents, Construction Manager, Contractor, Engineer, and/or Architect, or (iii) enter into any contract for the performance of any work or the supplying of any labor, materials, or services for the design or construction of any Improvements pertaining to the Project, including, without limitation, any Construction Contracts, which will incur an obligation in excess of Twenty-Five Thousand Dollars ($25,000.00) or which has a term exceeding thirty (30) days which is not cancelable on thirty (30) days notice without cause and without payments of a fee or penalty.

6.15 Payment of Withholding Taxes. To the extent failure to do so could cause a lien to be imposed on any Collateral, Borrower shall not use any portion of the proceeds of the Loan to pay the wages of employees unless a portion of such proceeds or other funds are also used to make timely payment to or deposit with the United States of all amounts of tax required to be deducted and withheld with respect to such wages under the Internal Revenue Code and all other applicable federal Laws, to make timely payment to or deposit with any local and/or state governmental authority having jurisdiction all amounts of tax and unemployment insurance required to be deducted and withheld with respect to such wages under any applicable local and/or state Laws and to make timely payments of all amounts required to be deducted or withheld under applicable labor agreements. "Laws" means all laws (including common law), statutes, rules, regulations, ordinances, and other pronouncements having the effect of law, and all policies and directives of any governmental authority.

6.16 [Intentionally Omitted]

6.17 No Distributions. Borrower shall not cause or allow: (a) any dividends or other distributions or other payments to be made to or for the benefit of Principals, FB or AACA Members in respect of FB Equity Interests, or AACA Equity Interests, as applicable or any other equity or membership interests in Borrower, other than distributions of the applicable Tax Amounts (as defined in the Operating Agreement) to the applicable members of the Borrower in accordance with the applicable Operating Agreements, (b) the redemption or acquisition of the Equity Interests or any other equity or membership interests in Borrower or the issuance of warrants, rights or other options to purchase such equity or membership interests or other interests or distributions of the proceeds of the issuance of membership or equity interests in Borrower or of capital contributions made in respect thereof, (c) payments to be made to, or for the benefit of, Principals from monies of, or payable to, Borrower, or (d) transfers of property of Borrower to, or for the benefit of, Principals to be made unless and until the Debt has been paid in full.

6.18 No Unauthorized Operating Expenditures. Except as provided for in the most recent Operating Budget approved by Lender or the Pre-Construction Budget,

Borrower shall not incur any cost or expense in connection with the maintenance and operation of the Project without Lender's consent

6.19 No Unauthorized Capital Expenditures. Except as provided for in the Pre-Construction Budget, the Construction Budget as the same may be modified by Change Orders approved by Lender or otherwise expressly authorized by this Agreement, Borrower shall not incur any costs or expenses in connection with the construction of the Improvements without Lender's consent.

## Article 7.
## Events of Default; Acceleration of Debt

7.1 Events of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default" under this Agreement:

(a) Failure of Borrower to pay principal or interest on the Loan within one(1) day of the date due or failure to pay any other amount due under the Note within five (5) days of receipt of written demand therefor;

(b) Failure of Borrower strictly to comply with Sections 4.39 (Single Purpose Entity), 5.4 (insurance), 5.7 (inspection), 5.16 (Deposit Account), 5.29 (Release of Collateral), 5.33 (Trade Payables), 5.37 (Major Decisions), 5.38 (Residency Agreement), 5.40 (Survey), 5.41 (OFAC), 5.42 (Permits and Approvals), 5.43 (Membership Documents), 5.44 (UCC 9 Policy), 5.46 (Amendments to Condominium) 5.47 (Sales Proceeds Reserve), 5.49 (Waster Water), 5.50 (Agreements), 5.51 (Assignment of Construction Documents), 5.52 (Post Closing Loan Documents), 6.1 (no amendments), 6.3 (restrictions on transfers), 6.4 (no additional liens), 6.9 (SPE), and 6.17 (no distributions) of this Agreement;

(c) Breach of any representation or warranty made or given by Borrower, Principals or any principal, agent, representative, Affiliate, member, partner, indemnitor or guarantor of Borrower or Principals (the "Borrower Group") to Lender which proves to have been false or misleading in any material respect as of the date of this Agreement.

