The parties hereto have executed this Agreement or has caused the same to be executed by their duly authorized representatives as of the date first above written.

BORROWER:

ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company

By FREEDOM BAY, LLC, a Rhode Island limited liability company, its managing member

By: ______________________
Name: Ronald A. Levesque
Title: Manager

FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company

By: ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company, its sole member

By: FREEDOM BAY, LLC, a Rhode Island limited liability company, its managing member

By: ______________________
Name: Ronald A. Levesque
Title: Manager

LENDER:

SIMS FREEDOM BAY, LLC, a Connecticut limited liability company

By: William B. Sims
Name: WILLIAM B. SIMS
Title: MANAGING DIRECTOR

## SCHEDULE I

## DOCUMENT PROTOCOLS

1. Certain Definitions. For the purposes of this Schedule I and the Document Protocols contained herein, all capitalized terms used but not otherwise defined herein shall have the meanings provided therefor in this Agreement or, if the context requires, in the agreement which incorporates this Schedule I by reference.

2. Document Protocols. With respect to any instrument that states in substance that it is governed by the "Document Protocols," the following shall apply:

(a) General Rules of Usage. These Document Protocols shall apply to such instrument as from time to time amended, modified, replaced, restated, extended or supplemented, including by waiver or consent, and to all attachments thereto and all other documents or instruments incorporated therein. When used in any instrument governed by these Document Protocols: references to a Person are, unless the context otherwise requires, also to its heirs, executors, legal representatives, successors and assigns, as applicable; "hereof," "herein," "hereunder" and comparable terms refer to the entire instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto; references to any gender include, unless the context otherwise requires, references to all genders, and references to the singular include, unless the context otherwise requires, references to the plural, and vice versa; (i) "shall" and "will" have equal force and effect; references in an instrument to "Article," "Section," "Paragraph" or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, paragraph or subdivision of or an attachment to such instrument; all accounting terms not otherwise defined therein have the meanings assigned to them in accordance with GAAP; and (ii) "include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

(b) Exculpation. The Obligations shall be full recourse obligations of Borrower. Except as expressly set forth in the Unconditional Guaranty of Payment and Performance, the Indemnity Agreement Regarding Hazardous Materials, the Pledge Agreements, the Blanket Assignment and Security Agreement, Principals' liability under the Loan Documents shall be limited to their interest in the Borrower and any other Collateral; provided, however, nothing set forth herein or elsewhere shall (i) constitute a waiver, release or impairment of any Obligation; (ii) impair the right of Lender to name any Principal as a party defendant in any action or suit for foreclosure, specific performance, breach of agreement, fraud or any other appropriate action or proceeding available against such Principal under a Loan Document or applicable law; (iii) affect the validity or enforceability of any Loan Document or any obligation of Borrower or any Principal thereunder including, without limitation, Principals' obligations set forth in or arising under the Unconditional Guaranty of Payment and Performance, the Indemnity Agreement Regarding Hazardous Materials, the Blanket Assignment and Security Agreement, or (iv) be deemed to be a waiver of any right which

Lender may have under Section 506(a), 506(b), 1111(b) or any other provision of the U.S. Bankruptcy Code to file a claim for the full amount of the indebtedness secured by the Loan Documents or to require that all Collateral and any other security for the Obligations shall continue to secure all of the Debt and other Obligations in accordance with the terms of the Loan Documents.

(c) Notices, Etc. All notices, consents, approvals, statements, requests, reports, demands, instruments, directions or other communications to be made, given or furnished pursuant to, under or by virtue of such instrument (each, a "notice") shall be in writing and shall be deemed given or furnished if addressed to the party intended to receive the same at the address of such party as set forth below (i) upon receipt when personally delivered at such address or (ii) one (1) Business Day after the date of delivery of such notice to a reputable commercial courier:

Lender: Sims Freedom Bay, LLC
c/o Herbert J. Sims & Co.
3530 Post Road, Suite 301
Southport, CT 06890
Attention: Jeffrey Sands

with a copy by the same means sent simultaneously to:

Paul, Hastings, Janofsky & Walker LLP
1055 Washington Boulevard
Tenth Floor
Stamford, Connecticut 06901
Attention: David E. Snediker, Esq.

Borrowers: Adult Assisted Care Associates, LLC
2547 West Main Road,
Portsmouth, Rhode Island 02871
Attention: Ronald A. Levesque

Freedom Bay Cottages, LLC

c/o Adult Assisted Care Associates, LLC
2547 West Main Road,
Portsmouth, Rhode Island 02871
Attention: Ronald A. Levesque

with copy to: David Martland, Esq.
Silva Law Group
1100 Aquidneck Avenue
Middletown, Rhode Island 02842

Principals: Ronald A. Levesque
2547 West Main Road,
Portsmouth, Rhode Island 02871

Edward F. Hayes
2547 West Main Road,
Portsmouth, Rhode Island 02871

Manuel P. DeMenezes, Jr.
2547 West Main Road,
Portsmouth, Rhode Island 02871

Any party may change the address to which any notice is to be delivered to any other address within the United States of America by furnishing written notice of such change at least fifteen (15) days prior to the effective date of such change to the other parties in the manner set forth above, but no such notice of change shall be effective unless and until received by such other parties.

(d) Severability. Whenever possible, each provision of such instrument shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of such instrument shall be prohibited by or invalid or unenforceable under the applicable law of any jurisdiction with respect to any Person or circumstance, such provision shall be ineffective to the extent of such prohibition, invalidity or unenforceability, without invalidating the remaining provisions of such instrument or affecting the validity or enforceability of such provisions in any other jurisdiction or with respect to other Persons or circumstances. To the extent permitted by applicable law, the parties to such instrument thereby waive any provision of law that renders any provision thereof prohibited, invalid or unenforceable in any respect.

(e) Remedies Not Exclusive. No remedy therein conferred upon or reserved to Lender is intended to be exclusive of any other remedy or remedies available to Lender under such instrument, at law, in equity or by statute, and each and every such remedy shall be cumulative and in addition to every other remedy given thereunder or now or hereafter existing at law, in equity or by statute.

(f) Liability. If Borrower, Pledgors, Principals, Indemnitors or Guarantors (each as defined in the Loan Documents) (each, a "Borrower Party") consists of more than one Person, the obligations and liabilities of each such Person under such instrument shall be joint and several.

(g) Binding Obligations; Covenants Run with the Land. Such instrument shall be binding upon the applicable Borrower Party and the successors, assigns, heirs and personal representatives of such Borrower Party, and shall inure to the benefit of Lender, its successors and assigns, including but not limited to HSH Nordbank AG, which is providing a loan to Lender to fund the Loan, and all subsequent holders of such instrument and their respective officers, directors, employees, shareholders, agents, successors and assigns and each Borrower Party agrees that all such successors and

assigns shall have all rights and benefits of Lender as if a direct party hereto. Nothing in such instrument, whether express or implied, shall be construed to give any Person (other than the parties thereto and their permitted successors and assigns and as expressly provided therein) any legal or equitable right, remedy or claim under or in respect of such instrument or any covenants, conditions or provisions contained therein. If such instrument is to be recorded, all of the grants, covenants, terms, provisions, covenants and conditions of such instrument shall run with the land.

