# UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE

THIS UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (this "**Guaranty**") is made as of this 14th day of July, 2005, jointly and severally, by RONALD A. LEVESQUE, an individual, EDWARD F. HAYES, an individual, and MANUEL P. DEMENEZES, JR., an individual, (individually, a "**Guarantor**" and collectively, the "**Guarantors**") and SIMS CAPITAL MANAGEMENT, LLC ("**SIMS Capital**") in favor of SIMS FREEDOM BAY, LLC, a Connecticut limited liability company, together with its successors and/or assigns ("**Lender**").

## RECITALS

WHEREAS, ADULT ASSISTED CARE ASSOCIATES, LLC, a Delaware limited liability company ("**AACA**") and FREEDOM BAY COTTAGES, LLC, a Rhode Island limited liability company ("**FBC**", together with AACA, jointly and severally, the "**Borrowers**") own the real property described in Exhibit A attached hereto and incorporated herein and made a part of this document for all purposes (the "**Land**") and the improvements thereto, with FBC owing the land, improvements and appurtenances thereto described on Exhibit A as Master Unit #1 and AACA owing the land, improvements and appurtenances thereto described on Exhibit A as Master Unit #2 (collectively, the "**Property**");

WHEREAS, Borrowers are concurrently entering into a Loan Agreement with Lender (as the same may be amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and related documents, dated as of the date hereof, providing for a loan in the principal amount of up to SIX MILLION DOLLARS ($6,000,000.00) (the "**Loan**"), which Loan shall be evidenced by a Promissory Note of even date herewith from Borrowers to Lender in the amount of the Loan (the "**Note**") and secured by, among other things, a mortgage and pledges and assignments of all Class B membership interests in AACA, certain Class A membership interests in AACA and all membership interests in FBC pursuant to those certain Pledge and Security Agreements (the "**Pledge Agreements**"), each of even date herewith;

WHEREAS, Borrowers intend to develop the Property, or cause the Property to be developed into a continuing care retirement community made up of up to one hundred forty-nine (149) independent living cottages, a senior residence comprising of sixty-seven (67) congregate independent living units and an assisted living residence comprising of forty (40) assisted living units (the "Independent/ Assisted Facility"), a nursing/home/assisted living/Alzheimer's facility consisting of fifty-four (54) units (the "Assisted Living/Nursing Facility"), a 60,000 sq. foot commercial/medical center (the "Commercial Facility") and a guest house consisting of eighteen (18) units for guest lodging (the "Guest House Facility") (each of the Independent/Assisted Living Facility, the Assisted Living/Nursing Facility and the Commercial Facility are hereinafter

sometimes referred to individually as a "Facility"). (The Improvements, as hereinafter defined, and the Property are collectively referred to as the "Project").

WHEREAS, Lender has agreed to make the Loan to Borrowers upon, and subject to, the terms and conditions set forth herein and in the Note, the Mortgage, the Loan Agreement, the Pledge Agreements, an Assignment of Rents and Leases and all other "Loan Documents" as defined in the Loan Agreement (as each of the same may be amended, modified, extended, renewed, restated, consolidated, substituted, supplemented or replaced from time to time, collectively, the **"Loan Documents"**); and

WHEREAS, AACA, as "Declarant" under that certain "Declaration of Condominium for Freedom Bay Condominium" made by AACA dated June 3, 2004 (as amended, the **"Declaration"**) has submitted the Land to the provisions of the Rhode Island Condominium Act and created with respect to the Land a multi-use condominium known as "Freedom Bay Condominium (the **"Master Condominium"**) consisting initially of two (2) land only units (the "Master Units") as described above and contemplated to ultimately have eleven (11) Master Units, with certain of the Master Units contemplated to be subjected to further or additional declarations (each, a **"Sub-Declaration"**) by AACA or its successor(s) or designee(s) to create one or more sub-condominiums (each, a **"Sub-Condominium"**);

WHEREAS, as a condition to making the Loan, Lender has required Guarantors and SIMS Capital to deliver this Guaranty, without which Lender would not make the Loan to Borrowers;

WHEREAS, the Guarantors and SIMS Capital have agreed to deliver this Guaranty to induce Lender to make the Loan as provided in the Loan Agreement because such making of the Loan will be to the direct interest, advantage and benefit of the Guarantors and SIMS Capital as owners of interests in Borrowers,

NOW, THEREFORE, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantors, jointly and severally, and SIMS Capital agree as follows:

## Article I.
## DEFINED TERMS

1.1 All capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Loan Agreement.

1.2 As used herein, the term **"Losses"** means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement, punitive damages and

foreseeable and unforeseeable consequential damages, of whatever kind or nature (including, without limitation, reasonable attorneys' fees and disbursements).

Article II.
GUARANTOR LIABILITY

2.1 Guaranty Obligations. Each Guarantor and SIMS Capital shall be personally liable for, and they unconditionally, irrevocably and absolutely guarantee the full payment and performance of their respective obligations (the "**Guaranty Obligations**")as and to the extent provided below:

2.1.1 Equity Loan Obligation. Guarantors and SIMS Capital agree, severally, to return any equity distributions ever received by them as a direct or indirect member in AACA, other than tax distributions (the "**Equity Return Obligation**") and further agree, jointly and severally, to make an unsecured loan to AACA of up to One Million Dollars ($1,000,000.00), in the aggregate, on a revolving basis to the extent such loan is ever repaid (the "**Member Loan Obligation**")(the Equity Return Obligation and the Member Loan Obligation are sometimes referred to herein as the "**Equity Loan Obligation**") if demand for such equity return or member loan is ever made by Lender to cover shortfalls in construction funding or working capital as Lender deems necessary to complete the development of the Project or the acquisition of nursing home beds. The Equity Loan Obligation shall be satisfied within thirty(30) business days after demand from Lender to do so. Should Lender make demand for satisfaction of the Member Loan Obligation, the Guarantors and SIMS Capital shall fund any such demand in proportion to their respective aggregate interests in AACA (including all direct interests in AACA and all indirect interests in AACA), but each Guarantor and Sims Capital shall be jointly and severally liable for the entire Member Loan Obligation and each shall be liable for its own Equity Return Obligation.

