**UNITED STATES DISTRICT COURT**
**FOR THE STATE OF RHODE ISLAND**

| | | |
|---|---|---|
| **EDWARD HAYES, MANUEL DEMENEZES, and RONALD LEVESQUE** | } | |
| **Plaintiffs** | } | |
| **v.** | } | **C.A. No. 08-0191-S** |
| **SIMS CAPITAL MANAGEMENT, LLC, HERBERT J. SIMS & CO., SCM FREEDOM BAY, LLC, SIMS FREEDOM BAY, LLC, WILLIAM B. SIMS, R. JEFFREY SANDS, and JAMES EAGAN** | } | |
| **Defendants** | } | |

# PLAINTIFFS' PRETRIAL CONFERENCE STATEMENT

In this case, plaintiffs submit, the defendants (sometimes hereinafter referred to as "the Sims defendants") crossed the line of being only lenders and became partners with the plaintiffs in their senior housing and long term care development in the Town of Portsmouth known as "Freedom Bay." As such, plaintiffs claim that the Sims defendants breached duties owed to the plaintiffs and by their actions caused the project to fail to the great detriment of the plaintiffs.

## a. The Underlying Facts

In 1998 a Rhode Island limited liability company called Adult Assisted Care Associates, LLC ("AACA") bought certain property known as the Novitiate from the Roman Catholic Diocese of Providence. AACA's intent from the outset was to develop the real estate, comprising 106 acres, into a continuing care retirement community known as Freedom Bay. Plaintiff Ronald Levesque ("Levesque") was an original member of AACA. About three years later in May 2001, Levesque decided to team up with plaintiffs Edward Hayes ("Hayes") and Manuel DeMenezes ("DeMenezes") to buy out the other

original members of AACA. Freedom Bay, LLC was formed to be the managing member of AACA and Levesque, Hayes, and DeMenezes became equal members.

In their efforts to obtain financing to buy out the other members of AACA, Levesque, Hayes, and DeMenezes entered into discussions with the Sims defendants. Defendant William Sims is reputed to have vast experience in the senior care industry and has overseen the management of hundreds of senior care projects throughout the United States. Mr. Sims was a principal in both Sims Capital Management, LLC (SCM") and Herbert J. Sims & Co, Inc. (H J SIMS"). SCM was involved in investing capital in senior living and long term care developments and HJ Sims specialized in structuring and underwriting senior living and long term care financings. Mr. Sims agreed that HJ Sims would finance the buy out of Levesque's original partners in AACA. The Sims defendants insisted that as a condition of providing an initial loan of $12 million to buy out Levesque's partners and pay off some other debt, SCM or its affiliate had to receive a 35% ownership interest in AACA. Induced by the Sims defendants' promises that the loan would close in 60 days *and* that construction financing would be available soon thereafter, Levesque, Hayes, and DeMenezes agreed.

In fact the closing on the $12 million loan was delayed by the Sims defendants for several months which forced the plaintiffs to pay an additional $600,000 to the individuals whose interests in AACA were being acquired for extensions of the agreement with them. When the $12 million loan did finally close SCM and/or its affiliate did receive a 35% ownership interest in AACA, and, the Sims defendants enumerated numerous management decisions which could not be made without their approval.

Construction financing was not made available by the Sims defendants shortly after the initial $12 million loan as promised. Rather, seven months later in December 2004 the Sims defendants finally arranged to have HSH Nordbank, AG, New York Branch ("Nordbank") provide a $12 million line of credit construction loan to AACA. The plaintiffs were required to guarantee the loan. Despite its ownership of 35% of AACA, SCM did not have to guarantee the loan.

The Sims defendants' delay in arranging the construction financing resulted in construction delays and delayed the sale of units. Instead of deriving positive cash flow from the sale of units plaintiffs were forced to exhaust the construction financing to pay indebtedness associated with the project including interest on the initial $12 million loan to buy out Levesque's original partners in the project.

Consequently, in June 2005 another loan had to be secured, this time from Sims Freedom Bay, LLC ("Sims Freedom Bay"), an affiliate of H J Sims. This loan, called the "mezzanine loan," was for $6 million. Although targeted for advance architectural and engineering costs and an installment payment on the construction loan consummated in December 2004, a significant portion of the loan wound up being used to pay enormous fees to Sims Freedom Bay, increased interest costs on the original acquisition loan and as a result less was available for the intended purposes of the mezzanine loan.