(d) A petition under any Chapter of Title 11 of the United States Code or any similar law or regulation is filed by or against Borrower, Operator or Principals (and in the case of an involuntary petition in bankruptcy, such petition is not discharged within sixty (60) days of its filing), or a custodian, receiver or trustee for any of the Project is appointed, or Borrower, Operator or Principals makes an assignment for the benefit of creditors, or any of them are adjudged insolvent by any state or federal court of competent jurisdiction, or any of them admit their insolvency or inability to pay their debts as they become due or an attachment or execution is levied against any of the Project;

(e) The occurrence of a default by any member of the Borrower Group under any Existing Loan Document or any Loan Document and, if such default is susceptible of cure, the expiration of any cure period applicable thereto under any such Loan Document;

(f) Borrower shall default in the payment of any indebtedness permitted hereunder (other than the Debt) and such default is declared and is not cured within the time, if any, specified therefor in any agreement governing the same;

(g) Any statement, report or certificate made or delivered to Lender by Borrower or Principals is not materially true and complete as of the date thereof;

(h) Any of the Health Care and Operating Licenses ceases to be in full force and effect, is modified, revoked, suspended, terminated or expires;

(i) If any event or omission shall occur which, with the giving of notice or the passage or time, or both, would constitute a default under any Management and Operating Agreement or the Marketing Agreement or the Development Agreement that could permit any party thereto validly to terminate any such agreement, or if any such agreement otherwise terminates for any reason whatsoever or is amended without the written consent of Lender to the extent consent is required;

(j) In the event Borrower and/or Principals shall fail, within ten (10) business days following a written request therefor from Lender, to contribute such amount as may be necessary to fund any shortfall in the Pre-Construction Budget or the Reserve;

(k) Any materially adverse and uncured change in the anticipated cost of constructing the Improvements, unless (i) such change is otherwise permitted herein and (ii) such costs are funded by Borrower to Lender's satisfaction, which is not cured within ten (10) days of receipt of notice from Lender to Borrower;

(l) Commence Construction without (i) notice to Lender of same and, if required by the Loan Documents, approval from Lender for such commencement of construction, (ii) execution of Construction Documents with respect thereto in accordance with the requirements of this Agreement, and (iv) delivery to Lender of copies of such Construction Documents and a written description of the Improvements to which commencement of construction relates;

(m) Failure of Borrower to pay any portion of the Debt within five (5) days following the due date, unless a Loan Document expressly provides for a different Loan payment period;

(n) The construction of any phase of the Improvements or any materials incorporated therein, fails to substantially comply with the Plans and Specifications, the Loan Documents, or any governmental requirements, which failure is not cured or waived within thirty (30) days after notice thereof to Borrower by Lender;

(o) Construction of any phase of the Improvements is abandoned or Lender determines that it is reasonably foreseeable that construction of the Improvements in accordance with this Agreement will not be completed on or before the applicable completion date for such phase, or Borrower fail to complete construction of any phase of the Improvements (and obtain all applicable licenses) in accordance with this Agreement on or before the applicable completion date;

(p) Any required license with respect to the Project or Operator lapses or ceases to be in full force and effect and Borrower do not reinstate, or cause the reinstatement of, any such license within twenty (20) days of such lapse;

(q) Borrower, or any Affiliate thereof either is enjoined or prohibited from performing any of their respective material obligations under or with respect to the Loan Documents, the Existing Loan Documents, any Management and Operating Agreement, any Residency Agreement, any Health Care and Operating Agreement, the Management Agreement, the Marketing Agreement, the Development Agreement, the Construction Management Agreement, the Construction Agreement, the Construction and Management Agreement, if applicable, the Architect's Agreement, the Engineering Agreement or any other Construction Document or any agreement with any governmental agency;

(r) if (i) a judgment (or judgments) is entered against Borrower Party, or if there is a levy upon any ownership interest in Borrower or Principals or their Affiliates for an amount in excess of $250,000.00 in the aggregate, and such judgment or levy is not discharged, released, bonded or otherwise satisfied within sixty (60) days after entry; provided however, the Borrower Party may timely appeal same provided (A) to the extent required by law, an appeal bond in all respects satisfactory to Lender has been filed, and (B) the appeal is in good faith, is diligently pursued, said appeal is permitted by law, the appeal has the effect of staying any type of action on such judgment or lien, in addition to an appeal bond required by law, if any, the Borrower Party posts any other security required by law, which other security shall be reasonably satisfactory to Lender, and the appeal does not subject Lender or the Project to any civil or criminal penalties; or (ii) a lien for the performance of work, the supply of materials or otherwise, be filed against the Project. Borrower shall have the right to contest any such claim of construction lien provided that (1) Borrower notifies Lender of such claim within five (5) Business Days of obtaining knowledge thereof, (2) during such contest the Property is not the subject of any

writ, levy, execution or sequestration, (3) such contest is pursued diligently and in good faith, (4) such contest is permitted by law and does not subject the Lender or the Property to any civil or criminal penalties, (5) within forty-five (45) days after the filing of a construction lien, Borrower shall cause such lien to be discharged, released of record, insured over or, in lieu thereof, Borrower shall furnish, or cause to be furnished to Lender, a bond in form and substance and with a surety reasonably satisfactory to Lender and otherwise in accordance with applicable Laws, indemnifying Lender against any liability, laws, costs or expense on account of any lien, such bond to be in the amount of the claim, plus a reasonable additional sum to pay all costs, interest and penalties that may be imposed or incurred in connection therewith; and (6) the contests, procedures, indemnities and other actions of the Borrower contained in this subsection are in continuous compliance with the provisions of the Loan Documents and the Existing Loan Documents;