(h) No Oral Modifications. Such instrument, and any of the provisions thereof, cannot be altered, modified, amended, waived, extended, changed, discharged or terminated orally or by any act on the part of any party thereto, but only by an agreement in writing signed by the party against whom enforcement of any alteration, modification, amendment, waiver, extension, change, discharge or termination is sought.

(i) Entire Agreement. Such instrument, together with the other applicable Loan Documents and this Schedule I, constitutes the entire agreement of the parties thereto with respect to the subject matter thereof and supersedes all prior written and oral agreements and understandings with respect to such subject matter.

(j) Waiver of Acceptance. Each Borrower Party hereby waives any acceptance of such instrument by Lender in writing, and such instrument shall immediately be binding upon such Borrower Party.

(k) JURISDICTION, COURT PROCEEDINGS. EACH OF LENDER AND EACH BORROWER PARTY, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND AFTER CONSULTATION WITH COMPETENT COUNSEL, (I) SUBMITS TO PERSONAL, NONEXCLUSIVE JURISDICTION IN THE STATE OF RHODE ISLAND (THE "STATE") WITH RESPECT TO ANY SUIT, ACTION OR PROCEEDING BY ANY PERSON ARISING FROM, RELATING TO OR IN CONNECTION WITH SUCH INSTRUMENT OR THE LOAN, (II) AGREES THAT ANY SUCH SUIT, ACTION OR PROCEEDING MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN THE STATE, AND (III) SUBMITS TO THE JURISDICTION OF SUCH COURTS. EACH BORROWER PARTY, TO THE FULLEST EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND UPON THE ADVICE OF COMPETENT COUNSEL, FURTHER AGREES THAT IT WILL NOT BRING ANY ACTION, SUIT OR PROCEEDING IN ANY FORUM OTHER THAN THE STATE (BUT NOTHING HEREIN SHALL AFFECT THE RIGHT OF LENDER TO BRING ANY ACTION, SUIT OR PROCEEDING IN ANY OTHER FORUM), AND IRREVOCABLY AGREES NOT TO ASSERT ANY OBJECTION WHICH IT MAY EVER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT LOCATED IN THE STATE AND ANY CLAIM THAT ANY SUCH ACTION, SUIT OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(l) Service of Process. Each Borrower Party hereby agrees that service of process mailed or delivered to such Borrower Party in the manner provided in this Schedule I shall be deemed in every respect effective service of process upon such Borrower Party.

(m) WAIVER OF COUNTERCLAIM. EACH BORROWER PARTY HEREBY KNOWINGLY WAIVES THE RIGHT TO ASSERT ANY COUNTERCLAIM, OTHER THAN A COMPULSORY OR MANDATORY COUNTERCLAIM, IN ANY ACTION OR PROCEEDING BROUGHT AGAINST IT BY LENDER OR ITS AGENTS.

(n) WAIVER OF JURY TRIAL. EACH BORROWER PARTY, TO THE FULL EXTENT PERMITTED BY LAW, HEREBY KNOWINGLY, INTENTIONALLY AND VOLUNTARILY, WITH AND AFTER CONSULTATION WITH COMPETENT COUNSEL, WAIVES, RELINQUISHES AND FOREVER FORGOES HEREBY THE RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING, INCLUDING, WITHOUT LIMITATION, ANY TORT ACTION, BROUGHT BY ANY OF THEM BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO OR IN CONNECTION WITH SUCH INSTRUMENT, THE LOAN OR ANY COURSE OF CONDUCT, ACT, OMISSION, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON (INCLUDING, WITHOUT LIMITATION, SUCH PERSON'S DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS OR ATTORNEYS, OR ANY OTHER PERSONS AFFILIATED WITH SUCH PERSON), IN CONNECTION WITH THE LOAN OR SUCH INSTRUMENT, INCLUDING, WITHOUT LIMITATION, IN ANY COUNTERCLAIM WHICH SUCH BORROWER PARTY MAY BE PERMITTED TO ASSERT THEREUNDER OR WHICH MAY BE ASSERTED BY LENDER OR ITS AGENTS AGAINST SUCH BORROWER PARTY, WHETHER SOUNDING IN CONTRACT, TORT OR OTHERWISE. THIS WAIVER BY EACH SUCH BORROWER PARTY OF ITS RIGHT TO A JURY TRIAL IS A MATERIAL INDUCEMENT FOR LENDER TO MAKE THE LOAN.

(o) No Waivers by Lender. No delay or omission of Lender in exercising any right or power accruing upon any default under such instrument shall impair any such right or power or shall be construed to be a waiver of any default under such instrument or any acquiescence therein, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power. Acceptance of any payment after the occurrence of a default under such instrument shall not be deemed to waive or cure such default under such instrument; and every power and remedy given by such instrument to Lender may be exercised from time to time as often as may be deemed expedient by Lender. Each Borrower Party hereby waives any right to require Lender at any time to pursue any remedy in Lender's power whatsoever.

(p) Waiver of Notice. No Borrower Party shall be entitled to, and each Borrower Party hereby waives its right to receive, any notices of any nature

whatsoever from Lender except with respect to matters for which such instrument specifically and expressly provides for the giving of notice by Lender to such Borrower Party, and except with respect to matters for which such Borrower Party, is not, pursuant to applicable legal requirements, permitted to waive the giving of notice.

(q) TIME OF THE ESSENCE. TIME SHALL BE OF THE ESSENCE IN THE PERFORMANCE OF ALL OBLIGATIONS OF EACH PARTY THEREUNDER.

(r) GOVERNING LAW. EACH INSTRUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF RHODE ISLAND, EXCEPT THAT TO THE EXTENT THAT THE APPLICABILITY OF ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, IN WHICH CASE SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.

(s) Sole Discretion of Lender. Wherever pursuant to such instrument, Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide that arrangements or terms are satisfactory or not satisfactory shall be in the sole discretion of Lender and shall be final and conclusive, except as may be otherwise specifically provided therein. In addition, Lender shall have the right to grant or withhold any consent, approval or acceptance, which is required or permitted to be granted or withheld by Lender under such instrument, in Lender's sole discretion except as may be otherwise specifically provided therein. The party seeking or required to seek any consent, approval or acceptance from Lender under such instrument shall provide Lender with a written request for such consent and shall deliver any information requested by Lender for Lender to consider whether Lender will grant or withhold its consent, approval or acceptance.

(t) Counterparts. Such instrument may be executed in any number of separate counterparts, each of which, when so executed and delivered, shall be deemed an original, but all of which, collectively and separately, shall constitute one and the same instrument. All signatures need not be on the same counterpart. The failure of any party thereto to execute such instrument, or any counterpart hereof, shall not relieve the other signatories from their obligations hereunder.