2.1.2 Recourse Obligations. Guarantors agree, jointly and severally, that they shall each be liable for repayment of the entire Debt and any other obligations of Borrowers under the Loan Documents in the event any of the following occurs and payment of Losses incurred by Lender arising as a result of any such event (the **Recourse Obligations**"):

(i) fraud or material misrepresentation or failure to disclose a material fact by any Borrower or Guarantor;

(ii) misapplication or misappropriation by any Borrower or Guarantor of receipts, deposits, revenues, rentals, income, insurance proceeds, condemnation awards, fees (including, without limitation, management fees, construction management fees and development fees), distributions, entrance fees, loan proceeds, payments or other moneys received by, or payable to, a Borrower;

(iii) A Borrower's failure to pay in full from available funds taxes and insurance premiums on all or any portion of the Property, charges for labor or materials or other charges that can create liens on all or any portion of the Property;

(iv) the removal of personal property from the Property by or on behalf of a Borrower which is not replaced with personal property of the same utility and of the same or greater value (except to the extent such personal property is obsolete or otherwise no longer necessary for the proper operation of all or any portion of the Project and is removed in connection with a renovation or alteration as permitted by Lender);

(v) any act of voluntary (as opposed to permissive) waste by any Borrower or any damage to the Project as a result of the intentional misconduct or gross negligence of any Borrower or Guarantor;

(vi) a breach of any of covenants or obligation set forth in any of the following Sections of the Loan Agreement: [3.5, 5.13, 6.1, 6.3, 6.4, 6.5 or 6.9];

(vii) the filing by any Borrower of any proceeding for relief under any federal or state bankruptcy, insolvency or receivership laws or an assignment for the benefit of creditors made by any Borrower;

(viii) the commencement by any Borrower or Guarantor or any attorney or agent on behalf of any such person or entity of an involuntary proceeding against any Borrower seeking bankruptcy or reorganization of any Borrower or the appointment of a receiver, custodian, trustee, liquidator, or other similar official;

(ix) the commencement of any other involuntary proceeding against any Borrower seeking bankruptcy or reorganization of any Borrower or the appointment of a receiver, custodian, trustee, liquidator, or other similar official, if such proceeding is not dismissed within sixty (60) days of the filing thereof;

(x) any Borrower or Guarantor or any attorney or agent on behalf of any such Person in any way contests, delays, opposes, impedes or otherwise interferes with a Lien Enforcement Action following an Event of Default by Borrower under the Loan Agreement; provided, however, no Guarantor shall not become liable under this Section 2.1.2(x) by reason of a claim or defense interposed by any Borrower or Guarantor or any attorney or agent on behalf of such Person in an action or proceeding if such Borrower or Guarantor is the prevailing party in such action or proceeding;

(xi) any Guarantor or any Borrower fails to give written notice to Lender within three (3) business days after such Guarantor or Borrower learns

of any event which constitutes or, with the passage of time or giving of notice or both would constitute, a default by any Borrower or Guarantor under a Loan Document.

2.2 Continuing Guaranty. This is a continuing guaranty of the Guaranty Obligations, which shall survive payment of the indebtedness owed to Lender by either Borrower; provided, however, if the indebtedness owed to Lender is paid in full, the liability of Guarantors regarding performance of any other Guaranty Obligations shall be limited to Losses actually incurred by Lender.

2.3 Liability of Guarantor Not Affected. This Guaranty shall remain in full force and effect without regard to, and shall not be released, discharged or affected in any way by:

(b) the attempt or the absence of any attempt by Lender to obtain payment or performance by Borrowers or any other person or entity;

(c) Lender's delay in enforcing the Guaranty Obligations or the obligations of any other person or entity, or any prior partial exercise by Lender of any right or remedy hereunder or under any of the other Loan Documents;

(d) any renewal, extension, substitution, modification, replacement of or indulgence with respect to, any indebtedness, liabilities, or obligations under the Loan Documents, including, without limitation, the Guaranty Obligations (collectively the "**Loan Document Obligations**"), all of which Lender is hereby authorized to make;

(e) the fact that any Borrower is not liable for the payment or performance of the Loan Document Obligations, or any portion thereof, for any reason whatsoever, each Guarantor being liable for the Guaranty Obligations notwithstanding that any Borrower may not be liable for any or all of the Guaranty Obligations or any or all of the other Loan Document Obligations;

(f) except as provided in the Loan Agreement, any sale, exchange, release, surrender or other disposition of, or realization upon, any collateral securing the Loan Document Obligations, or any settlement or compromise of any guaranties of the Loan Document Obligations, or any other obligation of any person or entity with respect to the Loan Documents;

(g) the acceptance by Lender of any additional security for the Loan Document Obligations;

(h) the lack of validity or enforceability of, or Lender's waiver or consent with respect to, any provision of any instrument evidencing, securing or otherwise relating to the Loan Document Obligations, or any part thereof;