Even as it became more and more obvious in the summer and fall of 2005 that additional financing was needed to actually advance the development of Freedom Bay and to make a scheduled payment on the original acquisition loan, the Sims defendants thwarted the plaintiffs' efforts to obtain such financing. For example, the plaintiffs managed to get a company called PRN Marshall Capital, LLC ("PRN Marshall") to agree to completely refinance the project and provide $42.5 million to pay off most of the existing debt and to fund development of the various components of the project. PRN Marshall only requested (a) that the Sims defendants leave $4.25 million (10% of the loan amount) of the mezzanine loan in place and subordinate it to the PRN Marshall loan and (b) a guarantor with net worth liquidity of $5 million. The Sims defendants refused to agree to these conditions and as a result PRN Marshall withdrew its offer of financing. Plaintiffs submit that the Sims defendants' refusal was unreasonable and in violation of the duty they owed to the plaintiffs by virtue of having become their partners in the project.

Following a series of efforts to forestall foreclosure, including agreeing to increase the Sims defendants' ownership in AACA to 52%, the final straw came in August 2006 when a company was found that was willing to purchase the entire project for $32 million plus incentives to Levesque, Hayes, and DeMenezes. The company is called Discovery Communities, LLC ("Discovery"), a major national developer of senior

care communities. The Sims defendants inexplicably dragged their feet long enough to cause Discovery to withdraw its proposal, which would have made whole the various Sims defendants on their loans to the development.

Later that year in December 2006 the project was placed into receivership.

Nordbank acquired the development from the court appointed receiver and granted an option to certain of the Sims defendants to acquire the property and develop it as a continuing care retirement community from which they will derive many tens of millions of dollars in profit.

Plaintiffs will present evidence that at all times relevant hereto they relied on the superior expertise of the Sims defendants in the decision making process.

To add insult to injury in 2008, long after the Sims defendants took over control of the development, they filed belated K1 filings for the years 2005 and 2006 and in doing so improperly reported phantom income for 2005 when the plaintiffs' membership interests were at their highest and attempted to shift losses to later years when the ownership of the Sims defendants was at its highest, and, have refused to correct their error or provide accounting information as required by AACA's operating agreement.

Plaintiffs will present evidence showing that the actions of the Sims defendants were at least reckless if not intended to drive the plaintiffs out of the project causing them to suffer not only financially but emotionally and physically as well.

(b) The Elements of Plaintiffs' Claims

**Count 1---Breach of Fiduciary Duty**

Generally, the relationship of a lender and its borrower is that of a creditor and debtor and, in the absence of special circumstances, does not give rise to a fiduciary duty. See, *e.g.*, *In re W.T. Grant Co*., 699 F.2d 599, 609-10 (2d Cir.) cert. denied, 464 U.S. 822 (1983).

However, when the lender transcends the traditional debtor-creditor relationship and assumes control of the operation of the debtor, courts have long held that the lender becomes a fiduciary and is, therefore, held to a higher standard of conduct.

In *Reid v. Key Bank of Southern Maine Inc.*, 821 F.2d 9 (1987), the First Circuit rejected the district court's sweeping view that a fiduciary duty may never exist and agreed with the view expressed by a majority of the courts which have decided the issue that such a duty may arise when a customer "reposes trust in a bank and relies on the bank for financial advice, or in other special circumstances," quoting *Baylor v. Jordan*, 445 So. 2d 254, 256 (Ala.1984). The *Reid* court stated that the existence of a confidential relation generally involves a fact intensive inquiry.

The existence of a confidential or fiduciary relation has been found to be supported in a variety of circumstances, including the following categories which are applicable here:

1. Where the lender goes beyond its traditional role of providing financing and offers financial advice and counsel, upon which the borrower relies. *Thomas v. N.A. Chase Manhattan Bank*, 1 F.3d 320 (5th Cir. 1993); *Virginia S. Klein v. First Edina National*, 196 N.W.2d 619 (Minn. 1972).

2. Where the lender exercises control over the borrower. *Waddell v. Dewey County Bank*, 471 N.W. 2d 591 (S.D. 1991) (A fiduciary duty between a lender and a borrower exists where (1) the borrower reposes faith, confidence, and trust in the lender, (2) the borrower is in a position of inequality, dependence, weakness or lack of knowledge, and (3) the lender exercises dominion, control, or influence over the borrower's affairs.)

3. Where the lender may profit from a transaction it finances for a borrower. *Barnett Bank of West Florida v. Hooper*, 498 So.2d 923 (Fla. 1986).