(s) the consummation by Borrower of any transaction which would cause an OFAC Violation; (ii) the failure of any representation in Section 4.42 to be true and correct in all respects as of the date thereof; or (iii) the failure of Borrower to comply in all material respects with the provisions of Section 5.41; or

(t) Breach of or failure to perform or comply with Sections 5.30 (Pre-Construction Budget), 5.31 (Development Plan) and/or 5.32 (Marketing Plan) of this Agreement, which is not cured within fifteen (15) days of receipt of notice from Lender to Borrower;

(u) Breach of or failure to perform or comply with any provision contained in this Agreement or any Loan Document, any covenant, representation or warranty contained in this Loan Agreement or any Loan Document other than as set forth in subsections (a), through (t) above, which is not cured within thirty (30) days of receipt of notice from Lender to Borrower;

7.2 Acceleration; Remedies. Upon the occurrence of an Event of Default at the option of Lender, the Debt shall become immediately due and payable without notice to Borrower and Lender shall be entitled to all of the rights and remedies provided in the Loan Documents or at law or in equity. Each remedy provided in the Loan Documents is distinct and cumulative to all other rights or remedies under the Loan Documents or afforded by law or equity, and may be exercised concurrently, independently, or successively, in any order whatsoever.

## Article 8.
## Miscellaneous

8.1 Borrower and Lien Not Released. Without affecting the liability of Borrower, Principals or any other Person liable for the payment of the Debt, and without affecting Lender's rights under this Agreement, Lender may, from time to time and without notice to any lien holder or holder of any other right or other interest in and to the

Project: (a) release any person so liable; (b) waive or modify any provision of this Agreement or the other Loan Documents or grant other indulgences; (c) release all or any part of the Project; (d) take additional security for any obligation herein mentioned; (e) subordinate its rights under any of the Loan Documents; (f) consent to the granting of any easement; or (g) consent to any map or plan of the Project.

8.2 Lender's Consultation Rights. Lender shall have the right from time to time (a) to consult with Borrower, and/or Principals regarding the business operation of the Project, and the financial and other condition of Borrower, the Operator, Principals or the Project, (b) to discuss with such entities any significant business issues involved in negotiating a plan of reorganization for Borrower or Principals including their proposed reorganization plans and operating plans for proceeding following such plan of reorganization coming into effect, and (c) to request such forecasts, projections and other financial and business data as Lender may deem reasonably appropriate.

8.3 Expenses. Borrower shall pay all Expenses incurred by Lender in connection with the negotiation, documentation, closing, modification, requests for consents, approvals and waivers, workout, collection or enforcement of the Loan or any of the Loan Documents (as applicable) and all such Expenses shall be included as additional Debt bearing interest at the Default Rate set forth in the Note until paid. For the purposes hereof "Expenses" means all reasonable costs and expenses which may be paid or incurred by or on behalf of Lender including repair costs, payments to remove or protect against liens, attorneys' fees (including fees of Lender's inside counsel), receivers' fees, appraisers' fees, engineers' fees, accountants' fees, independent consultants' fees (including, without limitation, any fees to consultants hired by Lender in connection with exercising their approvals or consents to "Major Decisions", and/or fees to environmental consultants), all costs and expenses incurred in connection with any of the foregoing, all costs and expenses of Lender (including reasonable fees and out-of-pocket expenses for counsel or other consultants) in connection with the release of any Master Units pursuant to Section 5.29 of this Agreement, out-of-pocket costs and expenses related to any audit or inspection of the Property, outlays for documentary and expert evidence, stenographers' charges, stamp taxes, publication costs, and costs (which may be estimates as to items to be expended after entry of an order or judgment) for procuring all such abstracts of title, title searches and examination, title insurance policies, and similar data and assurances with respect to title as Lender may deem reasonably necessary either to prosecute any action under which Lender is the prevailing party or such litigation, defense or proceeding is compromised, settled or withdrawn prior to the completion of such litigation, defense or proceeding, or to evidence to bidders at any sale of all or any portion of the Project or the Equity Interests the true condition of the title to, or the value of, the Project; provided, however, should any legal action or proceeding be commenced by Lender against Borrower or by Borrower against Lender and a Borrower is the prevailing party in such action or proceeding in a final, non-appealable judgment, Lender shall not be entitled to recover from Borrower legal fees incurred with respect to such action or proceeding.