(u) Exhibits Incorporated; Headings. The information set forth on the cover of such instrument, the table of contents, the headings and the exhibits annexed thereto, if any, shall be deemed to be incorporated therein as a part thereof with the same effect as if set forth in the body thereof. The headings and captions of the various articles, sections and paragraphs of such instrument are for convenience of reference only and shall not be construed as modifying, defining or limiting, in any way, the scope or intent of the provisions thereof.

(v) No Joint Venture or Partnership. Each Borrower Party and Lender intend that the relationship created under such instrument be solely that of

mortgagor and mortgagee, borrower and lender, or indemnitor and lender, as the case may be. Nothing therein is intended to create a joint venture, partnership, tenancy-in-common, agency or joint tenancy relationship between any Borrower Party and Lender, nor to grant to Lender any interest in the Property or the Equity Interests other than that of lender; it being the intent of the parties hereto that Lender shall not share in any loss whatsoever generated by the Property and that Lender shall have no control over the day-to-day management and operation of the Property.

(w) Remedies of Borrower and Indemnitors. If any Borrower Party shall seek the approval or consent of Lender under such instrument, which instrument expressly provides that Lender's approval shall not be unreasonably withheld, and Lender shall fail or refuse to give such consent or approval, the burden of proof as to whether or not Lender acted unreasonably shall be upon the Borrower Party. In addition thereto, in the event that a claim or adjudication is made that Lender has acted unreasonably or unreasonably delayed acting in any case where by law or under such instrument it has an obligation to act reasonably or promptly, Lender shall not be liable for any monetary damages, and a Borrower Party's remedies shall be limited to injunctive relief or declaratory judgment.

(x) Successive Actions. Separate and successive actions may be brought under any Loan Document or applicable law to enforce any of the provisions thereof at any time and from time to time. No action under a Loan Document or applicable law shall preclude any subsequent action, and all Borrower Parties waive and covenant not to assert any defense in the nature of splitting of causes of action or merger of judgments.

(y) Waiver of Statute of Limitations. Borrower hereby waives the right to assert any statute of limitations as a bar to the enforcement of the lien created by any of the Loan Documents or to any action brought to enforce the Note or any other obligation secured by any of the Loan Documents.

(z) Loss of Note. Upon notice from Lender of the loss, theft, or destruction of the Note and upon receipt of an indemnity reasonably satisfactory to Borrower from Lender, or in the case of mutilation of the Note, upon surrender of the mutilated Note, Borrower shall make and deliver a new note of like tenor in lieu of the then to be superseded Note.

(aa) Waiver of Certain Defenses. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of this Agreement and the other Loan Documents. Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under this Agreement, the Note, or the other Loan Documents by virtue of the investment by Lender or by any parent, subsidiary, or affiliate or Lender, in Borrower or in any constituent partner or member of the Borrower and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.

## SCHEDULE II

## CERTAIN DEFINED TERMS

"AACA Members" shall have the meaning set forth in Recital G of this Agreement.

"AACA" shall mean Adult Assisted Care Associates, LLC, a Rhode Island limited liability company.

"Affiliate" shall mean, with respect to any specified Person, any other Person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with such specified Person.

"Agreement to Complete" shall have the meaning set forth in Section 3.13 of this Agreement.

"Architect's Agreement" shall mean that certain Architect's Agreement to be entered into between AACA and Architect in accordance with Section 5.50 of this Agreement.

"Architect" shall mean Newport Collaborative Architects for the Master Planning and Cottage Design and the Medical Center and the Guest House and shall be The Architectural Team for the Congregate Care Facility.

"Assignment of Leases" shall have the meaning set forth in Recital K of this Agreement.

"Assignment of Construction Documents" shall have the meaning set forth in Section 5.50 of this Agreement.

"Assisted Living Facility" shall have the meaning set forth in Recital C of this Agreement.

"Blanket Assignment and Security Agreement" shall have the meaning set forth in Recital K of this Agreement.

"Bond Trustee Account" shall have the meaning set forth in Section 1.12 of this Agreement.

"Borrower Group" shall have the meaning set forth in Section 7.1(c) of this Agreement.

"Borrower Party" shall have the meaning set forth in Section 2(f) of Schedule I of this Agreement.

"Borrower's Equity" shall have the meaning set forth in Section 3.5 of this Agreement.

"Borrower" shall mean Adult Assisted Care Associates, LLC, a Rhode Island limited liability company (AACA) and Freedom Bay Cottages, LLC, also a Rhode Island limited liability company (FBC), and shall create joint, several and duplicate obligations on both AACA and FBC.

"Business Day" shall mean a weekday on which commercial banks are not authorized or required by Federal law to close.

"Change in Control" shall mean, with respect to any specified Person, a transfer (in a series of one or more transactions) which results in a change in the power to Control such Person.

"Closing Date" shall mean the date of disbursement of the proceeds of the Loan, upon which Borrower shall have satisfied all conditions precedent thereto as set forth in this Agreement.

"Collateral" shall have the meaning set forth in Section 2.1 of this Agreement.

"Commence Construction" means the "breaking of ground" (beyond "rough grading") for the purpose of commencing construction of any Improvement within the Project.

"Commitment Fee" shall have the meaning set forth in Section 3.10 of this Agreement.

"Commitment Letter" means that certain Loan Application dated October 7, 2003 executed by Borrower.

"CON" shall mean a certificate of need issued by the applicable DOH.

"Condominium Declaration" shall mean that certain Declaration of Condominium for Freedom Bay Condominium dated as of May 19, 2004 entered into by AACA.

"Condominium" shall have the meaning set forth in Recital D of this Agreement.

"Congregate Facility" shall have the meaning set forth in Recital C of this Agreement.

"Constituent Partner" shall mean, if an entity is a (a) limited partnership, the general partner of such limited partnership and, if such general partner is not a SPC, any additional upper tier entities until the general partnership interest in such limited partnership is controlled by a SPC or (b) limited liability company, the managing member and/or manager of such limited liability company and, if such manager and/or managing member is not a SPC, any additional upper tier entities until the managing membership interest and/or manager of such limited liability company constitutes a SPC, and (c) general partnership, the general partners of such general partnership and, if each of such general partners is not a SPC, any additional upper tier entities until the general partnership interests in such general partnership constitute SPCs.

"Construction Budget" shall have the meaning set forth in Section 3.19 of this Agreement.

"Construction Consultant" shall have the meaning set forth in Section 5.22 of this Agreement.

"Construction Contracts" shall have the meaning set forth in Recital J of this Agreement.

"Construction Documents" shall have the meaning set forth in Section 3.19 of this Agreement.

"Construction Management Agreement" shall mean that certain Construction Management Agreement to be entered into between AACA and Construction Manager in accordance with Section 5.50 of this Agreement.

"Construction Manager" shall mean Hodess Building Company.

"Construction Schedule" shall mean the anticipated schedule for construction of all or any portion of the Project indicating the anticipated progress of construction of the phases.

"Contractor" shall mean Somerfield Builder, LLC.

"Control" shall mean, when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other equity interests, by contract or otherwise; and the terms "Controlling" and "Controlled" have the meanings correlative to the foregoing.

"Controlled Account" shall have the meaning set forth in Section 1.12 of this Agreement.

"Cottage Construction Revolver" means the initial budget for operating and capital expenses prepared by Borrower and any revisions thereto, which reflects, on a line item basis, all budgeted costs and expenses which are expected to be incurred in connection with the marketing and development of the Project in accordance with the Development Plan and Marketing Plan. The initial Pre-Construction Budget is attached as Exhibit C.

"Cottage Construction Revolver Costs" means all of the costs of acquiring, developing and marketing the Project in accordance with the Development Plan and as specified in the Cottage Construction Revolver Budget.

"Debt" shall have the meaning set forth in Section 5.1 of this Agreement.

"Default Prepayment" shall have the meaning set forth in Section 1.6 of this Agreement.

"Deposit Account and Control Agreement (AACA)" shall mean that certain Deposit Account and Control Agreement among AACA, Lender and Lockbox Bank to be executed in accordance with Section 5.16 hereof.

"Deposit Account and Control Agreement (FB)" shall mean that certain Deposit Account and Control Agreement among FB, Lender and Lockbox Bank to be executed in accordance with Section 5.16 hereof.

"Developer" shall mean HDL, LLC, d/b/a RAL Company.

"Development Agreement" shall mean that certain Development Agreement to be entered into between AACA and Developer in accordance with Section 5.50 of this Agreement

"Development Milestones" shall have the meaning set forth in Section 5.33 of this Agreement.

"Development Plan" shall mean the development plan prepared by AACA for the Project, a copy of which is attached hereto as Exhibit G.

"Document Protocols" shall have the meaning set forth in Section 2 of Schedule I of this Agreement.

"DOH" shall mean the applicable state Department of Health.

"Engineer" shall mean Fuss & O'Neill.

"Engineering Agreement" shall mean that certain Engineering Agreement to be entered into between AACA and Engineer in accordance with Section 5.50 of this Agreement.

"Equity Interests" shall have the meaning set forth in Recital K of this Agreement.

"Event of Default" shall have the meaning set forth in Section 7.1 of this Agreement.

"Existing Lender" shall mean SCM Freedom Bay, LLC and HSH Nordbank, AG, as applicable.

"Existing Loan Documents" shall have the meaning set forth in Section 3.1(a) of this Agreement.

"Existing Loan" shall mean the loan in the original principal amount of $12,000,000.00 by SCM Freedom Bay, LLC to AACA and the revolving construction loan in the maximum principal amount of $12,000,000.00. by HSH Nordbank, AG to AACA and FB.

"Existing Mortgage" shall mean the Mortgage dated May 19, 2004 made by Borrower to Existing Lender encumbering the fee interest of AACA in the Project.

"Expenses" shall have the meaning set forth in Section 8.3 of this Agreement.

"Facility" shall have the meaning set forth in Recital C of this Agreement.

"FB" shall mean Freedom Bay, LLC, a Rhode Island limited liability company.

"Future Health Care and Operating Licenses" shall have the meaning set forth in Section 4.24 of this Agreement.

"Guest House" shall have the meaning set forth in Recital C of this Agreement.

"Hazardous Materials Indemnity" shall have the meaning set forth in Recital K of this Agreement.

"Health Care and Operating Licenses" shall have the meaning set forth in Section 4.24 of this Agreement.

"Health Care Laws" shall have the meaning set forth in Section 4.23 of this Agreement.

"Impositions" shall have the meaning set forth in Section 5.3 of this Agreement.

"Improvements" shall mean (i) the Guest House, independent living cottages, Congregate Facility, Nursing Congregate Facility, the Assisted Living Facility, Medical Center, and any other buildings constructed or to be constructed on the Property, (ii) all other improvements including, without limitation, systems and facilities for roadways, parking, lighting, fire prevention, sanitary sewer, drinking water, electricity, storm and surface water, drainage, sewage treatment and other utilities to be provided to or installed or constructed on the Property, and (iii) all off site improvements to be made in connection with the Project.

"Interest Reserve Account" shall have the meaning set forth in Section 1.12 of this Agreement.

"Land Unit Dimensions Plans" shall mean that certain plan entitled "Freedom Bay Development West Main Road Portsmouth/Middletown, Rhode Island Land Unit Dimensions Plan November 2001" prepared by Northeast Engineers & Consultants, Inc. consisting of Sheets 1 through 9.

"Land" shall mean the Property, together with all of the tenements, hereditaments, easements, rights-of-way, rights, privileges and appurtenances thereunto belonging or in any way pertaining thereto, all reversions, remainders, and all of the estate, right, title, interest, claim and demand whatsoever of any Person therein and in the streets, alleys, vaults and ways adjacent thereto, all rights to the use of common drive entries, all rights pursuant to any reciprocal easement agreement or trackage agreement, all strips and gores

within or adjoining such property, the air space and right to use the air space above such property, all transferable development rights arising therefrom or transferred thereto, and the drainage, mineral, water, oil and gas rights with respect to such property, either at law or in equity, if any, in possession or expectancy, now or hereafter acquired.

"Laws" shall have the meaning set forth in Section 6.15 of this Agreement.

"Leases" shall mean all leases and subleases in effect at the Project approved by Lender.

"Lender" shall mean SIMS Freedom Bay, LLC, a Connecticut limited liability company, and/or its successors and assigns.

"Loan Documents" shall have the meaning set forth in Recital L of this Agreement.

"Loan" shall have the meaning set forth in Recital A of this Agreement.

"Lockbox Bank" shall mean such bank as Lender shall approve in its sole and absolute discretion.

"Management Agreement" shall mean that certain Management Services Agreement to be entered into between AACA and Operator in accordance with Section 5.50 of this Agreement.

"Management and Operating Agreement" shall have the meaning set forth in Section 4.36 of this Agreement.

"Marketing Agents" shall mean Flagship Realty, LLC, Benchmark Associates, LLC and Continuing Care Management, LLC.

"Marketing Agreement" shall mean that certain Management and Marketing Agreement to be entered into between AACA and Marketing Agents in accordance with Section 5.50 of this Agreement.

"Marketing Plan" shall mean the marketing plan approved by AACA for the Project, a copy of which is attached hereto as Exhibit F.

"Master Unit" shall have the meaning set forth in the Condominium Declaration.

"Material Adverse Change" shall mean shall mean any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect upon the validity or enforceability of this Agreement or any of the other Loan Documents, (b) is or could reasonably be expected to be material and adverse to the business, properties, assets, financial condition, or results of operations of Borrower taken as a whole, (c) materially impairs or could reasonably be expected to materially impair the ability of Borrower to duly and punctually pay or perform its obligations under the Loan Documents, or (d) materially impairs or could reasonably be expected to

materially impair the ability of Lender to enforce its legal remedies pursuant to this Agreement or any of the other Loan Documents.

"Maturity Date" shall have the meaning set forth in Section 1.2 of this Agreement.

"Medical Center" shall have the meaning set forth in Recital C of this Agreement.

"Mortgage" shall have the meaning set forth in Recital K of this Agreement.

"Mortgaged Land" shall mean all Land, together with all improvements constructed or under construction thereon, that is encumbered by the Mortgage.

"Note" shall have the meaning set forth in Recital A of this Agreement.

"Nursing Congregate Facility" shall have the meaning set forth in Recital C of this Agreement.

"Obligations" shall have the meaning set forth in Section 5.1 of this Agreement.

"Operating Account" shall have the meaning set forth in Section 4.40 of this Agreement.

"Operating Agreement" shall have the meaning set forth in Section 4.3 of this Agreement.

"Operator" shall mean Continuing Care Management, LLC.

"Overall Unit Plan" shall have the meaning set forth in Section 5.8 of this Agreement.

"Permitted Exceptions" shall have the meaning set forth in Section 3.7 of this Agreement.

"Person" shall mean any individual, corporation, partnership, joint venture, estate, trust, limited liability company, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Personal Property" shall have the meaning set forth in Section 6.6 of this Agreement.

"Physical Plant Standards" shall have the meaning set forth in Section 4.30 of this Agreement.

"Plans and Specifications" shall mean (i) that certain plan entitled "Freedom Bay Development, West Main Road Portsmouth/Middletown, Rhode Island January 2000"

prepared by Northeast Engineers & Consultants, Inc. consisting of 49 sheets and stamped approved by RIDEM; (ii) that certain plan entitled "Freedom Bay Development, West Main Road Portsmouth/Middletown, Rhode Island, Permit Modification Application #99-0300, Revised March 27, 2001" prepared by Northeast Engineers & Consultants, Inc. consisting of 12 sheets and stamped approved by RIDEM; and (iii) that certain plan entitled "Freedom Bay Development, West Main Road Portsmouth/Middletown, Rhode Island, Request for Preliminary Determination, Revised July 31, 2001" prepared by Northeast Engineers & Consultants, Inc. consisting of 7 sheets and stamped approved by RIDEM.

"Pledge Agreements" shall have the meaning set forth in Recital K of this Agreement.

"Prepayment Consideration" shall have the meaning set forth in Section 1.6 of this Agreement.

"Principal" shall mean each of Ronald A. Levesque, Edward F. Hayes and Manuel P. DeMenezes, Jr.

"Project" shall have the meaning set forth in Recital C of this Agreement.

"Property" shall have the meaning set forth in Recital B of this Agreement.

"Proposed Improvements" shall have the meaning set forth in Section 5.15(d)(i) of this Agreement.

"Release Price" shall mean with respect to the sale of any Mortgaged Land, the price payable by an AACA Subsidiary to AACA for the applicable Master Unit, as provided in Exhibit J of this Agreement.

"Residency Agreement" shall have the meaning set forth in Recital D of this Agreement.

"Residential Units" shall mean an Unit for occupancy by Residents of the Project.

"Residents" shall mean the continuing life care residents of the of the Project.

"Single Purpose Entity" shall mean an entity which at all times complies in all respects with each and all of the covenants set forth in Section 6.9 of this Agreement.

"SPC" shall mean an individual or shall mean a corporation which (a) is a Single Purpose Entity, (b) has an Independent Director and (c) provides in its by laws or certificate of incorporation that the unanimous consent of all of the directors of such corporation shall be required for (i) the filing of or acquiesce with any bankruptcy or insolvency proceeding, (ii) the amendment of the by laws or certificate of incorporation or (iii) the incurrence of any indebtedness in addition to the Loan.

"Survey" shall mean a survey of the Project approved by Lender, dated no more than thirty (30) days prior to the Closing Date, prepared by a registered land surveyor in accordance with the 1999 American Land Title Associates/American Congress on Surveying and Mapping Standard and certified in favor of Lender and the title insurer. The surveyor shall certify that the Property is not in a flood hazard area and shall be sufficient for the title insurer to remove the general survey exception.

"Third-Party Payors' Programs" shall have the meaning set forth in Section 4.28 of this Agreement.

"Transfer Agreement" shall mean any and all agreements Borrower has or shall enter into with third parties to transfer any of the Residents to continuing care facilities outside of the Project in the event the Medical Center has not been Completed in order to accommodate each of the Residents' needs.

"Transfer" shall mean the conveyance, assignment, sale, transfer, mortgaging, collateral assignment, encumbrance, pledging, alienation, hypothecation, granting of a security interest in, granting of options with respect to, or other disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) all or any portion of any legal or beneficial interest in the Project, Property, Borrower or any Constituent Partner. The term "Transfer" shall include, without limitation, the following: an installment sales agreement wherein any person holding an interest in the Project or Borrower or a Constituent Partner agrees to sell all or any part of its interest in the Project or Borrower or Constituent Partner, respectively, for a price to be paid in installments; the dissolution or termination of Borrower or any Constituent Partner; the issuance of new stock in any corporation which is a Borrower or a Constituent Partner; the merger or consolidation with any other Person of Borrower or a Constituent Partner; and, if the Borrower is a non-member managed limited liability company, any change in the Person appointed as manager of such Borrower.

"Unconditional Guaranty of Payment and Performance" shall have the meaning set forth in Recital K of this Agreement.

"Unit" shall have the meaning set forth in the Condominium Declaration.

# PROMISSORY NOTE

# PROMISSORY NOTE

As of July 14, 2005 $6,000,000.00

FOR VALUE RECEIVED, FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company ("FBC"), having an address at 2547 West Main Road, Portsmouth, Rhode Island and ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company ("AACA") having an address at 2547 West Main Road, Portsmouth, Rhode Island (FBC and AACA are hereinafter collectively referred to jointly and severally as "Borrower"), each unconditionally promises to pay to the order of SIMS FREEDOM BAY, LLC, a Delaware limited liability company, together with its successors and/or assigns ("Lender"), at such place and to such order as Lender may from time to time designate in writing, the principal sum of SIX MILLION DOLLARS ($6,000,000.00) and all other amounts due or becoming due hereunder in lawful money of the United States of America, with interest thereon to be computed from and including the date of this Note, with respect to the principal balance of $6,000,000.00 (the "Initial Principal Balance"), which Borrower hereby acknowledges was funded on said date (the "Initial Funding Date") at the Applicable Interest Rate (as hereinafter defined), and to be paid in installments as described below (all initially capitalized terms used but not otherwise defined herein shall have the meanings provided therefor in the Loan Agreement, as hereinafter defined):

## Article I.
## PAYMENT TERMS

1.1 Installments of all accrued and unpaid interest shall be due and payable in advance on the first day of each calendar month, commencing on September 1, 2005, until this Promissory Note (this "Note") is paid in full (each, a "Scheduled Interest Payment Date"). A payment of interest on the entire principal balance evidenced by this Note at the Applicable Interest Rate for the period from and including the Initial Funding Date through and including the day preceding the first Scheduled Interest Payment Date shall be paid on the date hereof instead of on the first Scheduled Interest Payment Date.

1.2 The entire outstanding principal balance of this Note together with all accrued and unpaid interest and all other Debt (hereinafter defined) shall be due and payable in full on the third (3rd) anniversary of the date of this Note or any earlier date on which the Debt shall be required to be paid in full, whether by acceleration or otherwise (the "Maturity Date").

Article II.
INTEREST RATE

Interest under this Note shall be paid in arrears and shall be calculated based on a 360 day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. Except during that period of time when interest under this Note shall accrue at the Default Rate (as hereinafter defined), interest shall accrue on outstanding principal under this Note at a rate (the "Applicable Interest Rate"), of ten and five tenths percent (10.5%) per annum.

Article III.
DEFAULT AND ACCELERATION

3.1 The whole of (i) the principal sum of this Note, (ii) interest, default interest at the Default Rate (hereinafter defined), late charges and other sums due under this Note and any and all amounts due to Lender under (A) the Loan Agreement, dated as of the date hereof (as the same may be amended or modified, the "Loan Agreement"), between Lender and Borrower, and (B) any other documents and agreements evidencing and/or securing the Debt (as the same may be amended, modified, extended, renewed, restated, consolidated, substituted, supplemented or replaced from time to time, collectively, the "Loan Documents"), (iii) all other monies agreed or provided to be paid by Borrower in this Note, or the other Loan Documents, (iv) all sums advanced by Lender pursuant to the Loan Documents to protect and preserve the Collateral (as defined in the Loan Agreement) and the liens and security interests created thereby, and (v) all sums advanced by Lender and costs and expenses incurred by Lender in connection with the Debt or any part thereof, any renewal, extension, or change of or substitution for the Debt or any part thereof, or the acquisition or perfection of the security therefor, whether made or incurred at the request of Borrower or Lender (the sums referred to in (i) through (v) above, collectively, the "Debt") shall, without notice, become immediately due and payable at the option of Lender if any payment required in this Note is not paid prior to the earlier to occur of (w) the fifth (5th) day after the date when due, (x) the Maturity Date, and (y) the happening of any Event of Default as defined in the Loan Agreement (collectively, an "Event of Default").

3.2 Unless and until an Event of Default has occurred, payments received by Lender with respect to the Debt shall be applied first to accrued and unpaid interest and then to principal, with Lender having the option to add to the principal amount due hereunder from time to time any of the items referenced in clauses (ii) through (v) of the above definition of Debt, which are not paid when due. Upon the occurrence and during the continuance of an Event of Default, Lender may apply any and all payments it receives with respect to the Debt, as Lender shall determine in its sole and absolute discretion.

Under no circumstance shall the acceptance and application of any sums by Lender constitute a waiver by Lender of any of its rights under any of the Loan Documents.

3.3 Unless payments are made in the amount and as required hereunder, remittances in payment of all or any part of the Debt shall not, regardless of any receipt or credit issued therefor, constitute payment until the required amount is actually received by Lender in funds immediately available as specified herein and shall be made and accepted subject to the condition that any check or draft may be handled for collection in accordance with the practice of the collecting bank or banks. Acceptance by Lender of any payment in an amount less than the amount then due shall be deemed an acceptance on account only, and the failure to pay the entire amount prior to the fifth (5th) day after the date when due shall be and continue to be an Event of Default.

Article IV.
DEFAULT INTEREST

Borrower hereby agrees that upon the occurrence of an Event of Default, Lender shall be entitled to receive and Borrower shall pay interest on the entire unpaid principal sum at a per annum rate equal to the lesser of (i) the Applicable Interest Rate plus 5% and (ii) the maximum interest rate which Borrower may by law pay (the "Default Rate"). The Default Rate shall be computed from the occurrence of the Event of Default until the earlier of the date upon which the Event of Default is cured or the date upon which the Debt is paid in full. Interest calculated at the Default Rate shall be added to the Debt and shall be deemed secured by the Pledge Agreements, the Assignment of Leases, the Blanket Assignment and Security Agreement, the Mortgage, all other Loan Documents and all other pledges, security agreements and collateral assignments given to Lender by Borrower or Principals as security for all or any portion of the Debt. This clause, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

Article V.
PREPAYMENT

5.1 The principal balance of the Note may be prepaid in whole during the period which is after the six month anniversary of the date of this Note and prior to the twelve month anniversary of the date of this Note upon not less than thirty (30) days prior written notice to Lender specifying the date on which prepayment is to be made (the "Prepayment Date") and upon the payment of a prepayment penalty equal to one percent (1%) of the principal being repaid, all accrued interest payable to and including the Prepayment Date, together with all other Debt due under this Note (including, without limitation the Exit Fee due and payable to and including the Prepayment Date). The principal balance of the Note may be prepaid after the twelve month anniversary of the date of this Note upon not less than thirty (30) days prior written notice to Lender specifying the Prepayment Date and upon the payment of all accrued interest payable to

and including the Prepayment Date, together with all other Debt due under this Note (including, without limitation the Exit Fee due and payable to and including the Prepayment Date).

5.2 Except for a mandatory prepayment of principal when required pursuant to Schedule I hereto (a "Mandatory Prepayment"), the principal balance of the Note may not be prepaid in whole or in part on or before the six month anniversary of the date of this Note without the prior written consent of Lender, which may be withheld in Lender's sole and absolute discretion. Should any prepayment of the principal balance of the Note in whole or in part occur, other than a Mandatory Prepayment, after the sixth month anniversary of the date of the Note and prior to the twelve month anniversary of the date of the Note, whether with Lender's consent or otherwise, in addition to an Exit Fee, accrued and unpaid interest, principal and any other sums payable hereunder, Borrower shall also pay to Lender a prepayment fee in an amount equal to one percent of the principal being repaid (the "1% Prepayment Consideration"). Should any prepayment of all or any portion of the principal balance of the Note, other than a Mandatory Prepayment, occur on or before the six month anniversary of the date of this Note (a "Default Prepayment"), whether with Lender's consent or by reason of an Event of Default, in addition to an Exit Fee, accrued and unpaid interest, principal and any other sums payable hereunder, Borrower shall pay to Lender a prepayment fee (the "Lock-out Prepayment Consideration") in an amount equal to the lesser of (i) three percent (3%) of the principal balance of this Note outstanding on the date of such Default Prepayment, and (ii) the difference between (A) an amount necessary to provide Lender with an internal rate of return equal to twenty-one percent (21%) and (B) the sum of (1) interest accrued and unpaid at the Applicable Interest Rate through the date of payment of the Debt in full plus (2) the Exit Fee, which would then be payable if the prepayment were a permitted prepayment, calculated like interest and compounded monthly from the Initial Funding Date with respect to the Initial Principal Balance and, if applicable, from the date that any other sums are advanced by Lender or costs or expenses constituting Debt are incurred by Lender (it being acknowledged by Borrower that Lender shall have no obligation to incur or advance any such amounts), through and including the date of payment of the Debt in full, taking into consideration all interest payments made hereunder prior to such full payment but not taking into consideration the Commitment Fee (the 1% Prepayment Consideration or the Lock-out Prepayment Consideration, as applicable, is sometimes hereinafter referred to as the "Prepayment Consideration"). Mandatory Prepayments shall be applied as provided for in Schedule I hereto.

5.3 An "Exit Fee" representing deferred interest at the "Applicable IRR" in an amount computed by Lender shall be due and payable by Borrower to Lender (i) in connection with (a) any Mandatory Prepayment as provided in Schedule I, whether or not any principal payment is made and (b) payment of principal, whether in whole or in part or whether at or before the Maturity Date, except for principal prepaid as part of a Mandatory Prepayment pursuant to Schedule I after payment of the Exit Fee amount then due and (ii) at the Maturity Date with respect to any then unpaid principal. The term

"Exit Fee" shall mean an amount necessary to provide Lender with an Applicable IRR calculated like interest and compounded monthly from the Initial Funding Date with respect to the Initial Principal Balance and, if applicable, from the date that any other sums are advanced by Lender or costs or expenses constituting Debt are incurred by Lender (it being acknowledged by Borrower that Lender shall have no obligation to incur or advance any such amounts), through and including the date of payment of the Debt in full, taking into consideration all payments made hereunder prior to such full payment but not taking into consideration the Commitment Fee. The term "Applicable IRR" shall mean fifteen percent (15%). A partial prepayment of principal, (other than a Mandatory Prepayment), must be accompanied by payment of all accrued but unpaid interest, and other sums then due under the Loan Documents and a payment towards the Exit Fee, which payment towards the Exit Fee shall be in the amount necessary to provide Lender with the Applicable IRR through and including such payment computed as provided herein.

5.4 Lender shall notify Borrower of the amount and basis of determination of any Prepayment Consideration or Exit Fee to be paid by Borrower, which determination by Lender shall be conclusive and binding on Borrower absent manifest error. Lender shall not be obligated to accept any prepayment of the principal balance of this Note unless it is made in compliance with the provisions of this Note and accompanied by all other sums to be paid by Borrower in connection with such prepayment as provided herein. In the event that either (i) Borrower shall notify Lender of Borrower's intention to prepay this Note but shall not conclude such prepayment by paying to Lender all sums required on the Prepayment Date as specified herein, or (ii) a Default Prepayment occurs, then Borrower shall pay, indemnify and hold Lender harmless from and against any and all losses, costs and expenses that Lender may actually incur as a result thereof, including, without limitation, any costs incurred in connection with the termination of interest rate protection agreements or any other agreements to protect against currency exchange or interest rate risks maintained with respect to the Debt and any sums expended by Lender in calculating or otherwise preparing for such prepayment. Such amounts shall be paid by Borrower within fifteen (15) days after demand therefor by Lender, provided that Lender shall have delivered to Borrower a certificate setting forth in reasonable detail the amount of such compensation payable by Borrower, and such certificate shall be conclusive and binding on Borrower as to the amount thereof except in the case of manifest error or willful misconduct. BORROWER ACKNOWLEDGES AND AGREES THAT THE PREPAYMENT CONSIDERATION REPRESENTS A REASONABLE AND FAIR ESTIMATE OF COMPENSATION FOR THE LOSS THAT LENDER MAY SUSTAIN FROM THE PREPAYMENT OF THIS NOTE PRIOR TO THE TWELVE MONTH ANNIVERSARY OF THE DATE OF THIS NOTE. BORROWER ACKNOWLEDGES AND AGREES THAT IT HAS NO RIGHT TO PREPAY THIS NOTE PRIOR TO THE TWELVE MONTH ANNIVERSARY OF THE DATE OF THIS NOTE WITHOUT PAYING THE PREPAYMENT CONSIDERATION (WHETHER OR NOT SUCH PREPAYMENT IS WITH LENDER'S CONSENT), AND BORROWER

SPECIFICALLY ACKNOWLEDGES AND AGREES THAT IT SHALL BE LIABLE FOR THE PREPAYMENT CONSIDERATION UPON ANY DEFAULT PREPAYMENT, IN ADDITION TO THE PRINCIPAL AMOUNT HEREOF AND ALL OUTSTANDING INTEREST, FEES, PENALTIES AND OTHER SUMS DUE HEREUNDER OR UNDER ANY OTHER LOAN DOCUMENT.

## Article VI.
## SECURITY

This Note is secured by the Pledge Agreements, the Assignment of Leases, the Blanket Assignment and Security Agreement, the Mortgage and all other Loan Documents.

## Article VII.
## SAVINGS CLAUSE

It is the intention of Borrower and Lender to conform strictly to the usury and similar laws relating to interest from time to time in force, and all agreements between Lender and Borrower, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Lender as interest hereunder or under the other Loan Documents exceed the maximum permissible under applicable usury or such other laws (the "Maximum Amount"). If from any possible construction of any document, interest would otherwise be payable hereunder or under the other Loan Documents in excess of the Maximum Amount, or in the event for any reason whatsoever any payment by or act of Borrower pursuant to the terms or requirements hereof or the other Loan Documents shall result in the payment of interest which would exceed the Maximum Amount, then any such construction shall be subject to the provisions of this Article, and ipso facto such document shall be automatically reformed, without the necessity of the execution of any amendment or new document, so that the obligation of Borrower to pay interest or perform such act or requirement shall be reduced to the limit authorized under the applicable laws, and in no event shall Borrower be obligated to pay any interest, perform any act, or be bound by any requirement which would result in the payment of interest in excess of the Maximum Amount. Any amount received by Lender in excess of the Maximum Amount shall, without further agreement or notice between or by any party hereto, be deemed applied to reduce the principal sum hereof immediately upon receipt of such moneys by Lender, with the same force and effect as though Borrower had specifically designated such sums to be applied to principal prepayment. The provisions of this Article shall supersede any inconsistent provision of this Note or any other Loan Document.

Article VIII.
LATE CHARGE

If any sum payable under this Note is not paid prior to the fifth (5th) day after the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of 5% of the unpaid sum or the maximum amount permitted by applicable law to defray the expenses incurred by Lender in handling and processing the delinquent payment and to compensate Lender for the loss of the use of the delinquent payment. The amount thereof shall be secured by the Pledge Agreements, the Assignment of Leases, the Blanket Assignment and Security Agreement, the Mortgage all other Loan Documents.

Article IX.
WAIVERS

Borrower and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, protest and notice of protest and non-payment and all other notices of any kind. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any of the other Loan Documents made by agreement between Lender or any other person or party shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrower, and/or any other person or entity who may become liable for the payment of all or any part of the Debt, under this Note or any of the other Loan Documents. No notice to or demand on Borrower shall be deemed to be a waiver of the obligation of Borrower or of the right of Lender to take further action without further notice or demand as provided for in this Note or the other Loan Documents.

Article X.
TRANSFER AND BINDING EFFECT

Upon the transfer of this Note, Borrower hereby waiving notice of any such transfer, Lender may deliver all the collateral granted, pledged or assigned pursuant to the other Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter first arising from and after the date of such transfer; but Lender shall retain all rights and responsibilities hereby given to it with respect to any liabilities and the collateral not so transferred. All representations, covenants, warranties, indemnifications, promises and agreements by or on behalf of the Borrower that are contained in this Note shall bind and inure to the benefit of Lender and Lender's successors and assigns, and Borrower agrees that all such successors and assigns shall have all rights and benefits of Lender as if a direct party hereto.

Article XI.
DOCUMENT PROTOCOLS

This Note is governed by the Document Protocols set forth on Schedule I annexed to the Loan Agreement, which are incorporated herein as if fully set forth herein.

Article XII.
AUTHORITY

Borrower (and the undersigned representatives of Borrower, if any) represent and warrant that it has full power and authority to execute and deliver this Note, the execution and delivery of this Note has been duly authorized and does not conflict with or constitute a default under any law, judicial order or other agreement affecting any Borrower.

Article XIII.
JOINT AND SEVERAL OBLIGATIONS

All covenants, obligations, agreements, indemnities, representations and warranties of the Borrower contained herein shall be joint and several. Lender may rely on any notice or communication purportedly made by or on behalf of the Borrower by either AACA or FBC, and shall have no duty to verify the identity or authority of the person giving such notice or communication.

[THE REMAINDER OF THIS PAGE HAS BEEN INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company

By FREEDOM BAY, LLC, a Rhode Island limited liability company, its managing member

By: Ronald A Levesque

Name: Ronald A. Levesque

Title: Manager

FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company

By its sole member, ADULT ASSISTED CARE ASSOCIATES, LLC, a Rhode Island limited liability company

By its Manager, FREEDOM BAY, LLC, a Rhode Island limited liability company

By: Ronald A Levesque

Name: Ronald A. Levesque

Title: Manager

SCHEDULE I

MANDATORY PREPAYMENTS

(A) Borrower is obligated to make payments of principal at the time and in the manner set out below:

(1) An amount equal to 10% of the Condominium Sales Proceeds (as defined in the Construction Loan Agreement dated December 17, 2004 between HSH Nordbank AG, New York Branch and Freedom Bay Cottages, LLC and AACA) as and when such Condominium Sales Proceeds are received by Borrower.

(2) The following amounts shall be paid in connection with release of the indicated Master Unit parcels from the lien of the Land Loan, the Revolver Loan and the Loan, payable at the same time as they are released from the such loans: (a) $900,000. on release of the Independent/Assisted Living Land Unit; (b) $100,000. on release of the Assisted Living/Nursing Land Unit; (c) $250,000, on release of the Guest House Land Unit and (d) $150,000 on release of the Commercial Land Unit.

(B) The payments described in (1) and (2) above are to be applied in the following order of priority:

(i) Unpaid costs due from Borrower under the Loan Documents.

(ii) All accrued and unpaid interest at the applicable interest rate up to and including the date of prepayment

(iii) The Exit Fee as described in Paragraph 5.3 hereof.

(iv) Principal.

August 8, 2005

Freedom Bay Cottages, LLC
Adult Assisted Care Associates, LLC
2547 West Main Road,
Portsmouth,
Rhode Island
Attention: Mr. Ronald A. Levesque

**Re: Correction of Interest Payment Dates**

Dear Mr. Levesque:

Further to recent conversations between the parties, the parties agree as follows:

1. Notwithstanding the provisions in the Promissory Note (the "Note") and the Loan Agreement between Freedom Bay Cottages, LLC, ("FBC"), Adult Assisted Care Associates, LLC, ("AACA") and Sims Freedom Bay, LLC dated July 14, 2005 providing that interest is to be computed from and including the date of the Note, interest shall accrue from the actual date of funding which was July 20, 2005.

2. Notwithstanding Article II of the Note, interest is payable in advance on the first day of each calendar month, the next interest payment date to be on September 1, 2005.

Sincerely,

SIMS FREEDOM BAY, LLC, a Connecticut limited liability company

By: [signature]
Name: R. Jeffrey Sands
Title: Managing Director

Agreed to and accepted by FBC on
August 16, 2005:

FREEDOM BAY COTTAGES, LLC,
a Rhode Island limited liability company

By: [signature]
Name: Ronald A. Levesque
Its: Manager

Agreed to and accepted by AACA on
August 16 2005:

ADULT ASSISTED CARE ASSOCIATES, LLC,
a Rhode Island limited liability company

By: [signature]
Name: Ronald A. Levesque
Its: Manager

Approved and accepted by SCM FREEDOM BAY, LLC on
__________, 2005:

SCM FREEDOM BAY, LLC,
a Delaware limited liability company

By: ________________
Name:
Its:

Approved and accepted by HSH NORDBANK AG, NEW YORK BRANCH on
__________, 2005:

HSH NORDBANK AG, NEW YORK BRANCH,

By: ________________
Name:
Its:

By: ________________
Name:
Its:

Agreed to and accepted by FBC on
____________, 2005:

FREEDOM BAY COTTAGES, LLC,
a Rhode Island limited liability company

By: ______________________
Name: Ronald A. Levesque
Its: Manager

Agreed to and accepted by AACA on
____________, 2005:

ADULT ASSISTED CARE ASSOCIATES, LLC,
a Rhode Island limited liability company

By: ______________________
Name: Ronald A. Levesque
Its: Manager

Approved and accepted by SCM FREEDOM BAY, LLC on
____________, 2005:

SCM FREEDOM BAY, LLC,
a Delaware limited liability company

By: ______________________
Name:
Its:

Approved and accepted by HSH NORDBANK AG, NEW YORK BRANCH on
____________, 2005:

HSH NORDBANK AG, NEW YORK BRANCH,

By: ______________________
Name:
Its:

By: ______________________
Name:
Its:

Agreed to and accepted by FBC on
____________, 2005:

FREEDOM BAY COTTAGES, LLC,
a Rhode Island limited liability company

By: ______________________
Name: Ronald A. Levesque
Its: Manager

Agreed to and accepted by AACA on
____________, 2005:

ADULT ASSISTED CARE ASSOCIATES, LLC,
a Rhode Island limited liability company

By: ______________________
Name: Ronald A. Levesque
Its: Manager

Approved and accepted by SCM FREEDOM BAY, LLC on
____________, 2005:

SCM FREEDOM BAY, LLC,
a Delaware limited liability company

By: ______________________
Name:
Its:

Approved and accepted by HSH NORDBANK AG, NEW YORK BRANCH on
____________, 2005:

HSH NORDBANK AG, NEW YORK BRANCH,

By: Aldo M. Cicilia
Name: Vice President
Its: ... Nordbank AG, New York Branch

By: ______________________
Name: David Canavan
Its: Senior Vice President