(i) the failure by Lender to take any steps to perfect, maintain, or enforce its security interests or remedies under the Loan Documents, or to preserve its rights to or protect any security or collateral, for the Loan Document Obligations;

(j) any voluntary or involuntary bankruptcy, insolvency, reorganization, arrangement; readjustment, assignment for the benefit of creditors, composition, receivership, liquidation, marshaling of assets and liabilities or similar event or proceedings with respect to any Borrower or Guarantor, as applicable, or any of their respective properties (each, an "**Insolvency Proceeding**"), or any action taken by Lender, any trustee or receiver or by any court in any such proceeding;

(k) the failure by Lender to file or enforce a claim against the estate (either in an Insolvency Proceeding or other proceeding) of any Borrower or Guarantor or SIMS Capital;

(l) in any Insolvency Proceeding under Title 11 of the United States Code (11 U.S.C. Section 101 et seq.), as amended (the "Bankruptcy Code"): (1) any election by Lender under Section 1111 (b)(2) of the Bankruptcy Code, (2) any borrowing or grant of a security interest by any Borrower as debtor-in-possession under Section 364 of the Bankruptcy Code, (3) the inability of Lender to enforce the Loan Document Obligations against any Borrower by application of the automatic stay provisions of Section 362 of the Bankruptcy Code, or (4) the disallowance, under Section 502 of the Bankruptcy Code, of all or any portion of Lender's claim(s) against any Borrower for repayment of the Loan Document Obligations;

(m) the failure of any Guarantor or SIMS Capital to receive notice of any intended disposition of the collateral for the Loan Document Obligations;

(n) any merger or consolidation of any Borrower into or with any other entity, or any sale, lease or transfer of any of the assets of any Borrower or Guarantor or SIMS Capital to any other person or entity;

(o) any change in the ownership of any Borrower or any change in the relationship between any Borrower and any Guarantor or SIMS Capital, or any termination of any such relationship;

(p) dissolution or other change in status of any Borrower or Guarantor or SIMS Capital;

(q) the making of additional loans to any Borrower, the increase or reduction of the maximum principal amount of the Loan Document Obligations, the increase or reduction in the interest rate provided in the Note, or any other modification, amendment, release or waiver of the terms of the Loan Documents;

(r) the absence, impairment or loss of any right of reimbursement or subrogation or other right or remedy of any Guarantor or SIMS Capital;

(s) any changes (including, without limitation, change orders) to any agreement or any other matter pertaining to construction or development of the Project or any portion thereof, whether or not any of the foregoing has been approved by Lender, a Borrower or a Guarantor or SIMS Capital;

(t) any changes to any agreement or any other matter pertaining to operation of the Project or any portion thereof, whether or not any of the foregoing has been approved by Lender, a Borrower or a Guarantor or SIMS Capital;

(u) good faith acts or omissions of Lender, which vary, increase or decrease the risk on any Borrower or Guarantor or SIMS Capital;

(v) application of the proceeds of the Loan in any manner different than anticipated by a Borrower or a Guarantor or SIMS Capital;

(w) application of payments received by Lender from Borrowers, the Collateral or any other source to the Debt in any manner or priority different from that intended by a Guarantor or Borrower or SIMS Capital; or

(x) any other circumstance which might otherwise constitute a legal or equitable discharge or defense of a Borrower, Guarantor, SIMS Capital or any other person or entity.

2.4 Primary Liability. The liability of each Guarantor and SIMS Capital hereunder is and shall be direct and immediate as a primary and not a secondary obligation or liability, and is not conditional or contingent upon the pursuit of any remedies against any Borrower or any other person or entity, or against any collateral or liens held by Lender.

2.5 Guaranty of Payment. This is a guaranty of payment and a guaranty of performance. It is not a guaranty of collection. Upon any default of any Borrower under the Loan Documents, Lender may, at its option, proceed directly and at once, without notice, against any or all Guarantors and SIMS Capital to enforce the Guaranty Obligations, in whole or in part, and to collect and recover the full amount of the liability hereunder or any portion thereof, without proceeding against Borrowers or any other person or entity, or foreclosing upon, selling or otherwise disposing of or collecting or applying against the Debt any of the Collateral.

2.6 Rights of Lender. Lender is hereby authorized, without notice to or demand of any Guarantor or SIMS Capital and without affecting the liability of any Guarantor or SIMS Capital hereunder, to take any of the following actions from time to

time to the extent such actions are now or hereafter permitted by applicable law or any other agreement between Lender or any agent for Lender and Borrowers or Guarantor or SIMS Capital or any agent of Borrowers or Guarantor or SIMS Capital or by the Loan Documents, as such Loan Documents now exist or may at anytime be modified with or without consent or approval from, or notice to, a Guarantor or SIMS Capital: (a) increase or decrease the amount of, or renew, extend, accelerate or otherwise change the time for payment of, or other terms relating to, the Loan Document Obligations (hereinafter defined), or otherwise modify, amend or change the terms of any promissory note or other agreement evidencing, securing or otherwise relating to any of the Loan Document Obligations, including, without limitation, the making of additional advances thereunder; (b) accept and apply any payments on or recoveries against the Loan Document Obligations from any source, and any proceeds of any security therefor, to the Loan Document Obligations in such manner, order and priority as Lender may elect in its sole discretion; (c) take, hold, sell, release or otherwise dispose of all or any security for the Loan Document Obligations or the payment of this Guaranty; (d) settle, release, compromise, collect or otherwise liquidate the Loan Document Obligations or any portion thereof, (e) accept, hold, substitute, add or release any other guaranty or endorsements of the Loan Document Obligations; and (f) upon the failure of a Guarantor or SIMS Capital to perform any of the Guaranty Obligations, appropriate and apply toward payment of the Loan Document Obligations (i) any indebtedness due or to become due from Lender to such Guarantor or SIMS Capital, and (ii) any moneys, credits, or other property belonging to such Guarantor or SIMS Capital at any time held by or coming into the possession of Lender or any Affiliates thereof, whether for deposit or otherwise.

2.7 Subordination of Indebtedness to Guarantor. Any indebtedness of a Borrower to any Guarantor or SIMS Capital now or hereafter existing (including, without limitation, any rights to subrogation a Guarantor may have as a result of any payment by a Guarantor or SIMS Capital under this Guaranty), together with any interest thereon, shall be, and such indebtedness is, hereby subordinated to the prior payment in full of the Debt and performance of all other Loan Document Obligations. Until payment in full of the Debt (and including interest accruing on the Note after the commencement of a proceeding by or against either Borrower under the Bankruptcy Reform Act of 1978, as amended, 11 U.S.C. Sections 101 et seq., and the regulations adopted and promulgated pursuant thereto (collectively, the "**Bankruptcy Code**"), which interest the parties agree shall remain a claim that is prior and superior to any claim of a Guarantor or SIMS Capital notwithstanding any contrary practice, custom or ruling in cases under the Bankruptcy Code generally) and performance of all other Loan Document Obligations, each Guarantor and SIMS Capital agrees not to accept any payment or satisfaction of any kind of indebtedness of either Borrower to a Guarantor or SIMS Capital and hereby assigns such indebtedness to Lender, including the right to file proof of claim and to vote thereon in connection with any such proceeding under the Bankruptcy Code, including the right to vote on any plan of reorganization. Further, if a Guarantor or SIMS Capital shall comprise more than one person, firm or corporation, such Guarantor and SIMS

Capital agree that until such payment in full of the Debt, (a) no one of them shall accept payment from the others by way of contribution on account of any payment made hereunder by such party to Lender, (b) no one of them will take any action to exercise or enforce any rights to such contribution, and (c) if such Guarantor or SIMS Capital should receive any payment, satisfaction or security for any indebtedness of either Borrower to a Guarantor or SIMS Capital or for any contribution by the others for payment made hereunder by the recipient to Lender, the same shall be delivered to Lender in the form received, endorsed or assigned as may be appropriate for application on account of, or as security for, the Debt and until so delivered, shall be held in trust for Lender as security for the Debt.

2.8 Enforcement and Cure Costs. Upon demand by Lender, the Guarantors will reimburse Lender, to the extent that such reimbursement is not made by Borrowers, for all reasonable costs and expenses (including, without limitation, reasonable attorneys' and paralegals' fees, including the cost of inside attorneys and paralegals, costs and expenses and all court costs and costs of appeal) incurred by Lender in connection with the (a) enforcement of any or all of the Guaranty Obligations or the defense of any claims by any Borrower or Guarantor with respect to this guaranty or any or all of the Guaranty Obligations and (b) amounts advanced by Lender at any time and from time to time for Completion Obligations (collectively "**Enforcement and Cure Costs**"); provided, however, should any legal action or proceeding be commenced by Lender against a Guarantor or Borrower or against Lender by a Guarantor or Borrower and such Borrower or Guarantor is the prevailing party in such action or proceeding in a final, non-appealable judgment, Lender shall not be entitled to recover from such Guarantor legal fees incurred with respect to such action or proceeding.

2.9 Interest at Default Rate. All amounts due under this Guaranty shall be payable on written demand therefor and shall bear interest at the Default Rate (as defined in the Note) from the date of demand until full and final payment.

## Article III.
## GUARANTOR'S WAIVERS

3.1 Statutes of Limitation. Each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of statutes of limitation as a defense to any action or proceeding brought against any Guarantor or SIMS Capital by Lender, to the fullest extent permitted by law.

3.2 Election of Remedies. Each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of any claim or defense that any Guarantor or SIMS Capital may now or hereafter have based upon an election of remedies made by Lender or any other election afforded to Lender pursuant to applicable law, including, without limitation, (a) any election to proceed by judicial or non-judicial foreclosure or by Uniform Commercial Code sale or by deed or assignment in lieu thereof, or any election of remedies which destroys or otherwise impairs the subrogation

rights of a Guarantor or SIMS Capital or the rights of a Guarantor or SIMS Capital to proceed against a Borrower for reimbursement, or both, (b) the waiver by Lender, either by action or inaction of Lender or by operation of law, of a deficiency judgment against a Borrower, and (c) any election pursuant to an Insolvency Proceeding.

3.3 Rights of Subrogation and Other Rights. Until such time as the Guaranty Obligations are satisfied, each Guarantor and SIMS Capital defers (a) all rights at law or in equity to seek subrogation, contribution, indemnification or any other form of reimbursement or repayment from any Borrower or any other person or entity now or hereafter primarily or secondarily liable for any of the Loan Document Obligations for any payments made by a Guarantor or SIMS Capital under or in connection with this Guaranty, (b) all claims of any kind or type against a Borrower as a result of any payment made by a Guarantor or SIMS Capital to Lender, and (c) any right to participate in any security now or hereafter held by Lender. In furtherance, and not in limitation, of the foregoing, each Guarantor and SIMS Capital agrees that any payment to Lender pursuant to this Guaranty shall be deemed a contribution to the capital of Borrowers or other obligated party and shall not constitute a Guarantor or SIMS Capital a creditor of a Borrower or such other party. Each Guarantor and SIMS Capital further agrees that to the extent the waiver of its rights of subrogation as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation a Guarantor or SIMS Capital may have against a Borrower or against any collateral or security for any of the Loan Document Obligations shall be junior and subordinate to any rights Lender may have against Borrowers and to all right, title and interest Lender may have in such collateral or security.

3.4 Demands and Notices. Each Guarantor and SIMS Capital irrevocably waives all presentments, demands for performance, protests, notices of protest, notices of dishonor, notices of acceptance of this Guaranty and of the existence, creation or incurring of new or additional Loan Document Obligations, notices of defaults by a Borrower or any other person liable for the Loan Document Obligations and demands and notices of every kind that may be required to be given by any statute or rule or law, and each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of any claim or defense based on any of the foregoing or lack of notice of default, demand or performance or notice of acceleration to Borrowers or any other person or entity with respect to any matter.

3.5 Borrower Information. Each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of any claim or defense based on (a) any duty of Lender to advise a Guarantor or SIMS Capital of any information known to Lender regarding the Borrowers or the financial condition of Borrowers (it being the obligation of Guarantors and SIMS Capital to keep informed regarding such condition), or the status of the Project including the status of the construction of any improvements thereon, or (b) that Guarantors' and SIMS Capital's obligations exceed or are more burdensome than those of Borrowers.

3.6 Limitation of Liability. Each Guarantor and SIMS Capital irrevocably waives any claim or defense that Guarantor or SIMS Capital may now or hereafter have based on impairment, modification, change, release or limitation of the liability of, or stay of actions or lien enforcement proceedings against, a Borrower or Guarantor or SIMS Capital, their property, or their estate in bankruptcy, resulting from the operation of any provision of the state or federal bankruptcy laws, or from the decision of any court.

3.7 Lack of Diligence. Each Guarantor and SIMS Capital irrevocably waives any claim or defense that a Guarantor or SIMS Capital may now or hereafter have based upon lack of diligence in: (a) collection of any Loan Document Obligations; (b) protection of any collateral or other security for the Loan Document Obligations; or (c) realization upon the other Loan Documents.

3.8 Primary Liability. Each Guarantor and SIMS Capital irrevocably waives any claim or defense that a Guarantor or SIMS Capital may now or hereafter have based on rights of a Guarantor or SIMS Capital, if any, to require that (a) Lender first proceed against a Borrower or any other person or entity with respect to the Guaranty Obligations, or (b) Lender first proceed against any collateral held by Lender, or (c) any party to be joined in any proceeding to enforce the Guaranty Obligations.

3.9 Consideration. Each Guarantor and SIMS Capital acknowledges that it has received good, valuable and sufficient consideration for it to enter into this Guaranty and pay all sums and perform all obligations required of Guarantor hereunder, and each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of any claim or defense based on or relating to lack of consideration or insufficient consideration.

3.10 No Impairment. Each Guarantor and SIMS Capital irrevocably waives and agrees not to assert or take advantage of any claim or defense that a Guarantor or SIMS Capital may now or hereafter have based upon any of the acts, omissions, agreements, waivers, or other matters described in Section 2.3 of this Guaranty whether or not a Guarantor or SIMS Capital had or now or hereafter has notice or knowledge of same.

3.11 Other Defenses. Each Guarantor and SIMS Capital irrevocably waives and surrenders, to the fullest extent permitted by law, any other defenses, setoffs or counterclaims that a Guarantor or SIMS Capital may now or hereafter have (including without limitation those given to sureties) at law or in equity whether or not a Guarantor or SIMS Capital had or now or hereafter has notice or knowledge of same. It is the purpose and intent of this Guaranty that the obligations of Guarantors and SIMS Capital hereunder shall be absolute and unconditional under any and all circumstances.

## Article IV.
## REPRESENTATIONS AND WARRANTS

4.1 Each Guarantor represents and warrants to Lender as follows:

(y) Existence; Authority; Execution. To the extent Guarantor is a corporation, limited liability company or limited partnership, Guarantor hereby represents and warrants that: (i) it is duly formed or organized, as applicable, validly existing, and in good standing under the laws of the state of its incorporation or formation; and (ii) this Guaranty has been duly and validly authorized, executed and delivered and constitutes the binding obligation of Guarantor, enforceable in accordance with its terms.

(z) Financial Statements. All financial statements and other financial information furnished or to be furnished to Lender with respect to such Guarantor (i) are or will be true and correct and do or will fairly represent the financial condition of such Guarantor (including all contingent liabilities), and (ii) were or will be prepared in accordance with generally accepted accounting principles, consistently applied. There has been no material adverse change in such Guarantor's financial condition between the dates of the statements most recently furnished Lender and the date of this Guaranty.

(aa) No Defaults. There is no existing event of default, and no event has occurred which, with the passage of time and/or the giving of notice or both, will constitute an event of default under any agreement to which such Guarantor is a party, the effect of which event of default will impair performance by such Guarantor of the Guaranty Obligations pursuant to and as contemplated by the terms of this Guaranty, and neither the execution and delivery of this Guaranty nor compliance with the terms and provisions hereof will violate any presently existing provision of law or any presently existing regulation, order, writ, injunction or decree of any court or governmental department, commission, board, bureau, agency or instrumentality, or constitute a default under, any agreement to which such Guarantor is a party or by which such Guarantor is bound.

(bb) No Litigation. There is no action, suit or proceeding pending or threatened against such Guarantor before any court or any governmental, administrative, regulatory, adjudicatory or arbitrational body or agency of any kind that, alone or with any other action, suit or proceeding, will adversely affect performance by such Guarantor of the Guaranty Obligations.

(cc) Accuracy. Neither this Guaranty nor any document, financial statement, credit information, certificate or statement heretofore furnished or required herein to be furnished to Lender by such Guarantor or a Borrower contains any untrue statement of fact or omits to state a fact material to this Guaranty or the Loan. All facts and circumstances known by any Guarantor, which relate in anyway to the Loan, the Project, the Declaration, the Condominium, the Master Units or the Collateral are also known to Borrowers.

Article V.
GUARANTY EVENTS OF DEFAULT.

5.1 Upon the occurrence of any of the following events ("Guaranty Events of Default"), Lender may, without notice to Borrowers or Guarantors or SIMS Capital, immediately enforce the Guaranty Obligations:

(a) Failure of Completion. Any construction activity that Borrowers or Guarantor is required to complete under the terms of this Guaranty or any other Loan Document is not completed as and when required by this Guaranty and all other Loan Documents or within thirty (30) days after notice to Guarantors of such failure if no time frame for performance is set forth in this Guaranty or another Loan Document.

(b) Failure of Performance. Guarantor fails to perform any other Guaranty Obligation as and when required by this Guaranty or, if such failure is susceptible of cure, within thirty (30) days after notice to Guarantor of such failure if no time frame for performance is set forth in this Guaranty.

(c) Losses. Any event occurs regarding which Guarantor may then or thereafter have liability to Lender for Losses.

(d) Failure of Payment. Guarantor fails to pay Lender any amounts payable by Guarantor to Lender as and when required by this Guaranty or, if no time frame for payment is set forth in this Guaranty, within ten (10) days after notice to Guarantor of such failure.

(e) Attempted Revocation, Termination or Modification. Any Guarantor shall purport to, or attempt to, revoke or terminate or modify this Guaranty or any of a Guarantor's obligations hereunder; provided further, however, that no Guarantor shall be entitled to revoke or terminate or modify this Agreement or any Guarantor's obligations hereunder without the consent of Lender, which consent may be given or withheld in Lender's sole and absolute discretion.

(f) Breach of Representation or Warranty as of the Date hereof. Any representation or warranty made or given by a Borrower or Guarantor to Lender proves to have been false or misleading in any material respect as of the date of this Guaranty.

(g) Breach of Representation or Warranty Subsequent. Any representation or warranty made or given by a Borrower or Guarantor to Lender, which is not false or misleading in any material respect as of the date of this Guaranty, but which, by virtue of a change in circumstances subsequent to the date of this Guaranty, thereafter proves to be false or misleading in any material respect, subject to notice and cure rights, if any, with respect to such representation or warranty which are expressly provided for in the Loan Documents.

(h) Insolvency Proceeding. A Guarantor makes an assignment for the benefit of creditors, or a trustee or receiver is appointed for a Guarantor or for any property of a Guarantor, or a Guarantor becomes insolvent or the subject of any Insolvency Proceeding and, in the case of such a proceeding being commenced against Guarantor, such proceeding is not dismissed within forty-five (45) days following the commencement date thereof.

(i) Dissolution. A Guarantor, which is not an individual, dissolves or liquidates or the business of Guarantor is suspended or terminated for any reason.

(j) Other Loan Document Defaults. Any default by a Borrower or Guarantor, which is not otherwise addressed in this Section 5.1 occurs under any Loan Document and such default is not cured within the time period provided for cure thereunder, if any, or, if such default is susceptible of cure, within thirty (30) days after notice to Guarantors of such default if no other cure period is provided for in the Loan Documents with respect to such default.

## Article VI.
## REMEDIES

6.1 If a Guaranty Event of Default occurs, Lender, at its sole option, shall have the right but not the obligation, to:

(a) Payment or Performance of Obligations and Covenants to Others. Lender may pay any sums and perform or cause the performance of any obligation of a Guarantor or Borrower hereunder or under another Loan Document (with contractors of Lender's choice and such changes or modifications to the Construction Documents as Lender deems reasonably necessary), either before, during or after commencement of any proceedings brought by Lender to enforce its rights hereunder or under the other Loan Documents; and either before, during or after the pursuit of any other remedy of Lender against Guarantors, and Lender may expend such sums as Lender, in its reasonable discretion, deems proper in order to cause such payment and performance to occur. The amount of any and all expenditures incurred by Lender in causing such payment and performance (including without limitation expenditures for hard and soft costs and any legal and other professional fees and expenses incurred by Lender), together with interest thereon at the Default Rate, shall be immediately due and payable to Lender by Guarantors on demand of Lender;

(b) Breach of Guarantor Obligations. Lender may pursue any right or remedy that it may have hereunder, under any other Loan Document or at law or in equity, in separate actions or proceedings or in a single action or proceeding as Lender shall determine, to enforce payment or performance of any obligation of Guarantors or SIMS Capital hereunder including, without limitation, Guarantors' obligation for Enforcement and Cure Costs and Guarantor's liability for breach of any representation or

warranty by Guarantor set forth herein, and, in connection with any such action or proceeding may recover damages for Losses and any other amounts allowable at law or in equity, together with interest on all such sums at the Default Rate until fully and finally paid.

Article VII.
MISCELLANEOUS

7.1 Revival and Reinstatement. If at any time all or any part of any payment theretofore applied by Lender to any of the Guaranty Obligations is or must be rescinded or returned by Lender for any reason whatsoever (including, without limitation, the insolvency, bankruptcy or reorganization of Borrowers), such Guaranty Obligations shall, for the purposes of this Guaranty, to the extent such payment is or must be rescinded or returned, be deemed to have continued in existence, notwithstanding such application by Lender, and this Guaranty shall continue to be effective or be reinstated, as the case may be, as to such Guaranty Obligations, and Guarantors and, if applicable, SIMS Capital shall be fully liable therefore, all as though such application by Lender had not been made:

7.2 No Marshaling. Lender has no obligation to, and each Guarantor and SIMS Capital waives all rights and defenses to require Lender to, marshal any assets in favor of a Guarantor or SIMS Capital, or against or in payment of (a) any of the Loan Document Obligations, including the Guaranty Obligations, or (b) any other obligation owed to Lender by a Guarantor, SIMS Capital, a Borrower, or any other person or entity.

7.3 No Modification, Waiver or Release Without Writing. Except as may otherwise be expressly set forth herein, this Guaranty may not be modified, amended, revised, revoked, terminated, changed or varied in any way whatsoever, nor shall any waiver of any of the provisions of this Guaranty be binding upon Lender, except as expressly set forth in a writing duly executed by Lender. No waiver by Lender of any default shall operate as a waiver of any other default or the same default on a future occasion, and no action by Lender permitted hereunder shall in any way affect or impair Lender's rights or the obligations of Guarantors or SIMS Capital under this Guaranty.

7.4 Assignment; Successors and Assigns. No Guarantor or SIMS Capital may assign a Guarantor's obligations or liability under this Guaranty. Subject to the preceding sentence, this Guaranty shall be binding upon the parties hereto and their respective heirs, executors, successors, representatives and assigns and shall inure to the benefit of the parties hereto and their respective successors and assigns, and Guarantors and SIMS Capital agree that all such successors and assigns of Lender shall have all rights and benefits of Lender as if a direct party hereto. Lender may, without notice to anyone, sell or assign the Loan Document Obligations, the Note or Loan Documents or any part thereof or any interest therein, or grant participations therein.

7.5 Integration. This Guaranty is the entire agreement of Guarantors and SIMS Capital with respect to the subject matter of this Guaranty, provided that this Guaranty shall not in any way limit or abrogate the obligations of Guarantors under the other Loan Documents.

7.6 Rights Cumulative. All of Lender's rights and remedies under this Guaranty and the other Loan Documents are cumulative. The exercise of any one right or remedy does not exclude the exercise of any other right or remedy given in this Guaranty or the other Loan Documents or any other right or remedy of Lender not set forth in this Guaranty or the other Loan Documents. If there is more than one Guarantor hereunder, Lender may exercise such rights and remedies against any one or more Guarantors and the failure of Lender to proceed against one or more of Guarantors shall not affect the liability of the other(s) under this Guaranty.

7.7 Severability. Whenever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

7.8 Material Inducement; Consideration. Each Guarantor acknowledges and agrees that Lender is specifically relying upon the representations, warranties, agreements and waivers contained herein and that such representations, warranties, agreements and waivers constitute a material inducement to Lender to accept this Guaranty and to enter into the Loan Agreement and the transaction contemplated therein. Each Guarantor further acknowledges that it expects to benefit from Lender's extension of financing accommodations to Borrowers because of its relationship to Borrowers, and that it is executing this Guaranty in consideration of that anticipated benefit.

7.9 Indemnification. Each Guarantor agrees to indemnify, pay and hold Lender and its officers, directors, employees, agents, and attorneys (collectively called the "**Indemnitees**") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and

disbursements of any kind or nature whatsoever (including the reasonable fees and disbursements of counsel for such Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnitee shall be designated a party thereto) that may be imposed on, incurred by, or asserted against that Indemnitee, in any manner relating to or arising out of this Guaranty or the exercise of any right or remedy hereunder or under the other documents pertaining to the Loan Document Obligations (the "**Indemnified Liabilities**"); provided, however, Guarantor shall have no obligation to an Indemnitee under this Section 7.9 with respect to Indemnified Liabilities arising from the gross negligence or willful misconduct of that Indemnitee as determined by a court of competent jurisdiction. To the extent that the undertaking to indemnify, pay and hold harmless set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, Guarantor shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by the Indemnitees or any of them.

7.10 Joint and Several Obligations. If this Guaranty is executed by more than one Guarantor then all of the covenants, obligations, agreements, indemnities, representations and warranties of the Guarantors contained herein shall be joint and several and references to Guarantor shall be deemed to be joint and several references to all Guarantors, but a reference to a Guarantor or the Guarantors shall not be deemed to be a reference to SIMS Capital and SIMS Capital shall not have any liability or obligation for the obligations of any Guarantor except for the joint and several liability of SIMS Capital pertaining to the funding of a Member Loan as expressly provided in Section 2.1.1 hereof.

7.11 Waivers. THE WAIVERS SET FORTH IN THIS GUARANTY ARE KNOWINGLY, INTENTIONALLY, AND VOLUNTARILY MADE BY EACH GUARANTOR AND SIMS CAPITAL, AND EACH GUARANTOR AND SIMS CAPITAL ACKNOWLEDGES THAT NEITHER LENDER NOR ANY PERSON ACTING ON BEHALF OF LENDER HAS MADE ANY REPRESENTATIONS OF FACT TO INDUCE THESE WAIVERS OR IN ANY WAY TO MODIFY OR NULLIFY THEIR EFFECT. EACH GUARANTOR FURTHER ACKNOWLEDGES THAT IT HAS BEEN REPRESENTED (OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED) IN THE SIGNING OF THIS GUARANTY AND IN THE MAKING OF THESE WAIVERS BY INDEPENDENT LEGAL COUNSEL, SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THESE WAIVERS WITH COUNSEL.

7.12 Assignment of Rights in Insolvency Proceeding. In the event any Insolvency Proceeding is instituted by or against a Borrower, whether voluntary or involuntary, Lender shall have the right to: (a) file claims in any such proceeding on behalf of Guarantors and SIMS Capital and (b) vote Guarantors' and SIMS Capital's claims in any such proceeding.

7.13 [Intentionally Omitted]

7.14 Exculpation. No exculpatory language contained in the Loan Agreement, in any of the Loan Documents or in any other document or instrument shall in any way limit or abrogate the obligations of Guarantor hereunder or prevent or limit Lender from proceeding to enforce this Guaranty against Guarantor personally as set forth herein.

7.15 Document Protocols. This Agreement shall be subject to the Document Protocols attached as Schedule I to the Loan Agreement, all of which are incorporated herein as if fully set forth herein.

[THE REMAINDER OF THIS PAGE HAS BEEN LEFT INTENTIONALLY BLANK]

The undersigned have duly executed this Guaranty as of the date and year first above written.

GUARANTORS:

Ronald A. Levesque, an individual

Edward F. Hayes, an individual

Manuel P. DeMenezes, Jr., an individual

SIMS CAPITAL:

SIMS CAPITAL MANAGEMENT, LLC

By: ____________________
Name:
Title:

The undersigned have duly executed this Guaranty as of the date and year first above written.

GUARANTORS:

________________________________
Ronald A. Levesque, an individual

________________________________
Edward F. Hayes, an individual

________________________________
Manuel P. DeMenezes, Jr., an individual

SIMS CAPITAL:

SIMS CAPITAL MANAGEMENT, LLC

By: [signature]
Name: WILLIAM B. SIMS
Title: MANAGING DIRECTOR

# EXHIBIT A
# LEGAL DESCRIPTION

**PARCEL ONE**

THAT CERTAIN condominium unit designated as Master Unit 1 or Land Unit 1 in The Freedom Bay Condominium, a condominium project located on that certain parcel of land in the Towns of Middletown and Portsmouth, County of Newport, State of Rhode Island, more particularly described in that certain Declaration of Condominium for Freedom Bay Condominium dated May 19, 2004 and recorded in the Portsmouth Land Evidence Records in Book 1033 at Page 168 and in the Middletown Land Evidence Records in Book 852 at Page 74. As amended by the First Amendment To Declaration Of Condominium Of Freedom Bay Condominium dated September 17, 2004 and recorded September 29, 2004 at 9:15 AM in Book 1062 at Page 236 of the Portsmouth Land Evidence Records and in the Middletown Land Evidence Records at 9:47 AM in Book 872 at Page 256.

The above-described Master Unit 1 is shown on a plan by Fuss & O'Neill, Inc., entitled Land Unit Plan, dated April 23, 2004 and recorded June 3, 2004 in the Portsmouth Land Evidence Records, bearing document number 042920 and designated as Plan Index #847 and #848 and also recorded June 3, 2004 in the Middletown Land Evidence Records, bearing document 02411 and 02412 and identified as Plan 2004-14 and 2004-15. This parcel is subject to common use areas designated as "Master Common Area" on said plan.

The Unit is conveyed together with:

1. An undivided interest in the common areas and facilities of the Condominium described in the Declaration, together with the rights and easements appurtenant to said Units as set forth in the Declaration as shown on the recorded survey plat and plan.

2. The benefit of all other covenants, restrictions, easements and provisions of the Declaration, as amended from time to time, including the Special Declarant Rights and the Development Rights as defined therein.

3. The exclusive rights to the limited common elements appurtenant to the Units as described and set forth in the Declaration and as created by the Rhode Island Condominium Act, as applicable.

**PARCEL TWO**

THAT CERTAIN condominium unit designated as Master Unit 2 or Land Unit 2 in The Freedom Bay Condominium, a condominium project located on that certain parcel of land in the Towns of Middletown and Portsmouth, County of Newport, State of Rhode Island, more particularly described in that certain Declaration of Condominium for Freedom Bay Condominium dated May 19, 2004 and recorded in the Portsmouth Land Evidence Records in Book 1033 at Page 168 and in the Middletown Land Evidence Records in Book 852 at Page 74. As amended by the First Amendment To Declaration Of Condominium Of Freedom Bay

Condominium dated September 17, 2004 and recorded September 29, 2004 at 9:15 AM in Book 1062 at Page 236 of the Portsmouth Land Evidence Records and in the Middletown Land Evidence Records at 9:47 AM in Book 872 at Page 256.

The above-described Master Unit 2 is shown on a plan by Fuss & O'Neill, Inc., entitled Land Unit Plan, dated April 23, 2004 and recorded June 3, 2004 in the Portsmouth Land Evidence Records, bearing document number 042920 and designated as Plan Index #847 and #848 and also recorded June 3, 2004 in the Middletown Land Evidence Records, bearing document 02411 and 02412 and identified as Plan 2004-14 and 2004-15. This parcel is subject to common use areas designated as "Master Common Area" on said plan.

The Unit is conveyed together with:

1. An undivided interest in the common areas and facilities of the Condominium described in the Declaration, together with the rights and easements appurtenant to said Units as set forth in the Declaration as shown on the recorded survey plat and plan.

2. The benefit of all other covenants, restrictions, easements and provisions of the Declaration, as amended from time to time, including the Special Declarant Rights and the Development Rights as defined therein.

3. The exclusive rights to the limited common elements appurtenant to the Units as described and set forth in the Declaration and as created by the Rhode Island Condominium Act, as applicable.