**Count 2---Breach of Implied Covenant of Good Faith and Fair Dealing**

Case law and statutes have long recognized an implied duty of good faith and fair dealing. Article 1 of the Uniform Commercial Code has codified the concept of good faith in every transaction within the UCC. Case law has consistently enforced the duty of good faith found in the UCC. The Rhode Island Supreme Court has reaffirmed that "there is an implied covenant of good faith and fair dealing between parties to a contract." *Ide Farm & Stable, Inc. v. Cardi*, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972).

The Restatement (Second) of Contracts Section 205 (a) summarizes the common law treatment of the duty of good faith and observes:

> The phrase "good faith" is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness, or reasonableness.

In *Suffield Bank v. LaRoche,* 752 F.Supp. 54 (D.R.I.1990), the district court employed both a subjective and an objective standard in determining whether the lender had acted in good faith.

**Count 3---Fraud**

To establish a prima facie case for fraud under Rhode Island law, a plaintiff must prove that: "1) the defendant made a false representation; 2) the defendant intended to induce the plaintiff to rely on that representation; and 3) the plaintiff justifiably relied on the representation to his or her detriment." *Hasbro, Inc. v. Mikohn Gaming Corp,* 491 F.Supp. 2d 256 (D.R.I. 2007), quoting *Fraioli v. Lemcke,* 328 F.Supp.2d 250, 268 (D.R.I.2004) (citing *Women's Dev. Corp. v. City of Central Falls,* 764 A.2d 151, 160 (R.I.2001); *Travers v. Spidell*, 682 A.2d 471, 472-73 (R.I. 1996)).

**Count 4---Breach of Fiduciary Duty/Unlawful Shifting of Tax Liability**

**Count 5---Negligent and/or Wilful/Improper Shifting of Tax Liability**

Courts have held that persons who undertake the duty of filing information returns which improperly attribute income to the taxpayer have a duty to act with reasonable promptness to correct erroneous information they have sent to the IRS when such errors come to their attention in order to prevent being subjected to an IRS audit and wrongfully assessed back taxes, penalties, and interest, then having to undergo the inconvenience and expense involved in straightening things out after the passage of time and intervening events have compounded the initial error. This duty must rest upon the person who files the return, because the person who is shown to have received income is powerless to

correct the mistake by himself. e.g., *Clemens v. Usv Pharmaceutical*, 838 F.2d 1389 (5th Cir. 1988); *Buchanan v. Dowdy*, 772 F.Supp. 968 (S.D. Tex. 1991).

**Count 6---Intentional and/or Negligent Infliction of Emotional Distress**

In *Swerdlick v. Koch*, 721 A.2d 8 (R.I. 1998), which involved claims of both intentional and negligent infliction of emotional distress, the Rhode Island Supreme Court said:

> We previously have recognized a cause of action for the intentional infliction of emotional distress, and in doing so, we adopted the standard set forth in § 46 of the Restatement (Second) *Torts*.(fn17)[1] *See Champlin v. Washington Trust Co. of Westerly*, 478 A.2d 985, 988--89 (R.I.1984). To impose liability upon defendant based upon this cause of action, "(1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be extreme and outrageous, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe." *Id.* at 989. In addition, this Court has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of mental distress. *See Vallinoto v. DiSandro*, 688 A.2d 830, 838--40 (R.I.1997); *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 813 (R.I.1996); *Reilly v. United States*, 547 A.2d 894, 896 (R.I.1988).

By Their Attorney,

/s/ Joseph R. Palumbo, Jr.

Joseph R. Palumbo, Jr., Esquire
R.I. Bar No. 0405
294 Valley Road
Middletown, RI 02842
Tel: 401-846-520
Fax: 401-848-0984
Email: joseph@palumbolaw.net

[1] "(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Restatement (Second) *Torts*, § 46, at 71.

CERTIFICATE OF SERVICE

I, Joseph R. Palumbo, Jr., hereby certify that on the 28th day of July, 2008, I electronically filed the foregoing Plaintiffs' Pretrial Conference Statement with the Clerk of the United States District Court for the District of Rhode Island. The following participants have received notice electronically:

Joseph V. Cavanagh, Jr., Esquire
jvcblishcavlaw.com

Kristin E. Rogers, Esquire
ker@blishcavlaw.com

John E. Bulman, Esquire
jbulman@lmkbw.com

Michael D. Williams, Esquire
mwilliams@lmkbw.com

R. Thomas Dunn, Esquire
tdunn@lmkbw.com

/s/ Joseph R. Palumbo, Jr.