8.4 Disclosure of Information. Lender shall have the right (but shall be under no obligation) to make available to any party for the purpose of granting

participations in or selling, transferring, assigning or conveying all or any part of the Loan (including any governmental agency or authority and any prospective bidder at any sale of the Equity Interests of Borrower) any and all information which Lender may have with respect to the Project and Borrower, whether provided by Borrower, Principals or any third party or obtained as a result of any environmental assessments. Borrower and Principals agree that Lender shall have no liability whatsoever as a result of delivering any such information to any third party, and Borrower and Principal, on behalf of themselves and their successors and assigns, hereby release and discharge Lender from any and all liability, claims, damages, or causes of action, arising out of, connected with or incidental to the delivery of any such information to any third party.

8.5 Sale of Loan. Lender may, without notice to anyone, sell or assign the Loan Document Obligations, the Note or Loan Documents or any part thereof or any interest therein, or grant participations therein and Borrower agrees that any such successors or assigns shall have all rights of Lender hereunder, provided, however, Lender shall have an unimpaired right, prior and superior to that of any such assignee or holder, to enforce the rights transferred to such assignee or holder for the benefit of Lender and such assignee or holder; provided further, however, if Lender shall consist of more than one Person, the holder(s) of a majority in interest of the Loan shall have the sole right to enforce, compromise, waive, settle, release or otherwise act or refrain from acting as such majority interest holder(s) shall determine, in the sole and absolute discretion of such majority interest holder(s). As of the date hereof, SIMS Freedom Bay, LLC is the owner and holder of a majority in interest of the Loan. Lender shall provide notice to Borrower of the name of any successor holder(s) of a majority in interest of the Loan if such Person is no longer SIMS Freedom Bay, LLC, which notice Lender shall endeavor in good faith to deliver within thirty (30) days after the consummation of any such transfer.

8.6 Indemnity. Borrower shall indemnify, protect, hold harmless and defend Lender, its successors, assigns, shareholders, directors, officers, employees, and agents, and Borrower agrees that all such successors and assigns shall have all rights and benefits of Lender as if a direct party hereto, from and against any and all loss, damage, cost, expense (including attorneys' fees), and claims arising out of or in connection with (a) the Project, (b) the Collateral, (c) any act or omission of Borrower, Principals, or their respective employees or agents, whether actual or alleged, and (d) any and all brokers' commissions or other costs of similar type by any party in connection with the Loan, in each case except to the extent arising from the indemnitee's gross negligence or willful misconduct. Upon written request by an indemnitee, Borrower will undertake, at its own costs and expense, on behalf of such indemnitee, using counsel satisfactory to the indemnitee, the defense of any legal action or proceeding whether or not such indemnitee shall be a party and for which such indemnitee is entitled to be indemnified pursuant to this section.

8.7 Document Protocols. This Agreement and all of the other Loan Documents shall be subject to the Document Protocols attached hereto as Schedule I and made a part hereof.

8.8 Joint and Several Obligations. All of the covenant, obligations, agreements, indemnities, representations and warranties of Borrower contained herein shall be joint and several.

8.9 Power of Attorney. Lender is hereby appointed by the Borrower, as its true and lawful agent and attorney-in-fact, and in such capacity Lender shall have the right, with power of substitution for Borrower and in Borrower's name or otherwise, for the use and benefit of Lender, upon the occurrence and during the continuance of an Event of Default, (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment representing any interest or other distribution payable in respect of the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (d) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (e) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though Lender were the absolute owner of the Collateral for all purposes; and (f) to execute such documents and instruments on behalf of Borrower and to deliver the foregoing documents and instruments to the purchaser at any foreclosure sale of the Collateral; provided, however, that nothing herein contained shall be construed as requiring or obligating Lender to make any commitment or to make any inquiry as to the nature or sufficiency of any payment received by Lender, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby, and no action taken or omitted to be taken by Lender in good faith with respect to the Collateral or any part thereof shall give rise to any defense, counterclaim or offset in favor of Borrower or to any claim or action against Lender.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

The parties hereto have executed this Agreement or has caused the same to be executed by their duly authorized representatives as of the date first above written.

BORROWER:

ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company

By FREEDOM BAY, LLC, a Rhode Island limited liability company, its managing member

By: Ronald A Levesque
Name: Ronald A. Levesque
Title: Manager

FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company

By: ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company, its sole member

By: FREEDOM BAY, LLC, a Rhode Island limited liability company, its managing member

By: Ronald A Levesque
Name: Ronald A. Levesque
Title: Manager

LENDER:

SIMS FREEDOM BAY, LLC, a Connecticut limited liability company

By: ______________________
Name:
Title: